IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 13-09126-BKT |
| IXIA MERCADO CONCEPCION | CHAPTER 7 |
| Debtor | |
| NILSA LYON RIOS, LEON LYON, JR. | Adversary No. _____ |
| Plaintiffs | |
| vs. | |
| IXIA MERCADO CONCEPCION | |
| Defendant | |

**COMPLAINT CONTESTING AND OBJECTING DISCHARGEABILITY OF DEBT
PURSUANT TO 11 U.S.C. § 523 (a)(2)(a); (a)(4); (a) (6)**

TO THE HONORABLE COURT:

COME NOW Plaintiffs, Nilsa Lyon Rios and León Lyon Rejincos, (hereinafter "Plaintiffs") through the undersigned counsel, and respectfully state and pray as follows:

**I. Introduction**

This is an action brought against debtor Ixia Mercado objecting the dischargeability of her debts to Plaintiffs. While an adversary proceeding, this case is governed by the principles of *res judicata*, since the actions of Defendant which preclude

dischargeability under the Bankruptcy Code have already been litigated and adjudicated in a court of law entitled to full faith and credit by this Honorable Court.

## II. Jurisdiction

1. The jurisdiction of this Court is based on 28 U.S.C. § 157.

2. This action is brought pursuant to 11 U.S.C. § 523(a)(2)(a); (a)(4); and (a)(6) regarding the determination of dischargeability of a debt.

## III. Nature of Action

3. This action constitutes a core proceeding, under 28 U.S.C. § 157, brought by Plaintiffs contesting and objecting the dischargeability of Defendant's debts pursuant to 11 U.S.C. § 523(a)(2)(a); (a)(4); (a)(6), due to her false pretenses, representation, and actual fraud in order to obtain money and property; fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny; and her willful and malicious injury to another entity and the property of another entity.

## IV. The Parties

4. Plaintiff, Nilsa Lyon Rios, is a creditor of Defendant in the underlying bankruptcy case, having an address at 228 Charlotte Street, Saint Augustine, Florida 32084.

5. Co-plaintiff, León Lyon Rejincos, is a creditor of Defendant in the underlying bankruptcy case, with a postal address at P.O. Box 190, Saint Augustine, FL 32085.

6. Defendant, Ixia Mercado Concepción, is the debtor in the underlying bankruptcy case, reporting an address at Street 3, C-73, Paseo Las Vistas, San Juan, Puerto Rico.

### V. Facts

7. On September 8, 2003, Plaintiffs filed a claim in Puerto Rico state court against the members of the estate of León Lyon Martin (Clara Concepción and Tamara Lyon) and against Ixia Mercado. Plaintiffs alleged that those defendants appropriated and stole the assets belonging to the estate of León Lyon Martin, exploiting the estate's resources for their personal benefit. As such, Plaintiffs were deprived of their corresponding participation in the estate as heirs.

8. After several procedural incidents, the parties went to trial from May 24-28, 2010.

9. Accordingly, on September 20, 2010, a *Judgment* was issued by the Puerto Rico Court of First Instance. Among the findings of facts, that court made the following:

"**II. FINDINGS OF FACT**

    **A. PURSUANT TO THE PARTIES' STIPULATIONS**

1) The deceased León Lyon Martin died on January 17, 2003 in San Juan, Puerto Rico.
2) The deceased had three children from three different marriages: the plaintiffs, León Lyon Rejincos (hereinafter, León son) and Nilsa Lyon Ríos (hereinafter, Nilsa); and codefendant Tamara Lyon Concepción (hereinafter, Tamara).

3) Codefendant, Clara Concepción Lazarinni (hereinafter, Clara) is the third and last wife of the deceased. Clara had two children prior to marrying the deceased. Her children are" Jorge Mercado, and codefendant Ixia Mercado (hereinafter Ixia).

    **B. ACCORDING TO DOCUMENT AND TESTIMONY EVIDENCE**

    **i. BACKGROUND**

25) The evidence shows that the deceased invested heavily and successfully in the stock market.

### ii. INVESTMENT ACCOUNTS AND TRANSFERS

28) For the year 1996, the deceased, León Lyon Martin, was the owner of several investment accounts in the financial institution known at the time as PaineWebber (now UBS). These accounts were investment accounts, that although they belonged to the deceased in their totality, they were opened under his name and the names of other parties in this suit. These are the following: JX21741, under the name of the deceased and Nilsa Lyon; JK21724, under the name of the deceased and Tamara Lyon; JX23274, under the name of the deceased and Ixia Mercado; and JX14602, under the name of the deceased and Clara Concepción.

29) During the month of October 1996, the assets in all of these accounts were transferred to the following investment accounts:

a. $242,465 from the account JX21742 to the account JX31913 opened by codefendant Ixia Mercado;
b. $98,643 from the accountJX14602 to the account JX31913 opened by codefendant Ixia Mercado;
c. $613,914 from the account JX21741 to the account JX31913 opened by codefendant Ixia Mercado;
d. $116,694 from the account JX23274 to the account JX31913 opened by codefendant Ixia Mercado;
e. $125,325 from the account JX14602 to the account JX31912 opened by codefendant Clara Concepción.

The total amount transferred was $1,197,041.00.

31) Moreover, in 1999, the deceased and father of the plaintiffs had approximately $4,000,000.00 in the account number JX34593 of PaineWebber. Said account was under the name of a trust fund known as the Leon Lyon Martin Revocable Trust. Said trust was created in Dade County, Florida, on December 3, 1991, but revoked by the deceased on February 10, 1997 in the same place.

32) By the year 1999, the account number JX34539 of PaineWebber, associated with the revoked trust fund belonging to the deceased, had $3,976,088.00 in stocks and other assets.

33) During the month of May 1999, the $3,976,088.00 were transferred from the deceased's account in PaineWebber to other accounts of said institution belonging to codefendants.

35) **The amounts transferred and the receiving accounts in the month of may 1999 are the following:**

a. **$1,893,505 transferred to the account JX38425 for codefendant Ixia Mercado;**
b. **$89,078 transferred to the account JK31913 for codefendant Ixia Mercado;**
c. $1,893,505 transferred to the account JX38426 for codefendant Tamara Lyon;
d. $100,000 to the account JX31912 for codefendant Clara Concepción

37) **Codefendant Ixia Mercado admitted during her testimony in the court, to having appropriated the amounts transferred to the investment accounts in PaineWebber she opened under her name.**

39) **From the examination conducted by an expert calligrapher, Frank Harley Norwitch, it appears that the deceased's signature was falsified in the transfers made in 1996 and 1999.**

43) By the year 1999, León Lyon Martin was 81 years old and there are no checks or documents signed by the deceased after 1999.

44) The evidence shows that the checks and disposition of assets after that date were made by the defendants through joint bank accounts in which the authorized signatures are the deceased's and codefendants', Ixia Mercado and Clara Concepción.

45) **The actions of codefendants, consisting in stripping the deceased from his private goods prior to his death, show that they had no expectation on the ownership of said goods. Codefendants falsified the deceased's signature to appropriate his private goods several years before his death.**

46) **Codefendants are obligated to return to the estate all of the amounts they appropriated with their own goods.**

### iii. FINANCIAL CIRCUMSTANCES OF CODEFENDANT IXIA MERCADO

48) The report from CPA Quiñones shows that the highest income obtained by codefendant Ixia Mercado, from 1993 to 1998, was $16,875 according to her Income Tax Return. Codefendant Ixia Mercado's income for 1993 was $3,465, $16,875 for 1994 and $16,395 during 1995. These numbers show that she lacked the economic capability to buy the Armory in 1994 that is worth an approximate value of $400,000.00.

49) However, in 1999, the codefendant's tax return showed an increase in income of $48,400 and the sale of assets ascending to $240,000.00.

50) In 2000, codefendant Ixia Mercado sold capital assets for $888,172, according to her Income Tax Return filed that year.

51) Ixia Mercado's financial statements, as analyzed in the Expert Report by CPA Quiñones, show that she had a net income of $138,408, $143,928 and $130,040 for the years 2000, 2001, and 2002, respectively.

52) **Codefendant Ixia Mercado's Income Tax Return does not inform sufficient income to acquire the investments that justify the fund deposits made in her investment account in PaineWebber.**

### iv. THE METROPOLITAN ARMORY

53) The Armory is a business founded and developed by the deceased during the sixties and seventies. It continues operating in the De Diego Avenue 799, Caparra Terrace, San Juan, P.R.

54) On November 8, 1971, the Armory was formally incorporated by the deceased, his son (co-plaintiff, León Lyon Rejincos) and Jorge Mercado (son of codefendant Clara Concepción and brother of codefendant Ixia).

55) By 1994, the co-plaintiff León Lyon Rejincos and Jorge Mercado and his wife, Vanessa Látimer, were no longer shareholders of the Armory.

56) According to the Memorandum from November 1, 1994, all the shareholders were present in the Board of Directors' meeting and codefendant Ixia Mercado Concepción appeared as such for the first time.

57) It appears from the Expert's Report, that the Armory's Board of Directors emitted a Resolution on November 1, 1994, in which they ratified the stock purchase previously mentioned, and established that the 150 stocks belonging to the deceased would remain as the corporation's treasury stocks, and codefendant Ixia Mercado was declared director and new shareholder of the Armory. **In the blink of an eye, without placing a single cent, codefendant Ixia Mercado became owner of the Armory.**

58) **The previously described transactions covered up the trespass of the Armory's stocks to the codefendant Ixia Mercado.** On November 1, 2004 the shares supposedly bought by codefendant Ixia Mercado were valued at $400,000.00.

59) The **illicit donation** of the armory's stocks finalized on November 30, 1994. On said date, the deceased and codefendant Clara Concepción subscribed a Stock Purchase Agreement in which they sold their 150 corporate stocks to the Armory (they were redeemed) considering an alleged debt they allegedly had with the corporation. According to the agreement, the debt appeared in the Armory's financial statements for the fiscal year between 1993 and 1994. However, the alleged debt did not appear in said financial statements. **Codefendant Ixia Mercado did not provide any credible evidence to sustain that in fact the deceased and Clara Concepción had said debt to justify a total surrender of their shares in the Armory as means of compensation**.

60) In the agreement of November 30, 1994, codefendant Ixia Mercado appears on behalf of the corporation as its new President. **Codefendant Ixia Mercado has not provided any credible evidence as to show how she acquired the control and the Armory's corporate stocks. According to the testimony heard before the court, and the Expert Report prepared by CPA Quiñones, the Armory's stocks were donated to codefendant, Ixia Mercado, by the deceased. Codefendant Ixia Mercado did not provide any evidence to demonstrate she paid for the Armory's corporate stocks, which were worth $400,000.00. Said amount belongs to the deceased's estate.**

64) **Since the business' transfer to the codefendant Ixia Mercado to the present date, Mercado has exercised complete control of the Armory, has exploited and enjoyed its resources, along with codefendant Clara Concepción**.

### v. DONATIONS

65) In relation to the property where the Armory is located, CPA Quiñones' testimony and the evidence establish that said property was yielded by the deceased to codefendant Tamara Lyon on July 13, 1992, with no compensation in exchange. The codefendants did not refute this evidence. This was a donation.

66) On September 28, 1995, codefendant Tamara Lyon allegedly "sold" the property to the Armory (located in the De Diego Avenue #799, Caparra Terrace) to the codefendant Ixia Mercado for the price of $225,000.00. CPA Quiñones concluded that said property was "donated" to codefendant Ixia Mercado by the deceased and/or paid with the funds of the Armory. The defendants have not refuted said evidence. In few words, it was another donation.

67) Furthermore, according to the testimony of CPA Quiñones, codefendant Ixia Mercado received donations ascending to $533,471. This arises from Quiñones' Expert Report. The donations consist of the following: (a) $50,000.00 to liquidate the conjugal

partnership with her previous husband; (b) an apartment in Loyola Condominium worth $300,000; and (c) $183,471 in a deposit certificate canceled in 2003.

### vi. CODEFENDANTS' COURSE OF ACTION

70) The codefendants have not partitioned or adjudicated the estate's assets as the law orders. **This Court is astonished at how the codefendants denied these facts and did not comply with what the Puerto Rico Civil Code orders in terms of heritage.**

72) **At the time of the deceased's death, the codefendants had taken all of the estate's assets by transferring them to the investment and bank accounts under their names.**

73) **Their actions deprived plaintiffs from their participation in their father's estate and the corresponding goods. The codefendants conspired to deprive the deceased of his private assets prior to his death and intended to defraud plaintiffs.**

74) The amounts and value of the assets taken by the codefendants exceed the amount that, by the free disposition, could be transferred from the estate without affecting the rights of the entitled heirs and the last will of the deceased.

75) **The codefendants denied the allegations of the complaint; and made this Court believe they had valid defenses and credible testimony in order to deny and refute the operations of the estate and co-plaintiffs' claims. Furthermore, they obstructed the discovery of evidence; purposely delayed the process insisting on an expert witness and an expert report which they never presented. In addition, they assumed a challenging attitude during the trial, when this Court insisted on relevant evidence.** "

*Judgment* at Exhibit A of this Complaint, pp. 3-14. (Our Translation[1] and Emphasis).

10. The aforesaid *Judgment* issued by the Puerto Rico Court of First Instance was thereafter confirmed by the Puerto Rico Court of Appeals on October 11, 2012

---

[1] As it constitutes a public and official government document, entitled to full faith and credit, and due to its volume, Plaintiffs respectfully request that this Court accept and entertain the *Judgment* of the Puerto Rico Court of First Instance in the Spanish language. In the event that this Court denies Plaintiff's request for leave to file this document in Spanish, Plaintiffs respectfully request 60 days to file the certified English translation.

(KLAN201001695), see Exhibit B, and the Puerto Rico Supreme Court on April 5, 2013 (CC-2013-0074), see Exhibit C.

11. On July 17, 2013 Plaintiffs moved to execute the now final and binding *Judgment* by the Puerto Rico state court.

12. Defendant Ixia Mercado proceeded to file for bankruptcy under Chapter 7 of the Bankruptcy Code on October 31, 2013, Case No. 13-09126 (BKT).

**VI. First Count**

13. Plaintiffs incorporate each and every allegation set forth in paragraphs 1 to 12, including the findings of fact in the Puerto Rico state court *Judgment,* as if fully set forth herein.

14. Defendant Ixia Mercado incurred in false representations in order to appropriate the funds from the deceased's trust fund and investment accounts, by transferring his assets to a personal bank account.

15. Defendant Ixia Mercado admitted to having appropriated the amounts transferred to the investment accounts opened under her name. Furthermore, her Income Tax Return does not inform sufficient income to justify the fund deposits made in her investment account.

16. Along with Clara Concepción, Defendant Ixia Mercado participated and conspired to forge the deceased's signature in various checks in order to appropriate his private goods several years prior to his death.

17. Defendant Ixia Mercado also participated in a series of transactions in order to cover up the misappropriation of the Armory's stocks.

18. Defendant Ixia Mercado did not provide any credible evidence as to demonstrate how she acquired the control of the Armory's corporate stocks, or to demonstrate that she paid for said stocks, which were worth $400,000.00.

19. Defendant Ixia Mercado covered up an illicit donation of the corporation's stocks in order to become shareholder of the Armory and exercise full control over the Armory. Furthermore, she has exploited and enjoyed the Armory's resources.

20. As a result of said actions, Plaintiffs have been deprived of their rights as entitled heirs to the deceased's estate.

21. Under 11 U.S.C. § 523(a)(2)(a) there shall be no discharge from any debt for money, property, services, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud.

22. Pursuant to the previously cited section, Defendant Ixia Mercado should not be allowed to discharge any debt, as she has incurred in improper actions, as described in the Bankruptcy Code that enable this Court to deny her request for discharge.

### VII. Second Count

23. Plaintiffs incorporate each and every allegation set forth in paragraphs 1 to 12, including the findings of fact in the Puerto Rico state court *Judgment,* as if fully set forth herein.

24. Defendant Ixia Mercado had no expectation in receiving any goods from the estate, and thus incurred in a series of fraudulent transactions. The purpose of said

transactions was to appropriate the deceased's investment accounts and strip him from his assets prior to his death.

25. Defendant Ixia Mercado also covered up the misappropriation of the Armory's corporate stocks alleging they were a "donation" from the deceased. As such, she became the principal shareholder and president of the Armory. Since said misappropriation, she has exercised full control over the Armory and exploited its resources.

26. As a result of said actions, Plaintiffs have been deprived of their participation rights as entitled heirs to the deceased's estate.

27. Under 11 U.S.C. § 523(a)(4) there shall be no discharge from any debt for fraud and/or defalcation while acting in a fiduciary capacity, embezzlement or larceny. Therefore Defendant Ixia Mercado's claim is non-dischargeable.

### VIII. Third Count

28. Plaintiffs incorporate each and every allegation set forth in paragraphs 1 to 12, including the findings of fact in the Puerto Rico state court *Judgment,* as if fully set forth herein.

29. Defendant Ixia Mercado had no expectation in receiving any goods from the estate, and thus incurred in a series of fraudulent transactions. The purpose of said transactions was to appropriate the deceased's investment accounts and strip him from his assets prior to his death.

30. Defendant Ixia Mercado also covered up the misappropriation of the Armory's corporate stocks alleging they were a "donation" from the deceased. As such,

she became the principal shareholder and president of the Armory. Since said misappropriation, she has exercised full control over the Armory and exploited its resources.

31. These actions, along with her acts of fraud, have deprived Plaintiffs from their rightful participation in the deceased's estate.

32. Under 11 U.S.C. § 523(a)(6) there shall be no discharge from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity. Therefore, Defendant Ixia Mercado should not be granted a discharge.

33. Defendant Ixia Mercado has incurred in improper conduct as described in the Bankruptcy Code, thus this Court may deny discharge.

WHEREFORE, Plaintiffs respectfully request this Honorable Court to enter Judgment against Defendant Ixia Mercado and: (a) declare that the Debt owed by Defendant to Plaintiffs, as determined in the underlying bankruptcy proceedings, is non-dischargeable pursuant to 11 U.S.C. 523(a)(2)(a); 11 U.S.C. 523 (a)(4); and 11 U.S.C. 523 (a)(6), and thus remains due and owing to the listed creditors, (b) award Plaintiffs reasonable costs and attorneys' fees incurred in this action, and (c) provide such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 2nd day of January, 2014.

I HEREBY CERTIFY that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all participants of record.

I HEREBY CERTIFY that on this same date the foregoing was sent by regular mail to:

**MORELL BAUZA CARTAGENA & DAPENA**
PO Box 13399
San Juan, Puerto Rico 00908
Tel. (787) 723-1233; Fax: (787) 723-8763

s/ Ramón E. Dapena
RAMÓN E. DAPENA
USDC-PR 125005

s/ Victor J. Quinones
VICTOR J. QUINONES
USDC-PR 221410

- 13 -