RECEIVED:
SEP 2 3 2010

PAG. 01

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA DE SAN JUAN

LYONS RIOS, NILSA
　　　　DEMANDANTE
　　　　　VS.
LYONS MARTIN, LEON (SUCN)
　　　　DEMANDADO

CASO:K AC2003-5975
SALON:0508

ACCION CIVIL
　　　PARTICION DE HERENCIA
　　　CAUSAL/DELITO

LIC. DAPENA GUERRERO RAMON E
PO BOX 13399
SAN JUAN,PR 00908

　　　　　　NOTIFICACION DE SENTENCIA

　　　EL SECRETARIO QUE SUSCRIBE NOTIFICA A USTED QUE ESTE TRIBUNAL HA DICTADO
SENTENCIA  EN EL CASO DE EPIGRAFE CON FECHA 20 DE SEPTIEMBRE DE 2010, QUE HA
SIDO DEBIDAMENTE  REGISTRADA Y  ARCHIVADA EN LOS AUTOS DE ESTE CASO, DONDE
PODRA USTED ENTERARSE DETALLADAMENTE DE LOS TERMINOS DE LA MISMA.

　　　Y, SIENDO O REPRESENTANDO USTED LA PARTE PERJUDICADA POR LA SENTENCIA,
DE LA CUAL PUEDE  ESTABLECERSE  RECURSO DE  APELACION, DIRIJO A  USTED ESTA
NOTIFICACION, HABIENDO  ARCHIVADO EN LOS AUTOS DE ESTE  CASO COPIA DE ELLA
CON FECHA  DE  22 DE SEPTIEMBRE DE 2010.

ANDREU FUENTES JOSE A
261 AVE DOMENECH
SAN JUAN,PR 00918-3518

RAMIREZ ABARCA BEATRIZ M
CAPITAL CENTER BLDG TORRE SUR
239 AVE ARTERIAL HOSTOS STE 1104
SAN JUAN,PR 00918-1477

RODRIGUEZ CRUZ REBECCA
HATO REY CENTER
268 AVE PONCE DE LEON STE 1005
SAN JUAN,PR 00918-2006

RIVERA FONT JUAN R
221 PLZA
221 AVE PONCE DE LEON SUITE 403
SAN JUAN,PR 00917

PAG. 02

CASO NUM:K AC2003-5975
SALON:0508

CORDOVA MORALES NELSON N
220 DOMENECH AVE.
PMB 255
SAN JUAN,PR 00918

SAN JUAN, PUERTO RICO, A 22 DE SEPTIEMBRE DE 2010

LCDA. REBECCA RIVERA TORRES
------------------------------------------
SECRETARIO
POR: LIZ MAR MALDONADO SALAS
------------------------------------------
SECRETARIO AUXILIAR

O.A.T.704-NOTIFICACION DE SENTENCIA
TELETRIBUNALES:(787)759-1888/ISLA, LIBRE DE COSTO(787)1-877-759-1888

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| NILSA LYON RIOS, LEON LYON, JR.<br><br>DEMANDANTES<br><br>v.<br><br>SUCESIÓN DE LEON LYON MARTIN COMPUESTA POR: TAMARA LYON CONCEPCION, CLARA CONCEPCION LAZZARINI E IXIA MERCADO CONCEPCION, ARMERIA METROPOLITANA, INC.<br><br>DEMANDADOS | CIVIL NÚM. KAC2003-5975 (508)<br><br>SOBRE:<br><br>FAMILIAE ERCISCUNDAE INVENTARIO, AVALÚO, ADJUDICACIÓN Y PARTICIÓN DE HERENCIA |

**SENTENCIA**

## I. INTRODUCCION

La Sra. Nilsa Lyon y el Sr. León Lyon Rejincos, hijos del causante León Lyon Martin, presentaron esta demanda el 8 de septiembre de 2003 contra los otros miembros de la Sucesión León Lyon Martin (Clara Concepción Lazarini y Tamara Lyon) y contra la Sra. Ixia Mercado Concepción. Los demandantes alegaron que las demandadas se apropiaron y sustrajeron el caudal de León Lyon Martin durante los últimos años de su vida, caudal que continúan poseyendo y explotando para su único beneficio. Además, alegaron que los actos de las codemandadas le causaron daños económicos serios y continuos a la parte demandante quienes se han visto privados de los bienes y los frutos correspondientes que le pertenecen como herederos forzosos del causante. Además, los demandantes alegaron que, en la medida que todos los bienes en cuestión hubieren sido donados libremente por el causante, dichas donaciones serían inoficiosas debido a que lesionaban la legítima de los demandantes como herederos forzosos.

El 21 de enero de 2005, los demandantes enmendaron la reclamación para incluir como partes demandadas al Fideicomiso Blay Mercado y la Armería Metropolitana, Inc,. Plantearon que el causante efectuó ciertas transacciones simuladas relacionadas con las acciones y el inmueble del negocio Armería Metropolitana, Inc. que pasaron a manos de Ixia Mercado y/o de Tamara Lyon, y que dichas transacciones encubrían una donación nula.

Con relación al Fideicomiso Blay-Mercado ("Fideicomiso"), los demandantes

1

alegaron además, que la codemandada Ixia Mercado transfirió o convirtió bienes de la Sucesión Lyon Martin para dotar el Fideicomiso y que dicho fideicomiso era nulo de conformidad con los Artículos 846 y 853 del Código Civil, 31 L.P.R.A. secs. 2553 y 2560.

El 25 de agosto de 2006, la parte demandante presentó una segunda enmienda a la demanda únicamente para declarar que el causante y Clara se habían casado con capitulaciones matrimoniales, por lo que ésta no tenía derecho a participación ganancial alguna.

Consecuentemente, los demandantes solicitaron que se realizara el correspondiente inventario de los bienes del caudal relicto de su padre, y que se obligara a las demandadas a colacionar las partidas recibidas ilegalmente del caudal para entonces proceder a la partición del mismo de conformidad con el testamento ológrafo del señor Lyon Martin.

Las demandadas contestaron la reclamación por separado pero todas negaron haberse apropiado de bienes pertenecientes al caudal del causante León Lyon Martin. Por su parte, la codemandada, Clara Concepción, alegó en su contestación a la segunda demanda enmendada que en su matrimonio con el causante se habían comportado como una sociedad legal de gananciales y que, por ende, tenía derecho a su participación ganancial sobre el caudal relicto del causante y solicitó que se le fijara su cuota viudal usufructuaria. Posteriormente argumentó que había formalizado una comunidad de bienes con el causante.

A su vez, la codemandada Tamara Lyon presentó reconvención contra la codemandante Nilsa Lyon alegando que ésta le debía alrededor de $70,000.00 por alegados préstamos que le había realizado este con anterioridad a la muerte del causante.

El descubrimiento de prueba en este caso fue largo y accidentado. El récord está repleto de mociones relacionadas a controversias de descubrimiento y evidenciarias, particularmente debido a la renuencia de las partes demandadas a proveer información y producir documentos relacionados al caso. El 12 de diciembre de 2008, finalmente se presentó el Informe de Conferencia con Antelación al Juicio (el "Informe de Conferencia") y se celebró la correspondiente conferencia. La parte demandante designó perito al Contador Público Autorizado Reynaldo Quiñones Márques, que presentó un Informe Pericial de 14 de agosto de 2008. Dicho informe fue enmendado el 28 de septiembre de

2008 por el CPA Quiñones y por su testimonio en juicio. El informe del CPA Quiñones constituye un inventario, rastreo de bienes, colación y partición de los bienes del causante entre los que se encuentran los activos y el negocio de la Armería Metropolitana, Inc. (la "Armería"). Las partes codemandadas anunciaron perito, pero este no compareció a juicio.

El juicio en su fondo fue celebrado los días 24 al 28 de mayo de 2010. El Tribunal concedió según las partes solicitaron, tres (3) días a la parte demandante para presentar su caso y los días restantes a la parte demandada. La parte demandante presentó los testimonios de Nilsa Lyon (parte demandante), Jorge Mercado (hijo de la codemandada, Clara Concepción Lazarinni) y Clara Concepción Lazarinni. Además, la parte demandante presentó el testimonio pericial del contador público autorizado y licenciado, Reynaldo Quiñones, y del experto en caligrafía, Frank Harley Norwitch.

Los demandados presentaron su propio testimonio, mas no presentaron la prueba pericial que habían anunciado.

Habiendo examinado y analizado la evidencia documental y la prueba testifical presentada por cada una de las partes, este Tribunal ha llegado a las siguientes determinaciones de hechos.

## II. DETERMINACIONES DE HECHOS

## A. SEGÚN ESTIPULACIONES DE LAS PARTES

1) El CAUSANTE León Lyon Martin falleció el 17 de enero de 2003, en San Juan, Puerto Rico.

2) El causante procreó tres hijos de tres matrimonios distintos, a saber: los demandantes, León Lyon Rejincos (en lo sucesivo, León hijo) y Nilsa Lyon Ríos (en lo sucesivo, Nilsa); y la codemandada, Tamara Lyon Concepción (en lo sucesivo, Tamara).

3) La codemandada, Clara Concepción Lazarinni (en lo sucesivo, Clara), es la tercera y última esposa del causante. Clara tenía dos hijos antes de contraer matrimonio con el causante. Los hijos de Clara son: Jorge Mercado, la codemandada Ixia Mercado (en lo sucesivo, Ixia).

4) El causante y Clara se casaron el 21 de diciembre de 1957 bajo el regimen de capitulaciones matrimoniales suscritas el 17 de diciembre de 1957. En su parte pertinente, la escritura de capitulaciones dispone que "los aquí comparecientes [...] han decidido que durante el referido matrimonio no rija la sociedad económica de

gananciales".

5)      De conformidad con las capitulaciones, el causante Lyon era titular de dos inmuebles (uno, con dos edificios, en la calle McLeary y el segundo, en la Calle Sol del Viejo San Juan) y unas acciones corporativas. Por su parte, la codemandada Clara Concepción tenía a su haber una opción de compraventa de una propiedad inmueble ubicada en Caparra Terrace.

6)      El 20 de octubre de 1996, el causante redactó un testamento ológrafo protocolizado según Resolución de 13 de febrero de 2004, en el caso KJV2003-0379.

7)      Conforme a las disposiciones del testamento ológrafo, el tercio de legítima estricta sería dividido en partes iguales entre sus tres hijos: los codemandantes León Lyon, hijo; Nilsa Lyon y la codemandada, Tamara Lyon. El tercio de mejora consta adjudicado a sus hijas Nilsa y Tamara, en partes iguales. El tercio de libre disposición quedó adjudicado mediante legados a la codemandante Nilsa Lyon y la codemandada Tamara Lyon.   El remanente (si alguno) de dicho tercio de la libre lo legó a la codemandada, Ixia Mercado Concepción.

8)      Con relación a los legados, la codemandante Nilsa Lyon recibiría el valor del crédito hipotecario que tenía el causante sobre la propiedad ubicada en 5950 S.W. 111 St., Miami, Florida, así como los intereses, contribuciones y otras sumas de dineros relacionados a la propiedad. Por su parte, la codemandada Tamara recibiría mediante legado el apartamento #902 del Condominio Biltmore II de Coral Gables, Florida.

9)      El crédito hipotecario del causante sobre la propiedad ubicada en 5950 S.W. 111 St., Miami, Florida, fue cancelado por el propio causante en el año 1998. De esta manera, Nilsa recibió el título sobre el inmueble antes de la muerte del causante.

10)     La codemandada, Tamara Lyon, también recibió su legado consistente en el título sobre el apartamento #902 del Condominio Biltmore II de Coral Gables, Florida.

## B.  SEGÚN LA PRUEBA DOCUMENTAL Y TESTIFICAL

### i. TRASFONDO

11)     Durante el mes de enero de 2003, Nilsa y León hijo, quienes entonces vivían (y todavía viven) en el estado de Florida, se trasladaron a Puerto Rico para asistir a los actos fúnebres de su padre.

12)     La codemandada Tamara Lyon se le acercó en aquella ocasión y le indicó que el causante había perdido mucho dinero en la bolsa de valores por lo que no

quedaban bienes en el caudal. Indicó que, a pesar de la pérdida de valores en el mercado, ella le podría conseguir a la codemandante Nilsa Lyon, la suma de $300,000.00 en pago de su participación hereditaria.

13)   La codemandante Nilsa Lyon le expresó a su hermana la codemandada Tamara Lyon que, antes de considerar la oferta, le interesaba un inventario de los bienes del caudal relicto. Varios días más tarde y sin entregar información alguna sobre el causante, la codemandada Tamara Lyon llamó a la codemandante Nilsa Lyon y le indicó que había conseguido los $300,000.00, pero que necesitaba que ésta firmara un relevo antes de entregarle el dinero.

14)   La codemandante Nilsa Lyon respondió con una comunicación en la que solicitó a los demandados un inventario de los bienes de su padre. Esta comunicación no fue contestada por los codemandandos quienes limitaron a notificarle de un proceso de protocolización de testamento ológrafo que se estaba llevando a cabo en el Tribunal de San Juan. Varios meses más tarde, Nilsa y León Lyon hijo presentaron la demanda de epígrafe.

15)   El Sr. Jorge Mercado Concepción, hijo de la codemandada Clara Concepción (y hermano de la codemandada Ixia Mercado) testificó que, luego del sepelio del causante, las codemandadas le increparon acerca de porqué él no las estaba ayudando a convencer a Nilsa de que no quedaba dinero y que éstas tenía el objetivo de desposeer a los codemandantes de su herencia.   Testificó que él se rehusó y les recomendó que se evitaran problemas y le dieran a los demandados lo que le correspondía. A la pregunta específica que le hicieran las codemandadas, respondió que sólo si la codemandante renunciaba por escrito podrían quedarse con la herencia que le correspondía a aquella.

16)   De la declaración de Jorge Mercado, hijo mayor de la codemandada Clara Concepción, surge que:

a.   El causante era rico al momento de conocer y a cortejar a su madre Clara Concepción allá para el 1956.   Que ésta, su hermana y él vivían con el módico ingreso de su madre como secretaria en una agencia gubernamental. Tanto Clara, su hermana (Ixia) y él eran personas sin medios económicos.

b.   Ixia y él estudiaron en escuela pública mientras su madre se desempeñó como secretaria en DACO y la Comisión de Servicio Público de donde se pensionó por incapacidad en 1972.

c.    Recuerda la ocasión en que el causante fue por primera vez a la residencia de él y su madre para pretender a esta última.

17)    Eventualmente el Sr. Jorge Mercado se graduó de la UPR y trabajó como contador público autorizado con la firma de contabilidad Lucas Malavé y Assoc. Declaró que conocía de las inversiones y riquezas del causante por varias razones entre las cuales se encuentra el hecho de que fungió como consejero financiero del causante así como contador de la corporación (Armería Metropolitana, Inc.) que tenía con el causante.

18)    El Sr. Jorge Mercado declaró que, estando el causante de viaje, este le pidió que abriera con la codemandada Ixia Mercado unas gavetas en su escritorio para proveerle unos números de certificados de inversiones. Declaró que encontró cientos de miles de dólares en valores. La codemandada Ixia Mercado no controvirtió tal testimonio.

19)    El testimonio del Sr. Jorge Mercado merece entera y completa credibilidad. Su testimonio fue claro y contundente. Como futuro heredero de la codemandada Clara Concepción, sus declaraciones contra su propio interés pecuniario gozan de confiabilidad.

20)    El causante y la codemandada Clara Concepción capitularon matrimonialmente para excluir el régimen de bienes gananciales. A la luz de la totalidad de la prueba presentada en el caso, este Tribunal ha quedado convencido que entre el causante y la codemandada Clara Concepción, no se forjó comunidad de bienes alguna.

21)    Según la prueba testifical presentada en sala, el causante acostumbara a velar celosamente por los gastos de la familia, era tacaño para los gastos ordinarios y tenía un control absoluto de sus activos. Tanto así que, durante su matrimonio con el causante, la codemandada Clara Concepción tenía que pagarse sus propios gastos según ella misma declaró en sala. Mientras los hijos del causante fueron a escuelas privadas y vivieron una vida holgada, los hijos de la codemandada Clara Concepción estudiaron en escuela pública y su vida no fue tan cómoda. La codemandada Clara Concepción no tenía injerencia alguna en la forma y manera en que el causante manejaba y/o invertía sus bienes y dinero.

22)    Antes de conocer al causante, la codemandada Clara Concepción trabajó como secretaria de abogado y luego, para la ASERCO, la agencia predecesora del Departamento de Asuntos del Consumidor, y eventualmente, la Comisión de Servicio Público.

23)   Según la codemandada Clara Concepción, el causante le informaba a ella lo decidido en cuanto a todos los aspectos financieros del matrimonio.

24)   El causante acostumbraba a abrir cuentas conjuntas de distintos tipos con los miembros de su familia, incluyendo además a la codemandada Ixia Mercado. Entre las cuentas abiertas por el causante se encontraba cuentas de banco y/o de corretaje, cajas de seguridad, certificados de depósitos y propiedades, entre otros. Algunas de estas cuentas las creaba el causante sin el conocimiento de los otros "titulares". Las demandadas testificaron que en ocasiones el causante les solicitaba que firmaran papeles sin decir de qué se trataban y éstas accedían sin reparos.

25)   Surge de la prueba que el causante invirtió copiosamente y exitosamente en el mercado de valores.

26)   El causante acostumbraba abrir cuentas conjuntas con las partes de epígrafe (Clara, Nilsa, Tamara e Ixia) en los que depositaba de sus bienes privativos.

27)   A pesar de que las partes tenían sus respectivos empleos, ninguno pagaba lo suficiente para permitir que éstas acumularan riquezas.

## ii. LAS CUENTAS DE INVERSIONES Y TRANSFERENCIAS

28)   Para el año 1996, el causante, León Lyon Martin, era el titular de varias cuentas de inversión en la entidad financiera entonces denominada PaineWebber (ahora conocida como UBS). Las cuentas aludidas eran unas cuentas de inversión que, a pesar de que pertenecían al causante en su totalidad, se abrieron a nombre de él y otras partes de este pleito. Éstas son las siguientes: JX 21741, a nombre del causante y Nilsa Lyon; JX21742, a nombre del causante y Tamara Lyon; JX23274, a nombre del causante e Ixia Mercado; y JX14602, a nombre del causante y Clara Concepción.

29)   Durante el mes de octubre de 1996, los bienes en todas esas cuentas fueron transferidos a las siguientes cuentas de inversión:

a.   $242,465 de la cuenta JX21742 a la cuenta núm. JX31913 abierta por la codemandada Ixia Mercado [Exh. Est. 26 y 30];

b.   $98,643 de la cuenta JX14602 a la cuenta núm. JX31913 abierta por la codemandada Ixia Mercado [Exh. Est. 26 y 29];

c.   $613,914 de la cuenta JX21741 a la cuenta núm. JX31913 abierta por la codemandada Ixia Mercado [Exh. Est.26 y 28];

d.   $116,694 de la cuenta JX23274 a la cuenta núm. JX31913 abierta

por la codemandada Ixia Mercado [Exh. Est.26 y 27];

e.    $125,325 de la cuenta JX14602 a la cuenta núm. JX31912 abierta

por la codemandada Clara Concepción, [Exh. Est. 29].

El total transferido fue de $1,197,041.00.    Según los Exhs. 9 y 10 de la parte

demandante, Informe Final del Perito de la Demandante, Anejo 4.

30)    El 3 de diciembre de 1991, el causante creó un fideicomiso conocido como

el "Leon Lyon Martin Revocable Trust" en Dade County, Florida. [Exh. 7 de la parte

demandante] Para mediados de la década de los noventa, el causante abrió la cuenta

núm. JX34593 en PaineWebber a nombre del León Lyon Martín Revocable Trust y

transfirió activos suyos a dicha cuenta.

31)    Más aún, en el año 1999, el causante y padre de los demandantes tenía

alrededor de $4,000,000.00 en la cuenta núm. JX34593 de PaineWebber. Dicha cuenta

constaba inscrita a nombre de un fideicomiso conocido como el Leon Lyon Martin

Revocable Trust. El mismo fue creado en Dade County, Florida, el 3 de diciembre de

1991, pero revocado por el causante el 10 de febrero de 1997 en el mismo lugar.

32)    Para el año 1999, la cuenta núm. JX34593 de PaineWebber, asociada al

Fideicomiso revocado y perteneciente al causante, tenía $3,976,088.00 en acciones y

otros activos. [Exh. 24].

33)    En el mes de mayo de 1999, los $3,976,088.00 fueron transferidos de la

referida cuenta a JX34593 del causante en PaineWebber hacia otras cuentas de dicha

institución a nombre de las codemandadas. Véanse los Exhs. Ests. 11, 24, 25 y 26, y los

Exhs. 9 y 10 de la parte demandante.

34)    En relación con la transferencia efectuada en mayo de 1999 y explicada

previamente, la codemandada Clara Concepción era la titular de la cuenta núm. JX31912.

En el mismo mes de mayo de 1999, fecha en que ocurrieron las transferencias a favor de

las otras codemandadas, la codemandada Clara Concepción recibió una transferencia

monetaria de $100,000.00 a su cuenta núm. JX31912. Al igual que en el caso de sus hijas,

la transferencia provino de la cuenta del causante núm. JX34593. Véanse Exhs. Est.  24 y

32.

35)    Las sumas transferidas y cuentas receptoras de las transferencias efectuadas

en el mes de mayo de 1999 son las siguientes:

a.    $1,893,505 transferidos a la cuenta núm. JX38425 para la

codemandada Ixia Mercado) [Exh. Est. 11, 22, 24 y 26];

b.    $89,078 transferidos a la cuenta núm. JX31913 para la codemandada Ixia Mercado [Exh. Est. 24 y 26];

c.    $1,893,505 transferidos a la cuenta núm. JX38426 para la codemandada Tamara Lyon [Exh. Est. 24 y 25];

d.    $100,000 a la cuenta núm. JX31912 para la codemandada Clara Concepción [Exh. Est. 24 y 32]

Véase además los Exhs. 7, 8, 9 y 10 de la parte demandante.

36)    Los fondos transferidos y/o activos transferidos en 1996 y 1999 a las cuentas de las codemandadas pertenecían exclusivamente al causante.

37)    La codemandada Ixia Mercado admitió durante su testimonio en sala, haberse apropiado de las sumas transferidas a las cuentas de inversión en PaineWebber que abrió a su nombre.

38)    Luego de las transferencias antes indicadas, las codemandadas movieron algunos de los activos a Santander Securities, EuroBank y Financial Networks.

39)    Del examen que hiciera el perito calígrafo, Frank Harley Norwitch, surge que la firma del causante fue falsificada (o sobrepuesta) en transferencias efectuadas en 1996 y 1999. Véanse Exhibits 7 y 8 de la parte demandante.

40)    La codemandada, Clara Concepción, admitió haber firmado por y a nombre del causante en algunas ocasiones. Particularmente, la codemandada Clara Concepción, reconoció haber firmado por el causante en la planilla de contribución sobre ingresos para el año 1999 [Exh Est 11].

41)    De conformidad con la Planilla de Contribución sobre Ingresos del causante que firmó la codemandada Clara Concepción, las inversiones en acciones corporativas (y otras) vendidas durante 1999 ($3,976.088.00) habían sido adquiridas en el año 1950. [Exh. Est. 11] Las referidas inversiones en acciones y otros valores pertenecían al causante privativamente.

42)    Según certificación emitida por el Departamento de Estado, el causante no rindió planilla de contribución sobre ingresos con posterioridad al año 1999. [Exh 3 de la parte demandante]

43)    En el año 1999, León Lyon Martin tenía 81 años de edad y no existen cheques o documentos firmados por el finado luego del año 1999.

44)     La prueba refleja que los cheques y las disposiciones de bienes luego de esa fecha, las hicieron las partes demandadas mediante cuentas bancarias conjuntas en la que aparecen como firmas autorizadas del causante y las codemandadas, Ixia Mercado y Clara Concepción.

45)     Los actos de las codemandadas, consistentes en despojar al causante de sus bienes privativos antes de su muerte, reflejan que éstas no tenían la expectativa de titularidad sobre dichos bienes. Las codemandadas falsificaron la firma del causante para apropiarse de sus bienes privativos varios años antes de su muerte.

46)     Las partes codemandadas están obligadas a devolver al caudal todas las sumas apropidadas con sus frutos.

### iii.    LAS CIRCUNSTANCIAS FINANCIERAS DE LA CODEMANDADA IXIA MERCADO

48)     El Informe del CPA Quiñones refleja que el ingreso más alto devengado por la codemandada Ixia Mercado, entre 1993 y 1998, fue de $16,875 según sus Planillas de Contribución sobre Ingresos. La codemandada Ixia Mercado tuvo ingresos de $3,465 para el año 1993,  $16,875 para el año 1994 y $16,395 para el año 1995. Estos números demuestran que la codemandada Ixia Mercado no tenía la capacidad económica para comprar en 1994 la Armería con un valor aproximado de $400,000.00.

49)     En el 1999, sin embargo, la planilla de la codemandada Ixia Mercado refleja un aumento en ingresos de $48,400 y venta de activos ascendentes a $240,000.00.

50)     En el 2000, la codemandada Ixia Mercado vendió activos de capital por $888,172, según la Planilla de Contribuciones sobre Ingresos para dicho año.

51)     Los estados financieros de la codemandada Ixia Mercado, según analizados en el Informe Pericial del CPA Quiñones, reflejan que ésta tuvo ingresos netos de $138,408, $143,928 y $130,040 para los años 2000, 2001 y 2002, respectivamente.

52)     Las  Planillas de Contribución sobre Ingresos de la codemandada Ixia Mercado no informan ingresos suficientes para adquirir las inversiones que justifican los depósitos de fondos que se hicieron en las cuentas de inversión a su nombre en PaineWebber.

### iv.  LA ARMERIA METROPOLITANA

53)     La Armería es un negocio fundado y desarrollado por el causante en la

década de los años sesenta.  El mismo continúa operando en la Ave. De Diego 799, Caparra Terrace, San Juan, P. R.

54)   El 8 de noviembre de 1971, la Armería fue formalmente incorporada por el causante, su hijo (el codemandante, León Lyon Rejincos) y Jorge Mercado (hijo de la codemandada Clara Concepción y hermano de la codemandada Ixia).

55)   Para el 1994, el codemandante León Lyon Rejincos y Jorge Mercado y su esposa, Vanesa Látimer, habían dejado de ser accionistas de la Armería.

56)   De conformidad con Minuta de 1 de noviembre de 1994, en reunión de la Junta de Directores de la Armería estaban presentes todos los accionistas y aparece la codemandada Ixia Mercado Concepción como tal por primera vez.

57)   Surge del Informe Pericial, que la Junta de Directores de la Armería emitió una Resolución de 1 de noviembre de 1994 en la que se ratifica la compraventa de acciones antes descrita, se establece que las 150 acciones del causante permanecerían como acciones en cartera ("treasury stock") de la corporación y se declaró a la codemandada Ixia Mercado como directora y nueva accionista de la Armería. Así de un plumazo, (sin poner un centavo) la codemandada Ixia Mercado advino a ser dueña de la Armería.

58)   Las transacciones antes descritas encubrieron el traspaso de las acciones de la Armería a la codemandada Ixia Mercado. Para el 1 de noviembre de 2004, las acciones corporativas supuestamente adquiridas por la codemandada Ixia Mercado tenían un valor de $400,000.00. Véanse Exhibits 9 y 10 de la parte demandante, Informe Pericial del Lcdo. Quiñones.

59)   La donación ilícita de las acciones de la armería se convirtió el 30 de noviembre de 1994.  En esa fecha, el causante y la codemandada Clara Concepción suscribieron un "Stock Purchase Agreement" mediante el cual vendieron sus 150 acciones corporativas a la propia Armería (v.g., las redimieron) en consideración a una supuesta deuda que ellos alegadamente tenían con la corporación. [Ex. Est. 17] Según el acuerdo, la deuda aparecería en los estados financieros de la Armería para el año fiscal comprendido entre 1993 y 1994. La deuda alegada, sin embargo,  no apareció en los susodichos estados financieros. Véanse Exhibits 9 y 10 de la parte demandante, Informe Pericial del Lcdo. Quiñones.  Tampoco la codemandada Ixia Mercado, aportó prueba creíble alguna de que en efecto existiera una deuda del causante y la

codemandada Clara Concepción para justificar una redención total de las acciones de éstos en la Armería a manera de compensación.

60)   En el acuerdo de 30 de noviembre de 1994, la codemandada Ixia Mercado comparece en representación de la corporación como nueva Presidenta de la misma. La codemandada Ixia Mercado no presentó prueba creíble de cómo adquirió el control y las acciones corporativas de la Armería Metropolitana. Según testimonio vertido en sala y el informe del CPA Quiñones, las acciones de la Armería fueron donadas a la codemanda Ixia Mercado, por el causante. La codemandada Ixia Mercado no aportó prueba alguna que demuestre que ella pagó por las acciones corporativas de la Armería, que para el causante y las codemandadas valoraron en $400,000.00.   Ese monto pertenece al caudal del causante.

61)   La codemandada Clara Concepción, expresó en sala que ella trabajó en la Armería pero que dicho negocio siempre fue del causante y que este comenzó el negocio en su casa antes de que se casaran.   Declaró que éste había comenzado confeccionando balas en la propiedad que el causante tenía cuando se conocieron.   El Sr. Jorge Mercado confirmó este hecho con su testimonio.

62)   La codemandada Clara Concepción no presentó evidencia creíble para forjar una comunidad de bienes con el causante en cuanto a ninguno de los bienes ni para acrecentar el capital privativo del causante.   Según sus propias declaraciones, el causante  manejaba todos los bienes ya que eran de él.

63)   Si bien es cierto que la codemandada Clara Concepción ayudaba en la Armería y hasta tuvo puesto como directora en dicha entidad, el hecho es que la Armería es una corporación.  La reclamación de la codemandada Clara Concepción por concepto de salarios o envolvimiento en las operaciones de la Armería sería contra la corporación y no contra el caudal.  Por otro lado, ella misma reconoció que el negocio (las acciones de la Armería Metropolitana, Inc.,) eran del causante. La codemandada Clara Concepción declaró que llegó al matrimonio con una opción de compraventa sobre una propiedad inmueble y su testimonio coincide con el resto de lo expresado en sala con relación al control que el causante siempre ejerció sobre sus bienes.

64)   Desde la transferencia del negocio a la codemandada Ixia Mercado hasta el presente, la codemandada Mercado ha ejercido control directo de la Armería, ha explotado sus recursos y ha disfrutado, junto a la codemandada Clara Concepción, de

sus frutos.

## v. DONACIONES

65)    Con relación al inmueble donde ubica la Armería, el testimonio del CPA Quiñones y la prueba establecen que el mismo fue cedido por el causante a la codemandada Tamara Lyon el 13 de julio de 1992, sin pago a cambio. Los codemandados no controvirtieron dicha prueba. Esto fue una donación.

66)    A su vez, el 28 de septiembre de 1995, la codemandada Tamara Lyon alegadamente "vendió" el inmueble de la Armería (sita en Avenida De Diego #799, Caparra Terrace) a la codemandada Ixia Mercado por el precio de $225,000.00. Concluyó el CPA Quiñones que dicho inmueble fue "donado" a la codemandada Ixia Mercado por el causante y/o pagado con fondos de la Armería. Esto surge de los Exhibits 9 y 10 de la parte demandante, Informe Pericial del Lcdo. Quiñones, Anejos 4 y 6. Los codemandados no controvirtieron dicha prueba. En pocas palabras, se trató de otra donación.

67)    Además, según el testimonio del CPA Quiñones, la codemandada Ixia Mercado, recibió donaciones ascendentes a $533,471. Esto surge de los Exhibits 9 y 10 de la parte demandante, Informe Pericial del Lcdo. Quiñones, Anejo 19. Las donaciones consisten en lo siguiente: (a) $50,000.00 para liquidar la sociedad legal de gananciales con su anterior esposo; (b) un apartamento en el Condominio Loyola valorado en $300,000; y (c) $183,471 certificado de depósito cancelado en el 2003. Id.

68)    La demandante Nilsa Lyon, recibió donaciones en vida del causante cuyo valor al momento de la donación ascendieron a $300,000.00. Surge de los Exhibits 9 y 10 de la parte demandante, Informe Pericial del Lcdo. Quiñones, Anejo 19.

69)    En 1966, la codemandada Clara Concepción, recibió una donación del causante que consistió en una transferencia en efectivo de $100,000.00, según surge del testimonio del CPA Quiñones y el Anejo 19 de su Informe.

## vi.    EL CURSO DE ACTUACIONES DE LAS CODEMANDADAS

70)    Las codemandadas no han inventariado, colacionado, particionado ni adjudicado los bienes del caudal relicto según ordena la ley. Este Tribunal no sale de su asombro en cuanto a que las partes codemandadas negaron estos hechos y no se allanaron a efectuar lo que ordena el Código Civil de Puerto Rico en cuanto a caudales relictos.

71)   Con excepción de los legados, los demandantes de epígrafe no han recibido nada del caudal relicto del causante.

72)   Para la fecha del deceso del causante, las codemandadas habían sustraído todos los bienes del caudal transfiriéndolos a cuentas de inversiones y bancarias a sus nombres. Surge de los Exhibits 9 y 10 de la parte demandante.

73)   Con sus actos, las demandadas privaron a la parte demandante de su participación en el caudal relicto de su padre y de los frutos correspondientes. Las codemandadas se confabularon y conspiraron para despojar al causante de sus bienes privativos antes de su muerte y pretendieron defraudar a los demandantes.

74)   Las cantidades y el valor de los bienes que se apropiaron las codemandadas exceden la cantidad que, por libre disposición, podía transferirse del caudal relicto sin afectar los derechos de los co-demandantes (herederos forzosos) y la última voluntad del testador.

75)   Las codemandadas negaron las alegaciones de la demanda; e hicieron creer al Tribunal que tenían defensas válidas y testimonio creíble para negar la procedencia de las operaciones sobre el caudal relicto y la reclamación de los codemandantes. Para más, obstruyeron el descubrimiento de prueba; dilataron el proceso insistiendo en un perito, e informe pericial, que nunca presentaron. Además, asumieron una actitud retante durante el juicio, cuando el Tribunal insistió en prueba pertinente.

76)   La parte demandante presentó prueba pericial, mediante el testimonio y el informe del CPA Quiñones. El informe del CPA Quiñones resume las transferencias efectuadas en este caso y computa a su vez las donaciones efectuadas en vida por el causante estableciendo lo que le corresponde y le deben las codemandadas a los demandantes:

Nylsa Lyon Ríos :

- Total participación en caudal - $1,885,000.00

- Más Frutos o Intereses al 5% hasta el 31 de agosto de 2010 - $722,497.00

León Lyon Rejincos:

- Total participación en caudal - $754,000.00

- Más Frutos o Intereses al 5% hasta el 31 de agosto de 2010 - $288,998.00

viii.   LOS DAÑOS Y PERJUICIOS DE LA DEMANDANTE NILSA LYON

77)     La codemandante Nilsa Lyon Ríos testificó sobre su sufrimiento, angustias mentales, profunda tristeza, falta de sueño y depresión, permanecer en estado de "desheredación de facto".   Su expresión, aspecto y comportamiento ("demeanor") demuestra una persona que ha sufrido considerablemente.

78)     La codemandante Nilsa Lyon Ríos declaró que ha tenido que vivir una vida azarosa y de estrecheces con recursos muy limitados los cuales sólo alcanzan para el sustento básico de vida.

79)     Aún cuando ocasionalmente se desempeñaba como asistente legal, la condición de salud de la demandante Nilsa Lyon no le permite trabajar una jornada completa.   La ausencia de los ingresos de su legítima porción del caudal que le fuera usurpada por las codemandadas, la ha dejado en virtual estado de pobreza teniendo que recurrir a dádivas de familiares y amigos.   Tal es la condición de la codemandante Nilsa Lyon que tuvo que desprenderse de su residencia, entre otros bienes.

80)     El codemandante León Lyon Rejincos no compareció a juicio por razón de enfermedad. Por tanto, no desfiló prueba de daños y perjuicios físicos, emocionales y/o económicos.

## III. CONCLUSIONES DE DERECHO Y ANALISIS

### A.   *LAS CAPITULACIONES MATRIMONIALES SON LA LEY ENTRE LAS PARTES*

Es un hecho probado e irrefutable que el causante recidía en Puerto Rico antes de 1957, fecha en que suscribió escritura de capitulaciones matrimoniales con la codemandada Clara Concepción. Es igualmente un hecho probado que el causante era un hombre acaudalado para la fecha en que se casó con la codemandada Clara Concepción. Por otro lado, ésta carecía de caudal pues era entonces una madre soltera con dos hijos menores de edad y se sostenía con el ingreso devengado como secretaria en una agencia gubernamental de la cual eventualmente se pensionó por incapacidad.

Dispone el Artículo 1267 de nuestro Código Civil, 31 L.P.R.A. § 3551, "[l]os que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, estipulando las condiciones de la sociedad conyugal relativamente a los bienes presentes y futuros, sin otras limitaciones que las señaladas en este título". El citado artículo continua disponiendo que "a falta de contrato sobre los bienes, se entenderá el matrimonio contraído bajo el régimen de la sociedad legal de gananciales". Por otra parte, el Artículo 1271 del Código Civil establece que cualquier alteración a las

15

capitulaciones matrimoniales deberá tener lugar <u>antes</u> de celebrarse el matrimonio y con la asistencia y concurso de las personas que intervinieron como otorgantes. Véase 31 L.P.R.A. § 3555.

La validez de las capitulaciones matrimoniales depende de dos requisitos esenciales, a saber: (1) que el acuerdo se plasme en escritura pública; y (2) y que sea ejecutado previo a la celebración del matrimonio. Véase *Maldonado v. Cruz Dávila*, 161 D.P.R. 1 (2004); *Gil Enseñat v. Marini Morán*, 167 D.P.R. 553 (2006).

La exigencia de que las capitulaciones sean otorgadas antes de contraído el matrimonio es parte de una máxima que ha sido denominada como "la doctrina de inmutabilidad de las capitulaciones". Dicho principio a su vez conlleva que "si existen [capitulaciones matrimoniales], a ella han de amoldarse los cónyuges y los terceros; no cabe después del matrimonio cambio ni modificación alguna, o, lo que es lo mismo no pueden esos cambios tener eficacia, pues las capitulaciones han de subsistir tales como fueron hechas antes del matrimonio." *Vilariño Martínez v. Registrador*, 88 D.P.R. 288, 293 (1963). Los futuros cónyuges pueden optar por diversos regímenes económicos reconocidos por nuestro ordenamiento jurídico, tales como: (a) la total separación de bienes; (b) la separación de bienes, pero con una participación en las ganancias; (c) la sociedad legal de gananciales;   (d) renunciar al régimen legal de gananciales; o (e) cualquier otro régimen que combine estas posibilidades, siempre que no infrinja la ley, la moral o las buenas costumbres. *Domínguez Maldonado v. E.L.A.*, 137 D.P.R. 954 (1995); *Umpierre v. Torres Díaz*, 114 D.P.R. 449 (1983). En este caso, las capitulaciones matrimoniales contienen una renuncia expresa al régimen de ganciales.

En *Domínguez Maldonado*, el Tribunal expresó que "[n]o basta una mera alegación de la peticionaria de que existe una comunidad de bienes. La peticionaria tiene que demostrar que, a pesar de no existir una sociedad de gananciales, ella trabajó, brindó servicios, y se esforzó durante el matrimonio para acrecentar el capital privativo de su cónyuge". *Id*. a la pág. núm. 968. Casi una década más tarde, en *Maldonado v. Cruz*, 161 D.P.R. 1, 26 (2004), el Tribunal Supremo reiteró que, independientemente del hecho (o no) de que los esposos hayan realizado actos de administración y esfuerzo común, el tribunal estaría impedido de reconocer la existencia de una sociedad legal de gananciales dado que los esposos habían rechazado dicho régimen y habían optado por acogerse al régimen de separación de bienes. <u>Id</u>. 161 D.P.R. 1, 26 (2004).

Finalmente, en cuanto al tema de los frutos de bienes privativos, el Tribunal Supremo concluyó que "no era necesario excluir de forma expresa el incremento o aumento de valor de los bienes privativos del régimen económico seleccionado para que no se considerasen de naturaleza ganancial, toda vez que los derechos sobre los bienes privativos ya se habían regulado - y desvinculado de los intereses de la sociedad conyugal - mediante las otras disposiciones de la escritura." *Guadalupe Solís v. González Durieux*, 2007 TSPR 215, res. el 10 de diciembre de 2007.

De conformidad con todo lo anterior, y particularmente según expresado en *Domínguez Maldonado v. E.L.A.*, supra, el peso de la prueba para establecer la comunidad de bienes sobre determinado bien recae en la parte que pretende probar su existencia. Véase *Caraballo Ramírez v. Acosta*, supra, escolios [3] y [7], y Reglas 110 y 302 de las nuevas Reglas de Evidencia de 2010. Este Tribunal siguió bien de cerca y de la forma más desapasionada el testimonio y la prueba desfilada. Si algo se estableció por la prueba creíble y no contradicha es que el causante no dio espacio ni la codemandada Concepción hizo gestión para crear comunidad de bienes sobre bien alguno.

El matrimonio entre el causante y la codemandada Clara Concepción estuvo regido por la referida escritura de capitulaciones matrimoniales mediante las cuales las partes rechazaron, de manera expresa la creación de una sociedad legal de gananciales entre ellos. De esta manera, se activó el principio de inmutabilidad de las capitulaciones matrimoniales. *Vilariño Martínez v. Registrador*, supra; *Domínguez Maldonado v. E.L.A.*, supra; *Umpierre v. Torres Díaz*, supra.; *Maldonado v. Cruz*, supra; *Guadalupe Solís v. González Durieux*, supra. De conformidad con dicho principio y dado que los esposos rechazaron dicho régimen, este Tribunal está impedido de reconocer la existencia de una sociedad legal de gananciales.

En lo relacionado al producto proveniente de los bienes adquiridos por cada una de las partes antes de casarse, es decir, los frutos de los bienes privativos, se concluye que no era necesario excluir de forma expresa el incremento o aumento de valor de los bienes privativos ya que la separación de los bienes adquiridos por las partes antes de contraer matrimonio está dada, aún en ausencia de capitulaciones matrimoniales. En todo caso, al descartar la existencia de una sociedad e incluir el listado de los bienes privativos, las partes querían separar algo más que los bienes; ese algo mas son los frutos o incrementos en valor procedentes de los bienes privativos de cada cónyuge. El

comportamiento del causante así lo reitera según el propio testimonio de las partes que bien le conocieron.

Cabe señalar que toda donación entre cónyuges durante el matrimonio es nula de conformidad con el Artículo 1286 del Código Civil, 31 L.P.R.A. sec. 3588. A la codemandada Clara Concepción no le corresponde partida alguna del caudal del causante por razón de las referidas capitulaciones. Lo que tomó del caudal del causante tendrá que regresarlo.

## B. LA LEGÍTIMA Y LAS DONACIONES

Es un hecho probado que los demandantes eran y son acreedores a sus "legítimas" y porciones testadas. Es incomprensible la temeridad de los codemandados en negarlo y obligar un juicio para luego ni siquiera presentar la prueba pericial anunciada.

El artículo 735 del Código Civil, 31 L.P.R.A. sec. 2361, nos define la legítima como "...la porción de bienes de que el testador no puede disponer por haberla reservado la ley a determinados herederos, llamados por esto herederos forzosos." Igual conocemos que de conformidad con el artículo 736 del Código Civil,

> "Son herederos forzosos:
> (1)    Los hijos y descendientes legítimos respecto de sus padres y ascendientes legítimos [...]
> (2)    [...]
> (3)    El viudo o viuda en la forma o medida que establecen las secs. 2411, 2412, 2413, 2414 de este título." , 31 L.P.R.A. sec. 2362

Cuanto menos los codemandados tenían que reconcer que "Constituyen la legítima de los hijos y descendientes legítimos las dos terceras partes del haber hereditario del padre y de la madre. [...]", artículo 737 del Código Civil, 31 L.P.R.A. sec. 2363. Y previo los procesos de ley correspondientes tenían que  entregarla a los demandantes o pagarla.

Véase E. González Tejera, Derecho de Sucesiones: La Sucesión Testamentaria, T. 2, Editorial Universidad de Puerto Rico, San Juan, 2002, p. 455. "Como regla general, el Derecho Civil protege la libertad dispositiva sobre cuanto posee un titular. Pero, en atención a determinados intereses, el legislador limita dicha libertad y le prohíbe ciertos actos dispositivos, en especial que realice en fraude de acreedores y los que resulten en perjuicio de la legítima, de modo que se asegure de que una porción de sus bienes se reserve a sus parientes próximos. Protegidos éstos, entonces, le permite disponer del

resto de sus bienes dentro del amplio ámbito de su libertad dispositiva." Id., a las págs. 455-456.

El Artículo 743 del Código Civil protege al heredero forzoso declarando que: "a quien el testador haya dejado **por cualquier título** menos de la legítima que le corresponda, podrá **pedir el complemento de la misma**", 31 L.P.R.A. sec. 2369. [Énfasis y suplido nuestro]. Para ello, el Código Civil faculta al heredero lesionado a traer a colación todas las donaciones hechas en vida por el testador. Así pues y para efectos del cómputo del caudal y su distribución, el Artículo 747 del Código Civil claramente establece lo siguiente: "[l]as donaciones hechas a extraños se imputarán a la parte libre de que el testador hubiese podido disponer por su última voluntad".

Por otra parte, "el heredero forzoso con otros que también lo sean a una sucesión, debera traer a la masa hereditaria los bienes o valores que hubiese recibido del causante de la herencia, en vida de éste, por dote donación, u otro título lucrativo, para computarlo en la regulacion de las legítimas y en la cuenta de partición", Artículo 989 del Códigio Civil, 31 L.P.R.A. sec. 2841. En otras palabras, la ley prohibe hacer "fiesta" con los bienes del caudal a los que tengan su posesión.

Como lesionados, los codemandantes tienen facultad bajo el Código Civil, para traer a colación de todas las donaciones hechas en vida por el testador. La doctrina define la colación como la operación contador practicada como incidente particional que consiste en sumarle a la herencia el valor de lo transmitido gratuitamente por el causante durante su vida a sus herederos legitimarios e imputarle dichas liberalidades a la porción sucesoria de los herederos que las recibieron, de forma que las tomen de menos de los bienes que el causante les dejo a su fallecimiento. M. Albaladejo, *Curso de Derecho Civil*, Barcelona, Ed. Bosch, 1982, a la pág. 186. Véase Cf. Rodríguez v. Sucn. Rodríguez Montalvo, 126 D.P.R. 284 (1990).

El fin de la colación es procurar entre los herederos la igualdad en la distribución por presumirse--en ausencia de manifestación en contrario--que el causante no quiso la desigualdad de trato. J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, Vol. 3, 1977, a la pág. 643. Según Gonzalez Tejera, la premisa que justifica el instituto es la atribución como anticipo de herencia de lo recibido por los legitimarios del causante a titulo gratuito durante su vida. González Tejera, *op. cit.*, Vol. I, a la pág. 379. De nuevo la ley no

favorece que un heredero, con posesión de bienes del caudal, los disipe en perjuicio de sus coherederos.

Por otro lado, la computación permite "reconstruir hipotéticamente el patrimonio del causante" añadiéndole al caudal relicto neto el valor de **todas las donaciones no excluidas por ley** con el fin de calcular las legítimas de los herederos forzosos. González Tejera, *op. cit.*, Vol. I, a la pág. 403. Esta operación permite determinar a qué porción de la herencia deben cargarse las donaciones y legados y reducirlos en los casos en que resulten inoficiosos. *Id.*, a la pág. 405.

Tomada en su totalidad, la prueba presentada demostró que Ixia Mercado no tenía la capacidad económica para pagar por las acciones corporativas de la Armería, y aún ante la evidencia suministrada por la Armería quien pasó varios años como parte del pleito, la codemandada Ixia Mercado no aportó prueba alguna demostrativa de que hubiese pagado por las acciones. En vista de que la Sra. Mercado no pagó por las susodichas acciones corporativas, el traspaso de las acciones y por tanto, del negocio a su nombre constituye una donación inoficiosa de $400,000.00. Con relación a la Armería, se debe señalar que el causante logró formar una colección privada de armas (algunas del período nazi) las cuáles eran custodiadas en la Armería, pero que sin embargo, permanecieron en posesión de la codemandada Mercado cuando ésta tomó control de la corporación en 1994. No se presentó prueba sobre el valor de las armas.

En relación con el inmueble donde ubica la Armería Metropolitana, el mismo fue cedido por el causante a la codemandada Tamara Lyon el 13 de julio de 1992. A su vez, la codemandada Ixia Mercado advino dueña del edificio de la Armería a partir del año 1995. Resulta inverosímil que la codemandada Ixia Mercado, según ella sostuvo inicialmente, haya podido comprar las acciones de la Armería para finales del 1994 y seguidamente, haya comprado el inmueble de la Armería en 1995. La prueba testifical y documental establece que no contaba con activos o recursos económicos para sustentar dicha alegación. Tampoco presentó prueba a esos efectos. Por tanto, el inmueble fue donado y/o tramitado utilizando los bienes y dineros de la Armería misma al igual que ocurrió con las acciones de dicha entidad. Habiéndose establecido que la Armería pertenecía al causante, el valor del inmueble debe computarse como parte de la masa hereditaria.

Por otra parte, surge del Informe del licenciado Quiñones que la codemandada Ixia Mercado recibió otras donaciones del causante como, por ejemplo, un cheque de

$50,000.00 para liquidar su extinta sociedad legal de gananciales con Luis Blay. Además, se apropió de un certificado de depósito de Eurobank por la cantidad de $183,471.00. El monto total de los regalos, transferencias, cesiones y/o donaciones, todas inoficiosas, efectuadas a nombre de Ixia Mercado sumó la cantidad de $3,823,693.00, sin tomar en consideración los frutos. Dicho monto es la suma de las siguientes cantidades:

a. $1,071,717– transferencia del año 1996;

b. $1,893,505 – transferencia de mayo 1999

c. $400,000 – acciones de la Armería

d. $225,000 – inmueble de la Armería

e. $183,471 – CD de Eurobank

f. $50,000.00 – liquidación de Sociedad Legal de Gananciales.

Por otro lado, tenemos muy en cuenta que "[s]erá nula toda donación hecha durante el matrimonio por uno de los cónyuges a los hijos que el otro cónyuge tenga de diverso matrimonio, o a las personas de quienes sea heredero presunto al tiempo de la donación." Artículo 1287 del Código Civil, 31 L.P.R.A. § 3589. Por lo tanto, todo lo que tomó del causante y el caudal la codemandada Ixia Mercado (sin mediar contraprestación de igual valor) regresa al caudal con sus frutos.

El testimonio y la prueba, y en particular el ejercicio del CPA Quiñones, establece con certeza que las cantidades y el valor de los bienes de que se apropiaron las codemandadas, exceden la cantidad que, por libre disposición, podía transferírseles del caudal relicto, sin afectar los derechos de los co-demandantes (herederos forzosos) y la última voluntad del testador según su testamento, Exhíbits 9 y 10 de la parte demandante. Por tanto, los bienes sustraídos del caudal por las codemandadas revierten al caudal hereditario para ser distribuidos de acuerdo al testamento. Esta circunstancia conlleva un ejercicio de colación en cuanto a las donaciones realizadas a los coherederos y de computación en cuanto al resto de las donaciones efectuadas por el causante. Véanse Exhíbits 9 y 10 de la parte demandante.

La codemandante, Nilsa Lyon, es heredera en todos y cada uno de los tercios en los que se divide el caudal relicto para efectos de su división. Exh. Est. 19. El codemandante, Leon hijo, ha sido llamado a participar del tercio de legítima estricta. Id. De conformidad con los hechos estipulados por las partes en preparación para el juicio y otros hechos establecidos, procede que se regrese al caudal para su colación (en cuanto

a las coherederos demandados se refiere) y a computación (en cuanto a la codemandada Ixia Mercado) todos los bienes que fueron removidos del caudal en los años 1992, 1996 y 1999, así como todas las donaciones efectuadas a nombre de todas las partes envueltas en el caso.

A la luz de todo lo anterior y de conformidad con en el informe pericial del CPA Quiñones, las demandadas deben devolver al caudal todas las transferencias antes descritas, incluyendo sus frutos, y restituir a los codemandantes las partidas que le corresponden en derecho.

## C.   LA ACEPTACION Y ADMINISTRACION DE BIENES DE LA HERENCIA Y LAS PENAS RELACIONADAS

De conformidad con el Código Civil la aceptación de la herencia simple y pura puede ser expresa o tácita. La "expresa" es la que se hace en documento público o privado, mientras que la "tácita" ocurre mediante actos que suponen necesariamente la voluntad de aceptar, o que no habría derecho a ejecutar sino con la cualidad de heredero. Artículo 953 del Código Civil, 31 L.P.R.A. § 2781. Seguidamente, el artículo 956 dispone que "[l]os herederos que hayan sustraído u ocultado algunos efectos de la herencia, pierden la facultad de renunciarla, y quedan con el carácter de herederos puros y simples, sin perjuicio de las penas en que hayan podido incurrir." Por la aceptación pura y simple, "[...] el heredero quedará responsable de todas las cargas de la herencia, no sólo con los bienes de ésta, sino también con los suyos propios", Art. 957 del Código Civil, 31 L.P.R.A. § 2785. Los efectos de la aceptación son retroactivos al momento de la muerte de la persona a quien se hereda. Véase Artículo 944 del Código Civil, 31 L.P.R.A. sec. 2772. El gravamen de la ley es claro. El heredero que aproveche su posición para tomar, sustraer y/o aprovechar bienes del caudal, le responde al heredero perjudicado con todos sus bienes. De nuevo, la ley no mira con buenos ojos al que hace "Fiesta" con los bienes del coheredero.

Por razón de que entraron en posesión y usufructuaron el caudal ilícitamente, las codemandadas deberán responder con sus bienes personales de la lesión y daños sufridos por los codemandantes. Véase los artículos 953, 956, 957 del Código Civil; 31 L.P.R.A. §§ 2781, 2784 y 2785.

## D.   LA ACCION DE PARTICION DE HERENCIA   (ACTIO FAMILIAE ERCISCUNDAE)   Y LA OBLIGACION DE POSEEDORES DE BIENES DEL CAUDAL

Por otra parte, "[t]odo coheredero que tenga la libre administración y disposición de sus bienes, podrá pedir en cualquier tiempo la partición de la herencia" Artículo 2872 del Código Civil, 31 L.P.R.A. § 2872. Además, "ningún coheredero podrá ser obligado a permanecer en la indivisión de la herencia, a menos que el testador prohíba expresamente la división. Esta prohibición no alcanzara a los bienes que constituyen la legítima de los herederos." Artículo 2872 del Código Civil, 31 L.P.R.A. § 2871.

El Artículo 582 del Código de Enjuiciamiento Civil, 32 L.P.R.A. § 2442, requiere que se cumpla todo lo que hubiere dispuesto el testador sobre la administración de su caudal hasta entregarlo a los herederos. Dispone a su vez el artículo que cuando el testador nada haya dispuesto sobre dicho tema, "[...]la administración de las testamentarías se ajustará a las reglas establecidas por las secs. 2241 et seq. de este título". El artículo 554 del Código de Enjuiciamiento Civil, en resumidas cuentas establece la responsabilidad de aquellas personas en cuya compañía vivía el finado con relación a la administración del caudal. En lo ahora pertinente, la misma dispone que "[...] el dueño de la habitación en que ocurra el fallecimiento o cualquier otra persona en cuya compañía haya vivido el finado tendrá el deber de ponerlo en conocimiento del tribunal más próximo, manifestando lo que supiere y toda persona que dejare de cumplir este deber será responsable de las pérdidas o extravíos que por falta de esta diligencia se ocasionen a los bienes del finado." 32 L.P.R.A. § 2331.

Debe tenerse presente que "las obligaciones derivadas de la ley no se presumen" y "sólo son exigibles las expresamente determinadas en este título [31 L.P.R.A.] o en leyes especiales, y se regirán por los preceptos de la ley que los hubiere establecido, y en lo que ésta no hubiere previsto, por las disposiciones del presente subtítulo [Subtítulo 4. Obligaciones y Contratos]". Con relación a las obligaciones nacidas de los delitos o faltas, dispone el Código Civil que aquellos que, en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, quedan sujetos a la indemnización de los daños y perjuicios causados". Artículo 1054 del Código, 31 L.P.R.A. § 3018. A su vez, el artículo 1053 explica que "[i]ncurren en mora los obligados a entregar o a hacer alguna cosa desde que el acreedor les exija judicialmente o extrajudicialmente el cumplimiento de su obligación" y también expresa que no será necesaria la intimación del acreedor

para que exista la mora cuando, entre otros supuestos, la obligación o la ley lo declaren así expresamente. Id.

## E. EL FRAUDE Y LA SIMULACION

El derecho de contratos en nuestro ordenamiento jurídico está asentado en la premisa inexorable de que no existe contrato sin causa o cuando la causa es ilícita. Art. 1227 del Código Civil; *Julsrud v. Peche de P. R., Inc.*, 115 D.P.R. 18 (1983); *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 418 (1978); *Gual v. Sucn. Sobrinos de A. Ribot*, 88 D.P.R. 159, 162--164 (1963); *Hernandez Usera v. Srio. de Hacienda*, 86 D.P.R. 13, 18--25 (1962); *Serra v. Salesian Society*, 84 D.P.R. 322, 335 (1961); Rubio Sacarello v. Roig, 84 D.P.R. 344, 350--353 (1962). Como corolario, la ilicitud de la causa, conlleva la nulidad Arts. 1257 y 1258 del Código Civil, 31 L.P.R.A. secs. 3516 y 3517.

Los negocios en fraude de herederos están comprendidos en las doctrinas de nulidad por causa torpe o ilícita, sin perjuicio de la acción que pueda tener un inocente contra los culpables de la ilicitud. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985). Declarada la nulidad de una obligación, los contratantes deben restituirse recíprocamente las cosas que hubiesen sido materia del contrato, con sus frutos, y el precio con los intereses, salvo lo que se dispone en las secciones siguientes. Art. 1255 del Código Civil, 31 L.P.R.A. § 3514. "La rescisión obliga a la devolución de las cosas que fueron objeto del contrato con sus frutos y del precio con sus intereses; en consecuencia sólo podrá llevarse a efecto cuando el que la haya pretendido pueda devolver aquello a que por su parte estuviese obligado. Tampoco tendrá lugar la rescisión cuando las cosas objeto del contrato se hallaren legalmente en poder de terceras personas que no hubiesen procedido de mala fe. En este caso podrá reclamarse la indemnización de perjuicios al causante de la lesión." Art. 1247 del Código Civil, 31 L.P.R.A. § 3496.

El heredero en posesión que vende bienes del caudal sin previa colación partición y autorización del tribunal o por unanimidad de los herederos, como lo hicieron los codemandados, responden de los daños que su conducta cause a los interesados, aunque los terceros adquirentes están al margen de las acciones que los interesados puedan incoar (excepto que sean partícipes de la conducta indebida del administrador). Véase Sánchez Rodríguez v. López Jiménez, supra, citando a E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. I, pág. 192.

24

Las codemandadas encontraron al causante multimillonario y, en la década de los años 90, transfirieron los bienes del causante al punto de que este murió sin nada a su haber. Recordamos que el Código Civil dispone que a nadie le es permitido donar más allá de lo que debe reservar por legítima a sus herederos forzosos. Cf. Arts. 735 y 734 del Código Civil, 31 L.P.R.A. sec. 2361 y 2369. Igual no puede donar sin reservar para sus propias necesidades. Art. 576 del Código Civil, 31 L.P.R.A. sec.2021. Las codemandadas se negaron a realizar las operaciones que la ley exige con relación a caudales relictos. Sus acciones y omisiones relativas al caudal fueron simuladas y fraudulentas. Aún cuando el fraude no se presume, tampoco hay que demostrarlo con prueba concluyente o con certeza matemática, prueba que es rara vez posible. *García López v. Méndez García*, 102 D.P.R. 383 (1974). Una vez levantada la inferencia de fraude por la parte demandante-fundada en los hechos probados se transfirió los codemandados el peso de rebatir tal inferencia. De no rebatirla el demandado, queda establecido el fraude. *Id*

En *García v. Aponte*, supra, el Tribunal Supremo discutió el estado de derecho aplicable relacionado a la simulación:

> Observamos, pues, que el fraude realmente adquiere categoría autónoma cuando consiste en un negocio real, no ficticio, dirigido a perjudicar a terceros. Por el contrario, en el supuesto de una compraventa simulada cuya intención es perjudicar a los acreedores o herederos de uno de los contratantes --haciéndoles creer que el activo de su deudor es menor del que realmente es o tratando de beneficiar a un heredero en perjuicio de los demás-- el negocio simulado es falso. Nuestro ordenamiento jurídico distingue entre la simulación relativa y absoluta. La distinción es importante por las consecuencias jurídicas que acarrea. Veamos. La simulación relativa tiene lugar cuando bajo la falsa apariencia se encubre un negocio realmente querido que los contratantes desean sustraer de la curiosidad e indiscreción de terceros. El caso típico de este tipo de simulación --cuya validez examinamos en *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9 (1982)-- es la compraventa con una donación subyacente. En este tipo de casos, hemos provisto para que, cumplidos unos requisitos, el contrato simulado quede eliminado y cobre vigencia el verdadero y disimulado. Por su parte, la simulación absoluta se produce cuando el acto jurídico nada tiene de real y meramente crea la apariencia de un negocio. En esta, el contrato --por carecer de causa-- es nulo, inexistente y no produce efectos jurídicos. *Reyes v. Jusino*, 116 D.P.R. 275 (1985); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172 (1985); *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13 (1962).

Para probar la existencia de un acto simulado cobran valor excepcional los medios probatorios indirectos, a saber, los testigos y las presunciones. A través de estos el juzgador puede llegar a determinar, con certeza razonable, la ocurrencia de la simulación. En estos casos se admite con valor inusual la prueba de presunciones y por ellas se puede llegar a evidenciar la ficción de un negocio, incluso aunque conste en documento público. A través de estos, el juzgador puede llegar a determinar, con certeza razonable, la ocurrencia

de la simulación. Diez Duarte, op. cit., Págs. 187--188; Cifuentes, op. cit., Págs. 533--534. A tal efecto, cuando la alegada simulación afecta la causa del contrato, el demandante debe probar que no medió precio ni su equivalente, o que bajo la causa falsa subyace otra verdadera y lícita que hace válido el negocio. Aunque nuestro Código Civil presume que todo contrato tiene causa y que esta es lícita, esta presunción puede ser destruida. El Tribunal Supremo ha resuelto que se entenderá que no medio precio ni su equivalente cuando en la escritura pública el notario no da fe de su entrega, o si confesando los contratantes haberse este verificado con anterioridad, no se justificare el hecho. *Ledesma Marrero v. Ledesma Marrero*, 84 D.P.R. 167 (1961).

Ciertamente, los demandantes dejaron establecido que no medió contraprestación ni equivalente en ninguna de las transacciones que las codemandadas realizaron sobre el caudal. Las codemandadas tuvieron la oportunidad de presentar prueba creíble al efecto. Debemos concluir que carecen de tal prueba.

**F.    TEMERIDAD**

La totalidad de la prueba creíble presentada en sala refleja que las demandadas actuaron de común acuerdo, conspiraron y, de manera fraudulenta y dolosa, se apropiaron del caudal del causante sin el aval o consentimiento de éste. Las codemandadas se fueron apropiando ilícitamente del caudal durante los últimos años de vida del causante, y lo ostentaron y disfrutaron por más de 10 años, y hasta esta fecha, privando a los codemandantes de sus derechos hereditarios. Es decir, las codemandadas "desheredaron" de facto a los codemandantes sin aparente remordimiento ni contricción alguna. Las codemandadas le responden a los codemandantes por el caudal, sus frutos y por los daños y perjucios causados.

Luego de casi 7 años de litigio intenso ante este Tribunal, la prueba (casi sin oposición válida) claramente estableció que las codemandadas no tienen justificación para negar gran parte de las aseveraciones en la demanda. Igual no tenían justificación para rehusar estipular lo que desfiló en sala como prueba incontrovertida. Particularmente hiere el hecho de que los codemandados dilataron los procedimientos de descubrimiento de prueba y la celebración de la conferencia y el juicio basándose principalmente en la supuesta importancia de su propia prueba pericial. Las codemandadas, sin embargo, no presentaron prueba pericial alguna y tiempo de sobra tuvieron para ello.

Es evidente que este caso pudo haber sido resuelto mucho antes de no haber sido por las estrategias dilatorias y obstinadas deplegadas por las codemandadas. Por tanto, el Tribunal resuelve que las codemandadas fueron temerarias dentro del ámbito de la Regla 44.1 (d) de Procedimiento Civil vigentes, 32 L.P.R.A. Ap. V.

## G.  INTERESES POR MORA

Aplica el cómputo de intereses por mora en este caso. La usurpación y usufructo de los bienes del caudal, en detrimento de los herederos es contrario a los Artículos 956 y 957 del Código Civil, 31 L.P.R.A. §§ 2784 y 2785 y el Artículo 554 del Código de Enjuiciamiento Civil, 32 L.P.R.A. § 2331. Se trata de que la ley obliga al heredero en posesión de bienes del caudal a someterlos de inmediato al proceso de colación, partición y liquidación particularmente cuando se les ha requerido. El Artículo 1053 del Código Civil dispone que incurre en mora el obligado cuando se le requiere judicial o extrajudicialmente y la ley dispone para ello. 31 L.P.R.A. §3017. El interés por mora, según el Código Civil, sobre la obligación de ley insatisfecha es 6%. Art.1061 del Código Civil, 31 L.P.R.A. § 3025.

### SENTENCIA

Ante la ausencia de prueba sobre colación, partición y liquidación del caudal relicto del causante León Lyon Martín t/c/p León Lyon y visto que las partes demandadas no presentaron prueba creíble alguna que dispute la sometida por la parte demandante; se dispone para la colación, partición y liquidación de caudal relicto del causante León Lyon Martín, según el informe y testimonio incontrovertido del C.P.A. Reynaldo Quiñones Marques.

En lo atinente a la liquidación del caudal relicto del causante León Lyon Martín, se declara a los codemandantes herederos y acreedores de los bienes del referido caudal, y SE CONDENA a los co-demandados a entregar a los co-demandantes, Nilsa Lyon Ríos y León Lyon Rejincos, los bienes que los codemandados sustrajeron y usufructuaron del caudal, y/o el valor equivalente de los mismos, más sus frutos, para satisfacer la suma que por liquidación de **$2,607,497.00**, a Nilsa Lyon Ríos, y **$1,042,998.00** a León Lyon Rejincos al 31 de agosto de 2010. Los bienes del caudal o sumas adeudadas al respecto acumulan $258.21 y $103.28 diario (perdiem), respectivamente, en frutos (a la tasa de interés de 5%) hasta la fecha de esta Sentencia.

A los bienes o sumas que le corresponden a la codemandante Nilsa Lyon Ríos, se le rebajará $45,500.00 por concepto de las dádivas (o adelantos) que le hiciera la

codemandada Tamara Lyon a la codemandante Nilsa Lyon. Tal crédito se aplicará luego de que la codemandante Nilsa Lyon Ríos recobre la totalidad de lo que le corresponde por concepto de la liquidación de su parte en el caudal y los frutos.

En vista de la prueba creíble no controvertida y los Artículos 953, 956, 957 del Código Civil, los co-demandados responden con todos sus bienes a los co-demandantes por la totalidad de los bienes, sumas y frutos antes indicados hasta total pago.  31 L.P.R.A. §§ 2781, 2784 y 2785.

SE CONDENA a los codemandados al pago de interés por temeridad y/o mora de 6% según los Artículos 1053 y 1061 del Código Civil, computados sobre el principal del caudal relicto adeudado, desde el fallecimiento del causante (12 de enero de 2003) hasta total pago de esta Sentencia. 31 L.P.R.A. §§ 3117, 3025. El cómputo de dichos intereses por mora equivale a $ 158,340 al año [=($1,885,000 + $754,000) x 0.06 anual] por un perídodo 7 años y 7 meses. Por tanto, el monto total de intereses por mora es $1,213,795.30 [=($158,340 x 7) + ($158,340/365) x 243 días hasta el 31 de agosto de 2010].

SE CONDENA a los co-demandados a pagar solidariamente a la co-demandantes Nilsa Lyon Ríos la suma de $250,000.00 por los daños y perjuicios que sus acciones u omisiones torticeras le irrogaron en forma de sufrimientos por la limitación económica, penurias y los daños emocionales a que le sometieron por espacio de 7 años y 7 meses, o sea, desde la muerte del causante.

SE CONDENA a cada uno de los co-demandados al pago de $5,000.00 por concepto de temeridad a ser pagados a cada uno de los codemandantes, Nilsa Lyon Ríos y León Lyon Rejincos.

SE IMPONE igual suma de $5,000.00 por concepto de temeridad, sobre cada uno de los codemandados, a pagarse al Estado dentro del término de 30 días de esta Sentencia.

Esta sentencia devengará intereses desde dictada, a la tasa de interés variable según publicados por el Comisionado de Instituciones Financiera.

Surge del expediente que el Tribunal concedió una solicitud de embargo preventivo el 28 de marzo de 2005, requiriendo, en aquel entonces, la prestación de una fianza de $1,900,000.00 a la parte demandante.  En esta etapa, el Tribunal reconsidere la imposición de fianza entonces solicitada y se deja sin efecto. Desfilada la prueba se

demostró que la parte demandante carecía entonces de los medios para prestar la fianza con tal de proceder con el embargo preventivo, mientras las partes codemandadas no aportaron prueba alguna relativa a la localización actual de los bienes del caudal. La parte demandante podrá proceder al embargo post sentencia de bienes de los codemandados sin necesidad de prestar fianza, *Feliciano v. Tolte* 134 D.P.R. 909, 912-913 (1993), ya los tengan consigo o terceros, desde dictada ésta, mediante el embargo de bienes muebles e inmuebles hasta satisfacer la totalidad de la Sentencia. La Secretaria del Tribunal expedirá el mandamiento correspondiente sin necesidad de ulterior orden.

En San Juan, Puerto Rico, hoy 20 de septiembre de 2010.

**REGISTRESE Y NOTIFIQUESE.**

CARLOS E. CARRASQUILLO SOTO
JUEZ SUPERIOR

CERTIFICO:
Lic. Rebecca Rivera Torres
Secretaria Regional

Por_____
Secretaria Auxiliar

29