ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
REGION JUDICIAL DE SAN JUAN

RECEIVED

OCT 17 2012

|  |  |
|---|---|
| LYON RIOS, NILSA<br><br>VS<br><br>SUCN LEON LYONS MARTIN | * CASO NUM. KLAN201001695<br>*<br>* SOBRE: APELACION CIVIL<br>*<br>*<br>*<br>*<br>*<br>* |

* * * * * * * * * * * * * * * * *

LIC. GERMAN J BRAU RAMIREZ
P O BOX 13399

SAN JUAN PR 00908


N O T I F I C A C I O N   D E   S E N T E N C I A

EL SECRETARIO QUE SUSCRIBE NOTIFICA A USTED QUE ESTE TRIBUNAL
HA DICTADO SENTENCIA EN EL CASO DE EPIGRAFE CON FECHA DE
11 DE OCTUBRE DE 2012 , QUE HA SIDO DEBIDAMENTE REGISTRADA Y
ARCHIVADA EN LOS AUTOS DE ESTE CASO, DONDE PODRA USTED ENTERARSE
DETALLADAMENTE DE LOS TERMINOS DE LA MISMA.

Y SIENDO  O  REPRESENTANDO USTED LA PARTE PERJUDICADA POR LA
SENTENCIA, DE LA CUAL  PUEDE  ESTABLECERSE  RECURSO DE APELACION,
DIRIJO A USTED ESTA NOTIFICACION, HABIENDO ARCHIVADO EN LOS AUTOS
DE ESTE CASO COPIA DE ELLA CON FECHA 16 DE OCTUBRE DE 2012 .

LIC. RAMON E DAPENA GUERRERO - PO BOX 13399
SAN JUAN PR 00908
LIC. JUAN R RIVERA FONT - AVE. GONZALEZ GIUSTI # 27, EDIF. TRES RIOS
OFICINA 602 GUAYNABO PR 00968
SECRETARIO GENERAL SAN JUAN (SUP) -
PO BOX 190887 SAN JUAN PR 00919
LIC. BEATRIZ M RAMIREZ ABARCA - EDIF CAPITAL CENTER TORRE SUR
239 AVE ARTERIAL HOSTOS, STE 1104 SAN JUAN PR 00918
LIC. REBBECCA RODRIGUEZ CRUZ - HATO REY CENTER
268 AVE PONCE DE LEON STE 1005 SAN JUAN PR 00918-2006
LIC. HAROLD D VICENTE GONZALEZ - PO BOX 11609
SAN JUAN PR 00910-1609
LIC. NELSON N. CORDOVA MORALES - PMB 255
220 AVE DOMENECH SAN JUAN PR 00918


SAN JUAN, PUERTO RICO, A 16 DE OCTUBRE DE 2012 .


DIMARIE ALICEA LOZADA
_____
SECRETARIO


CONT. CASO NUM. KLAN201001695

PAG. 02

```
POR:   MARIBEL CRUZ CENTENO
     _____
          SEC. AUX. TRIB.
```

OAT 704-1 - NOTIFICACION DE SENTENCIA-TA
WWW.RAMAJUDICIAL.PR
TELETRIBUNALES:(787)759-1888/ISLA 1-877-759-1888 LIBRE DE COSTO

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL IV

| | | |
|---|---|---|
| NILSA LYONS, LEÓN LYONS<br><br>Apelados<br><br>v.<br><br>SUCESIÓN DE LEÓN MARTÍN COMPUESTA POR TAMARA LYON CONCEPCIÓN, CLARA CONCEPCIÓN LAZZARINI (EN CUOTA VIUDAL USUFRUCTUARIA) IXIA MERCADO CONCEPCIÓN Y OTROS<br><br>Apelantes | KLAN201001695 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Sobre: Familia Erciscundae, Inventario, Avalúo, Adjudicación y Partición de Herencia<br><br>Caso Núm: K AC2005-5975 (508) |

Panel integrado por su presidente, el Juez Vizcarrondo Irizarry, la Juez Nieves Figueroa y el Juez Rivera Román.[1]

Nieves Figueroa, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 11 de octubre de 2012.

Comparecen ante nosotros las apelantes Tamara Lyon Concepción (en adelante "Tamara"), Ixia Mercado Concepción (en adelante "Ixia") y Clara Concepción Lazzarini (en adelante "Clara"), mediante recurso de *Apelación* presentado el 15 de noviembre de 2010. Nos solicitan la revocación de la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala de San Juan (en adelante "TPI"), el 20 de septiembre de 2010, notificada y archivada en autos el 22 de septiembre de 2010. Por medio de dicho dictamen, el TPI declaró Con Lugar la *Demanda* presentada por Nilsa Lyon Ríos (en adelante "Nilsa")

---

[1]Mediante Orden Administrativa TA-2012-232-se designó al Juez Rivera Román, para entender y votar del caso de epígrafe.





KLAN201001695                                                                2

y León Lyon Rejincos (en adelante "León, Jr.") contra Tamara, Ixia y Clara por privación de caudal relicto y sus frutos.

Examinados los escritos presentados por ambas partes y la transcripción estipulada de la prueba oral, así como el derecho aplicable, se modifica la *Sentencia* apelada y, así modificada, se confirma.

**I.**

El caso ante nuestra consideración tiene su origen con el fallecimiento del causante León Lyon Martin (en adelante "causante") el 17 de enero de 2003. El causante se casó tres veces y tuvo hijos en cada uno de sus matrimonios. Nilsa y León, Jr. son hermanos de padre entre sí e hijos, respectivamente, de los primeros dos matrimonios del causante. A la fecha de su muerte, el causante estaba casado con Clara, con quien procreó a Tamara. Ixia es la única parte en el pleito, con excepción de Clara, quien no es hija del causante. Por el contrario, ésta es hija del primer matrimonio de Clara, en el cual también se procreó a su hermano Jorge Mercado Concepción (en adelante "Jorge").

El 17 de diciembre de 1957 el causante y Clara otorgaron capitulaciones matrimoniales en las cuales se dispuso que no regiría una sociedad legal de gananciales. No obstante, no se estableció el régimen económico que, en efecto, regularía el matrimonio.[2] En las capitulaciones, el causante y Clara hicieron un inventario de sus bienes privativos: el causante aportó $58,000.00 consistentes en un inmueble ubicado en la calle McCleary, otro en la Calle Sol y acciones y cantidades de dinero, así como bienes muebles, que valoró en la

---

[2] Véase, Apéndice 27, págs. 189-194, del alegato de las apelantes.





cantidad de $5,000.00.   Por su parte, Clara tenía únicamente una opción de compra de una casa en Caparra Terrace valorada en $6,000.00.   Posteriormente, el 21 de diciembre de 1957, el causante y Clara contrajeron nupcias y permanecieron casados por más de cuarenta y cinco (45) años, hasta el fallecimiento del causante el 17 de enero de 2003.

El 8 de septiembre de 2003, los apelados Nilsa y León, Jr. presentaron una *Demanda* ante el TPI contra los otros miembros de la Sucesión de León Lyon Martin (en adelante "Sucesión"), a saber, Tamara, Ixia y Clara.   Alegaron que las apelantes se apropiaron ilegalmente del caudal del causante sustrayendo del mismo durante los últimos años de su vida, continuando poseyéndolo y explotándolo para su único beneficio.   Añadieron que dichos actos le causaron daños económicos serios y continuos a los apelados, quienes se han visto privados de los bienes y los frutos correspondientes que le pertenecen como herederos forzosos del causante.   Además, alegaron que de haber sido todos los bienes donados por el causante, dichas donaciones serían inoficiosas por lesionar la legítima correspondiente a los apelados como herederos forzosos.

La *Demanda* fue enmendada el 21 de enero de 2005, a los fines de traer como partes demandadas al fideicomiso Blay Mercado (en adelante "Fideicomiso") y a la Armería Metropolitana, Inc. (en adelante "Armería").   Los apelados plantearon que el causante efectuó transacciones simuladas en relación con las acciones y el inmueble del negocio de la Armería,   pasando parte del caudal a manos de Tamara e Ixia, y que dichas transacciones encubrían una donación nula.

Además, alegaron que Ixia utilizó fondos de la Sucesión para la compra de ciertas propiedades transferidas al fideicomiso.

Posteriormente, el 25 de agosto de 2006 los apelados presentaron una segunda enmienda a la *Demanda* a los fines de alegar que Clara no tenía derecho a participación ganancial alguna, ya que ésta se había casado con el causante con previa otorgación de capitulaciones matrimoniales en la cual se contemplaba la total separación de bienes. A su vez, los apelados solicitaron que se realizara el correspondiente inventario de los bienes del caudal relicto, y que se obligara a las apelantes a colacionar las partidas recibidas del caudal para posteriormente proceder a la partición del mismo de conformidad con el testamento ológrafo del causante.

En las contestaciones a dicha reclamación, las apelantes negaron haberse apropiado de bienes pertenecientes al caudal del causante. Por su parte, Clara, en su contestación a la segunda enmienda a la *Demanda*, alegó que en su matrimonio con el causante éstos se habían comportado como una sociedad legal de bienes gananciales, por lo que ésta tenía derecho a la cuota viudal usufructuaria. Argumentó, además, que había formalizado una comunidad de bienes con el causante. También presentó *Reconvención* en la que alegó no haber recibido dinero alguno correspondiente a su participación ganancial del caudal relicto del causante y a la cuota viudal usufructuaria, por lo que reclamó dichos pagos.

Por otro lado, Tamara presentó *Reconvención* en la que alegó ser acreedora de $70,000.00 que le había dado a Nilsa en calidad de préstamo y que ésta le adeudaba.

KLAN201001695                                                                              5

Trabada así la controversia, se celebró el juicio en su fondo el 24 y 25 de mayo de 2010.  El TPI escuchó los testimonios que a continuación se resumen, según constan en la transcripción de la prueba oral provista.

El primer testigo fue Nilsa.  Ésta declaró ser hija del causante y que para la fecha de su muerte residía en el estado de Florida.[3] Testificó haber nacido en Nueva York, pero haberse criado en San Juan, Puerto Rico, desde 1953, cuando tenía tres años.  Relató que vivía con su padre en una casa en Caparra Heights, en la Calle Escorial, y que para los años cincuenta sus padres se encontraban en proceso de divorcio.[4]  Añadió que su padre tenía dos propiedades: una en el Viejo San Juan en la calle Sol y otra en la calle McCleary.[5]

Posteriormente, Nilsa declaró que su padre se casó con Clara y éstos tuvieron a Tamara cuando ella tenía 8 años.  Los cuatro vivían en la casa de Caparra Heights.  Fue para esa época que su padre se hizo aficionado del deporte del tiro al blanco.  Inclusive, en una de las habitaciones de la casa, él hacía sus propias balas.[6]

De ahí se mudaron a la casa de dos pisos en Caparra Terrace que era propiedad de Clara, donde vivieron por aproximadamente tres años. En el segundo piso vivían los padres de Clara con Ixia y Jorge y en la primera planta vivían el causante, Clara, Tamara y Nilsa.  En la parte posterior de la casa el causante construyó una habitación en donde comenzó a vender y reparar armas.[7]





---

[3] Véase, pág. 18 del Tomo I de la transcripción de la prueba oral.
[4] Véase, págs. 22-24 del Tomo I de la transcripción de la prueba oral.
[5] Véase, pág. 25 del Tomo I de la transcripción de la prueba oral.
[6] Véase, págs. 26-27 del Tomo I de la transcripción de la prueba oral.
[7] Véase, págs. 27-28 del Tomo I de la transcripción de la prueba oral.

KLAN201001695                                                                    6

Posteriormente se mudaron a una casa que compró su padre en la Urbanización La Riviera, donde construyó una armería y lo convirtió en un negocio con vitrina, caja de registro, armas y balas (en adelante "Armería"). Nilsa testificó que León, Jr. y Jorge ambos trabajaron con su padre en la Armería. Luego se mudaron a la Avenida De Diego 799, donde todavía existe la estructura de dos plantas donde ubica actualmente la Armería. En el segundo nivel vivían el causante, Clara, Tamara y Nilsa.[8]

Nilsa relató que se graduó de la Facultad de Derecho de la Universidad de Puerto Rico en el 1974. En el 1973 se casó con el Sr. Scott Kalish con quien tuvo tres hijos.[9] Éstos se mudaron a la propiedad ubicada en la calle McCleary.[10] Declaró que "siempre lo consideré un regalo porque primeramente fue idea de mi padre... Segundo, la propiedad tenía un valor de aproximadamente $30,000.00, y yo creo que yo solamente le doy como $10,000.00 de ese cheque de la lotería."[11] Nilsa y su esposo hipotecaron dicha propiedad para poder hacerle unas mejoras y utilizar el balance para un depósito de un apartamento en el Condominio Prila, al cual posteriormente se mudarían.[12]

Para 1974 se mudaron a Boston para que su esposo hiciera una maestría y ella trabajó como abogada con el "Attorney General of Massachusetts". Luego regresaron a Puerto Rico a la propiedad de McCleary en el 1976. Alquilaron la propiedad de McCleary y después se

---

[8] Véase, págs. 28-30 del Tomo I de la transcripción de la prueba oral.
[9] Véase, págs. 30-31 del Tomo I de la transcripción de la prueba oral.
[10] Véase, pág. 32 del Tomo I de la transcripción de la prueba oral.
[11] Véase, págs. 34-35 del Tomo I de la transcripción de la prueba oral.
[12] Véase, pág. 35 del Tomo I de la transcripción de la prueba oral.

mudaron al Condominio Prila en el 1981.[13]  Mientras vivieron en Puerto Rico, trabajaron en el Bufete Kalish & Lyon.  En el 1985 se mudaron a Florida y vendieron la propiedad del Condominio Prila.  En el 1986 compraron una propiedad en Collins Heights en Florida.[14]  Más o menos para esa época el causante compró una casa en Coral Gables, Miami, para poder estar más cerca de su familia y vivía allí seis (6) meses al año.[15]

Cuando Nilsa se divorció en el 1995, su esposo le cedió su parte de la propiedad de Collins Heights para que ella fuera dueña exclusiva.[16]  Ese mismo año, el causante pagó a Nilsa el balance de la hipoteca y otorgaron una escritura de hipoteca donde Nilsa se obligaba a pagarles a su padre y a Clara la cantidad de $145,000.00.[17] Posteriormente en el 1998 el causante y Clara otorgaron una escritura donde liquidaban la hipoteca pendiente y le dejaban la propiedad a Nilsa en nuda propiedad, salda y libre de todo gravamen.[18]  Desde el momento en que el causante otorgó la escritura de hipoteca, éste se encargaba de realizar los pagos correspondientes a las contribuciones sobre la propiedad a nombre de Nilsa.[19]

El saldo de la hipoteca fue hecho con un cheque de una cuenta conjunta que tenía el causante con Nilsa.  Ésta declaró enterarse de la existencia de la cuenta al ver el cheque durante los trámites de descubrimiento de prueba en este caso.  Sin embargo, declaró que "sí sabía que [el causante' tenía muchas cuentas bancarias conjuntas [con





---

[13] Véase, págs. 36-38 del Tomo I de la transcripción de la prueba oral.
[14] Véase, págs. 39-41 del Tomo I de la transcripción de la prueba oral.
[15] Véase, pág. 42 del Tomo I de la transcripción de la prueba oral.
[16] Véase, pág. 47 del Tomo I de la transcripción de la prueba oral.
[17] Véase, pág. 50 del Tomo I de la transcripción de la prueba oral.
[18] Véase, pág. 59 del Tomo I de la transcripción de la prueba oral.
[19] Véase, pág. 63 del Tomo I de la transcripción de la prueba oral.

ella] porque [ella] le firmaba...la libreta de banco. Y [sabía] que tenía

cuentas de acciones conjuntas [con ella]". Testificó, además, no haber

tenido control alguno de dichas cuentas.[20]

Sobre las cuentas del causante Nilsa declaró lo siguiente:

> TESTIGO:
> Bueno, sé que tenía esa cuenta en particular que le indiqué, donde él me entrega la libreta de banco. Y sé que tenía una cuenta conjunta en Paine Weber conmigo.
> LCDO. RIVERA:
> Okey. ¿Cómo usted sabe que tenía una cuenta conjunta de Paine Weber con usted?
> TESTIGO:
> Bueno, primero él me lo dice, y luego cuando muere, durante el descubrimiento de prueba veo que el monto de la cuenta conjunta que tenía conmigo en Paine Weber excedía $600,000.00.
> LCDO. RIVERA:
> ¿Y cuándo vio esto?
> TESTIGO:
> Esto yo lo vi cuando Paine Weber nos entregó unos documentos. También vi que esos, que esa cuenta conjunta que mi padre tenía conmigo, que ese dinero le fue transferido a Ixia Mercado.
> LCDO. RIVERA:
> Unjú.
> TESTIGO:
> Con una carta de autorización supuestamente firmada por mí y mi padre.
> LCDO. RIVERA:
> ¿Unjú?
> TESTIGO:
> Cosa que no es cierta, sobre nuestras firmas falsificadas, recortadas y fotocopiadas en otro documento.
> LCDO. RIVERA:
> ¿Si yo le enseño esa carta usted sabría reconocerla?
> TESTIGO:
> Por supuesto que sí.[21]

Posteriormente, añadió:

> LCDO. RIVERA:
> Le pregunto, ¿esa es su firma la que aparece ahí?
> TESTIGO:
> Sí y no.
> LCDO. RIVERA:





---

[20] Véase, págs. 55-56 del Tomo I de la transcripción de la prueba oral.
[21] Véase, pág. 67-68 del Tomo I de la transcripción de la prueba oral.

KLAN201001695                                                                9

¿Qué quiere decir con sí? ¿Qué quiere decir con no?
TESTIGO:
Esta carta yo jamás la firme.  Aparece una firma, una media firma mía, que ha sido fotocopiada de otro documento. Un "cut and paste".
[...]
LCDO. RIVERA:
... ¿Usted autorizó la transferencia monetaria de alrededor de $613,000.00 a nombre, a la cuenta número JX31931-5B, a nombre de Ixia Mercado, según surge de esta comunicación?
TESTIGO:
No.[22]





Por otro lado, Nilsa declaró que su padre otorgó un testamento ológrafo que fue posteriormente protocolizado, mediante el cual dividió su caudal de la siguiente manera: la legítima estricta la dividió por igual entre León, Jr., Tamara y Nilsa; el tercio de mejora lo dividió en partes iguales entre Tamara y Nilsa; y el tercio de libre disposición lo dividió en varios legados, a saber, el apartamento de Biltmore en Coral Gables lo legó a Tamara, a Nilsa le acreditó una hipoteca de $145,000.00 y ciertos pagos de contribuciones sobre dicha propiedad, y el remanente se lo legó a Ixia.[23]  Nilsa testificó no haber recibido bien alguno del caudal relicto del causante al momento de la protocolización del testamento ni después. Añadió que no tenía conocimiento de que se hubiera llevado a cabo algún procedimiento de partición o adjudicación de herencia.[24]

Posteriormente, Nilsa indicó haber suscrito una declaración jurada luego de la muerte del causante con el propósito de admitir, a su mejor recuerdo, las donaciones y los regalos recibidos en vida del causante.  Estimó los mismos en aproximadamente $200,000.00. Estos consistían en $145,000.00 del saldo de la hipoteca de la

---

[22] Véase, pág. 69-71 del Tomo I de la transcripción de la prueba oral.
[23] Véase, págs. 18-22 del Tomo I de la transcripción de la prueba oral.
[24] Véase, pág. 22 del Tomo I de la transcripción de la prueba oral.

KLAN201001695                                                                    10

propiedad de Collins Heights en Miami, varios años de contribuciones

sobre la propiedad y gastos médicos.[25]

En cuanto a la *Reconvención* presentada por Tamara, Nilsa

declaró lo siguiente:




> LCDO. RIVERA:
> ... Y como parte de la reconvención, pues [Tamara] alega $70,000.00 que alegadamente le entregó a usted. Le voy a preguntar sobre eso. O sea, cuéntele, dígale al Tribunal en qué medida, si alguna, la Sra. Tamara Lyon la ayudó a usted monetariamente hablando.
> TESTIGO:
> Cuando yo me separo de mi esposo y se empiezan los procedimientos de divorcio, es cuando Tamara se me acerca. Ella vivía en Nueva Jersey, yo vivía en Florida. Se me pone a visitar, se me acerca. Me ofrece apoyo emocional y ayuda financiera. Me dice, mira Nilsa, yo te voy a dar una tarjeta de mi banco, una chequera. Tú puedes gastarte de ahí todos los meses de hasta $800.00 a $1,000.00; y hasta un poco más. Porque yo tengo dinero de sobra. Yo tengo una cuenta de acciones de más de medio millón de dólares. Yo tengo un "broker" que es un sabio... Así que tú en confianza. Me compró ropa, nos fuimos juntas a un viaje a esquiar. Me invitó a su casa en Nueva Jersey con mi hija Melissa... Nos contamos secretos de niñez, no sé.
> LCDO. RIVERA:
> ¿Cuándo fue todo esto? Esto que nos está contando, la época.
> TESTIGO:
> Quiero decir del '95 al '96; o tal vez finales del '94 hasta el '96, casi '97.
> LCDO. RIVERA:
> Okey.
> TESTIGO:
> Ah, perdón. Que no se me olvide que en esa época yo tenía un auto usado que me había regalado mi suegra... Y [Tamara] me ofreció comprarme un auto. Un regalo así tan grande, y yo con 3 niños fue una cosa significativa para mí. Me compró una van Nissan.
> LCDO. RIVERA:
> ¿Unjú?
> TESTIGO:
> Que yo encontré espectacular. Me sentí tan emocionada, que dije, mira, un regalo así yo no lo puedo aceptar sin yo proveerte un pagaré, algo. Algo te tengo que poder dar a cambio para sentirme bien, porque después de todo yo estaba recibiendo "child support".

---

[25] Véase, pág. 79-81 del Tomo I de la transcripción de la prueba oral.

LCDO. RIVERA:

¿Unjú?

TESTIGO:

... Y le dije, te voy a hacer un pagaré y te voy a entregar unos bienes privativos; o sea, míos personales, que es lo que tengo.

Le entregué un collar de perlas que me había regalado cuando me comprometí con mi esposo Scott. Le di un abrigo de pieles, un "mint coat", que me había dado mi suegra, en abono, por así decirlo, porque yo no tenía ningún otro bien que pudiera darle a cambio, para yo no sentirme tan, que estaba aceptando este auto y yo sin poder dar algo a cambio. Y le firmé ese pagaré.

LCDO. RIVERA:

¿Cómo usted se sintió con esta ayuda de la Sra. Tamara Lyon?

TESTIGO:

Super agradecida. Tan agradecida, que cuando estaba visitándola y ella me sonsacaba y me decía, mira, ¿Qué cosas malas tu recuerdas de mami? Y yo le decía, mira, yo con tu mamá, si hubo problemas, yo los he olvidado porque yo no tengo nada en contra de ella.

LCDO. RIVERA:

Muy bien.

TESTIGO:

Y le dije, de papi no tengo nada. Hasta que finalmente, como un hecho de confianza de lo único otro que yo tenía que ofrecerle fue el decirle, mira, sí, es verdad, papi me tiene una cuenta y me dio esta llave de la caja de depósito de banco.

LCDO. RIVERA:

Le pregunto, ¿actualmente usted le debe dinero a Tamara Lyon?

TESTIGO:

No, yo de...

LCDO. RIVERA:

¿Por estos desembolsos?

TESTIGO:

¿Perdón?

LCDO. RIVERA:

Por estos desembolsos que nos ha contado.

TESTIGO:

Yo considero que moralmente, legalmente y personalmente jamás. El ayudarme con una mano, y apuñalarme por la espalda con la otra, yo lo siento.

LCDO. RIVERA:

¿A qué usted le llama apuñalar con la otra"

TESTIGO:

Al hecho de que ella, con su hermana y su madre, despojaron a mi padre de 4 millones de dólares, y de mi cuenta, los $613,000.00. O sea, eso sería una amargura,

KLAN201001695                                                                                          12

una perversidad, el yo tenerle que agradecer eso.[26]

Sobre la caja de depósito y la llave que le entregó su padre, Nilsa

relata que ocurrió lo siguiente:

TESTIGO:
Ah, perdón, sí. El, por supuesto, nos hacía regalos. También recuerdo una cosa muy importante que fue cuando me entregó una llave de una caja de depósito de banco.

LCDO. RIVERA:
Vamos sobre eso. ¿De qué llave de depósito de banco usted está hablando?

TESTIGO:
En una ocasión mi padre me vino a visitar y me dijo, me entregó una llave de una caja de depósito de banco, y una libreta de banco para que tuviera protección y un poco de seguridad financiera. En adición...

LCDO. RIVERA:
¿Eso es lo que él le dijo a usted?

TESTIGO:
Es correcto.

LCDO. RIVERA:
Ajá.

TESTIGO:
En adición quisiera decirle que...

LCDO. RIVERA:
¿Pero qué pasó con esa llave?

TESTIGO:
Ah, bueno. Esa llave yo nunca le dije a mi marido en aquel entonces, ni a mis hijos, ni a nadie, que yo la tenía. Pero cuando estoy en proceso de divorcio mi media hermana Tamara se me acerca, me viene a sonsacar que me iba a ayudar económicamente. Usa mi tarjeta de cheques, usa una tarjeta de crédito. Ese auto que tú tienes usado eso no sirve. Yo te voy a comprar un auto nuevo, yo te quiero mucho, nos tenemos que acercar. Y mientras tanto, oye, ¿por casualidad tienes tú alguna cuenta con papi? Yo no le dije nada.
Cuando finalmente la voy a visitar con mi niña a Nueva Jersey, cuando la voy a visitar, en un momento de confianza, cuando yo estoy en una situación un poco frágil, por así decirle, me sigue con la pregunta. Finalmente, le digo, mira, sí, papi me dijo que me tenía una cuenta que cuando yo llegara a los 50 yo tuviera mis cientos de miles de dólares y no me tuviera que preocupar, y me dio una llave de una caja de banco.
No pasaron 24 horas cuando recibí una llamada de Doña Clara, donde me dice, oye, ¿cómo tú te atreves, una

---

[26] Véase, pág. 82-86 del Tomo I de la transcripción de la prueba oral.

llave de banco? Y yo digo, ¿pero y qué?  Esa llave me la dio
mi padre.  Me dice, me la traes aquí inmediatamente.  Y así
fue.  Le entregué la llave a una caja de depósito que nunca
abrí porque me parecía que, me parecía que rompería la
confianza que mi padre…

> […]
> LCDO. RIVERA:
> Okey.  ¿Entonces qué pasó con la llave?
> TESTIGO:
> Le entregué la llave a Doña Clara.   Y esa caja
> desapareció con su contenido, al igual que las cuentas de
> banco que me tenía mi papá.  Y la cuenta, si me permite…
> LCDO. RIVERA:
> Vamos, vamos…
> TESTIGO:
> Disculpe.
> LCDO. RIVERA:
> ¿Usted  alguna vez obtuvo, vio lo que había dentro de
> la caja de seguridad que nos está contando?
> TESTIGO:
> No.  No la abrí porque mi entendimiento era que eso
> era para cuando… o bien si algo le pasara a mi padre o ya
> yo estuviera en mis años cincuenta.
> LCDO. RIVERA:
> ¿Y entonces por qué es que usted le entrega la llave a
> Doña Clara?
> TESTIGO:
> Porque ella me la pide de una manera contundente.
> Me chocó, porque quien me tenía que pedir la llave era mi
> padre, no ella.
> LCDO. RIVERA:
> ¿Pero aun así usted se la entregó?
> TESTIGO:
> Se la entregué, sí.[27]



En cuanto a Clara, Nilsa testificó que ésta siempre le enviaba

dinero para su cumpleaños, Navidades y a sus hijos. También le estuvo

pagando un seguro médico de Blue Cross Blue Shield aproximadamente

desde el 2000 hasta la muerte del causante en el 2003.  A tales efectos,

Nilsa identificó varios cheques firmados por Clara correspondientes a

dichos desembolsos.  Sobre el particular, Nilsa declaró lo siguiente:

> LCDO. RIVERA:
> ¿Está segura que esos cheques provinieron por parte
> de la Sra. Lyon?

---

[27] Véase, págs. 63-67 del Tomo I de la transcripción de la prueba oral.

TESTIGO:
Bueno, todos, con la excepción del cheque de
$5,000.00 que veo está a nombre de mi padre, León Lyon
Martin y/o Clara y/o Ixia Mercado. Está firmado por Doña
Clara, pero yo sé que ella no, o sea, si usted, según he
dicho, usted ve esos cheques que eran por cientos de
dólares. Ella nunca había hecho un cheque para mí o a mi
favor, de una suma de miles de dólares, porque ella y mi
padre mantenían sus finanzas separadas desde el día en
que se casaron.
LCDO. RIVERA:
Pero, sin embargo, tenían cuentas conjuntas, ¿no?
TESTIGO:
Sí, pero eso es, al igual que tenía cuentas bancarias
conjuntas conmigo, con Tamara, eso era en realidad dinero
de mi padre. El simple... él simplemente tenía muchas
cuentas de banco.[28]



Además, añadió:

LCDO. RIVERA:
Le voy a hacer la misma pregunta que le hice
anteriormente. ¿Usted le debe algo a Doña Clara
Concepción?
TESTIGO:
No, yo en realidad no le debo nada.
LCDO. RIVERA:
¿Por qué usted entiende que no le debe nada?
TESTIGO:
Porque Doña Clara, junto con sus hijas, se prestó
para dejar a mi padre sin un centavo, cuando todavía vivía
en el año 1999. Mi padre, un hombre que siempre controló
sus finanzas, su dinero, una persona que nació en la época
de la depresión que no se... El único lujo que ése daba, que
se dio, eran sus relojes y su, un Mercedes diesel para
economizar en gasolina. Porque hasta mi boda fue con una
chaqueta, ni siquiera con un traje completo. Los zapatos se
los llevaba a enmendar. [29]



Al día siguiente del funeral del causante, Nilsa declaró que

sostuvo una conversación con Tamara en la cual ésta última le indicó

que a su padre ya casi no le quedaba dinero:

TESTIGO:
El día del funeral de papi, primeramente, cuando yo
llegué para el funeral de papi, yo me estaba quedando con
Doña Clara en su apartamento en Parque De Loyola. Y

---

[28] Véase, págs. 89-90 del Tomo I de la transcripción de la prueba oral.
[29] Véase, págs. 91-92 del Tomo I de la transcripción de la prueba oral.

llevé a mi hija Melissa y también llegó Tamara a quedarse allí.

Al día siguiente Tamara me dice, Nilsa, tenemos que hablar de dinero. Yo le dije está bien. Ahí es que me dice, oye, tú sabes que papi ha perdido una fortuna, casi todo, en el "stock market". Pero puede, pero van a hacer como $300,000.00 para darte a ti. Yo le digo está bien. Le digo, ¿quieres mi número de cuenta para que me lo transfieras? Y me dice, no, no, nos ponemos de acuerdo luego.

Ahí es que Ixia me viene a buscar para llevarme al aeropuerto y empieza con las preguntitas de, ¿Y si tu papá se lo gastó todo?, ¿y su tu papá se lo gastó todo" Y yo le dije, imposible, mi papá no se compraba nada. ¿Cómo se lo va a haber gastado todo? ¿Por qué me preguntas eso? Y me regresé a Miami.

Cuando regreso a Miami, recibo un mensaje que me dejan en el teléfono, en la grabadora, Tamara, diciéndome, hay Nilsa, no te he podido mandar el dinero porque la tubería de mi casa está congelada o explotó. Necesito que un abogado me prepare un papelito, un pequeño "release", que tan pronto tú me los firmes, yo te envío tus $300,000.00.[30]

El segundo testigo fue Jorge Mercado Concepción, hijo del primer matrimonio de Clara, hermano de padre y madre de Ixia Mercado Concepción y medio hermano de Tamara Lyon Concepción. Jorge declaró estar casado, tener una hija de veinticinco años en aquél entonces y ser residente de Paseo Alto. Relató haber conocido al causante cuando éste último pretendía a su madre y para cuando él tenía aproximadamente trece años en el '55 o '56. Añadió que para ese entonces vivían en Caparra Terrace en una casa de bajo costo luego de haberse mudado de San Germán. Testificó que su mamá trabajaba en pesas y medidas y que después trabajó como secretaria en la Comisión de Servicio Público. Jorge continuó declarando que Ixia estudió en la Gabriela Mistral y él en el Colegio Santa Cruz de Trujillo Alto, y luego en la Central High.[31]





---

[30] Véase, págs. 92-93 del Tomo I de la transcripción de la prueba oral.
[31] Véase, págs. 45-49 del Tomo II de la transcripción de la prueba oral.

KLAN201001695                                                           16

Sobre la condición económica del causante, Jorge testificó que era un hombre millonario y acaudalado y que lo sabía por haber visto sus certificados al portador que guardaba en la gaveta. Declaró que aunque los certificados llevaban los nombres de él, su esposa y sus hijas, que el dinero era del causante en propiedad.[32]

Jorge relató que se graduó con un bachillerato en contabilidad y trabajó para la firma de Lucas Malavé. Además, indicó que trabajó en la Armería del '71 al '83 y del '90 al '94. También testificó que para el 1971 se asoció con el causante en la corporación de la Armería, la cual fue dividida en tres partes iguales, incluyendo a León, Jr. [33] Por dicha participación hizo un "down payment" de $20,000.00 y luego iba abonando el 50% de los dividendos que le pagaban cada año, para un total de $75,000.00.[34]

Sobre la venta de su participación en la Armería, Jorge testificó lo siguiente:





> TESTIGO:
> En el 1983 yo me divorcio de mi primera esposa. En eso mi primera esposa me amenaza con que se va a meter a la armería. Y yo, para proteger la armería, le digo a León, mira estoy en esta situación y yo no quiero envolverte a ti en este problema ni a mi mamá ni a nadie; cómprame mis acciones. Y me dice, ah, pues está bien, yo te las compro. Y preparamos con el CPA un documento donde yo le vendía mis acciones.
> Cuando voy a cobrar, me dice, no, yo no te voy a dar na'. Y yo dije, pero y qué es eso, si te estoy beneficiando por un lado porque mi esposa no va a entrar aquí. Y el segundo, son mis acciones, que valen dinero... Ah, no, pero yo no te voy a dar nada. Y entonces me dieron $15,000.00.[35]

---

[32] Véase, pág. 50 y 53-54 del Tomo II de la transcripción de la prueba oral. Además, véase, págs. 80-89 del Tomo II de la transcripción de la prueba oral.
[33] Véase, págs. 51-53 del Tomo II de la transcripción de la prueba oral.
[34] Véase, págs. 92-94 del Tomo II de la transcripción de la prueba oral.
[35] Véase, pág. 102 del Tomo II de la transcripción de la prueba oral.

KLAN201001695                                                    17

A preguntas del licenciado Dapena, Jorge testificó lo siguiente en cuanto a las intenciones y capacidad económica de las apelantes:

LCDO. DAPENA:
Le pregunto, ¿si en algún momento les aconsejó usted a su mamá y a su hermana cómo proceder con relación al caudal de Don León?
TESTIGO:
Sí, sí, sí, precisamente ellas fueron a mi casa a pedirme un consejo de cómo eliminaban a Nilsa para darle menos, que lo que tenían eran $300,000.00.
LCDO. DAPENA:
¿Unjú?
TESTIGO:
Y yo le dije eso no lo debes de hacer, porque eso te va a traer problemas.  Dale copia del testamento, que yo sé que hay un testamento, porque él hizo varios, y de esa manera quedas bien con todo el mundo.  Además, hay muchos millones para repartir.
LCDO. DAPENA:
¿Y cuál fue la respuesta posterior de su hermana... de su mamá o su hermana?
TESTIGO:
No me habló.  Ella actualmente ni me habla.
[...]
LCDO. DAPENA:
Don Jorge, ¿usted tiene algún interés económico o de otro tipo en este caso?, con lo suscitado en este caso?
TESTIGO:
Yo tenía interés en la armería, en el edificio de la armería y en el negocio de la armería.  Y no me lo quisieron pagar.
LCDO. DAPENA:
¿Okey?
TESTIGO:
Ahora no tengo absolutamente ningún interés.  Porque si hubiese querido tener interés los hubiera demandado en aquel momento.
LCDO. DAPENA:
¿Usted ha recibido alguna oferta económica de la parte demandante, de su hermanastra o de algún familiar a los efectos?
TESTIGO:
No, no.
[...]
LCDO. DAPENA:
¿Conoció... conoce o conoció usted algún evento en el cual su madre o su hermana, por su propio esfuerzo o trabajo, pudieran haber advenido a fortuna, a dinero?
TESTIGO:



No.[36]

El tercer testigo fue Doña Clara Concepción Lazzarini, la viuda del causante. Clara declaró que previo a contraer nupcias con el causante éstos otorgaron capitulaciones matrimoniales. [37] Además, indicó que el causante se encargaba de pagar los gastos comunes del hogar y ella se pagaba sus gastos personales.[38] Testificó que antes de casarse con el causante había trabajado en la Comisión de Servicio Público, después en Estabilización Económica y luego en el Centro Médico como secretaria de dos doctores.[39] Indicó que se retiró en el 1971 cuando se acogió al Fondo por incapacidad.[40]

Sobre las cuentas y el dinero del causante, Clara testificó lo siguiente:

> LCDO. RIVERA:
> Le pregunto, ¿sí o no? Es que no la escuché. ¿Si Don León tenía cuentas conjuntas además de con usted, con otras personas?
> TESTIGO:
> Bueno, él, él su dinero lo ponía en, ponía León Lyon y Nilsa, y León Lyon Tamara, y León Lyon Clara. Pero él vivía de eso. Eso no era para que entraran y cogieran. Eso era de él.
> LCDO. RIVERA:
> De él. Y él controlaba su dinero, ¿correcto?
> TESTIGO:
> Ah, sí.
> LCDO. RIVERA:
> ¿Sí o no?
> TESTIGO:
> Sí.
> [...]
> LCDO. RIVERA:
> Okey. Doña Clara, le pregunto, ¿usted ha tenido cuentas en Paine Weber?
> TESTIGO:



---

[36] Véase, págs. 55-59 del Tomo II de la transcripción de la prueba oral.
[37] Véase, pág. 130 del Tomo II de la transcripción de la prueba oral.
[38] Véase, pág. 132 del Tomo II de la transcripción de la prueba oral.
[39] Véase, pág. 133 del Tomo II de la transcripción de la prueba oral.
[40] Véase, págs. 134-136 del Tomo II de la transcripción de la prueba oral.

KLAN201001695                                                                          19

León me puso, sí, que siempre ponía Clara, León y Clara.
LCDO. RIVERA:
¿Y de quién era los chavos?
TESTIGO:
Esos eran de León.[41]

Clara identificó su firma en varios cheques.  Reconoció que en ocasiones firmaba Clara Concepción, otras veces Clara Lyon y también Clara Concepción Lyon.[42]  Declaró que los dos firmaban las planillas de contribución sobre ingresos.[43]  Además, admitió haber firmado por el causante en la planilla del 1999.[44]  "Sí, porque, sí.  Si él me decía firma yo firmo.  Puede estar ocupado o estaba durmiendo, pues... Me decía firma y yo firmaba."[45]  Clara testificó poder reconocer la firma del causante y la de sus hijas en distintos documentos.[46]  Sobre la propiedad de Coral Gables en Miami, a preguntas del Lcdo. Rivera sobre quién compró el apartamento, Clara respondió que fue Lyon, pero que los dos firmaron la escritura.[47]

Clara identificó la carta con fecha de 16 de octubre de 1996 mediante la cual se aprobaron dos transferencias de las cuentas del causante con Clara a las cuentas personales de Ixia y de Clara.[48] Posteriormente, admitió haber firmado la referida carta y testificó que el causante le había dado ese dinero para que lo tuviera en su cuenta.[49] De dicha carta se desprende que se llevaron a cabo dos transferencias: una a la cuenta de Clara por la cantidad de $125,325.33 y otra a la

[41] Véase, págs. 134 y 158 del Tomo II de la transcripción de la prueba oral.
[42] Véase, pág. 138 del Tomo II de la transcripción de la prueba oral.
[43] Véase, pág. 139 del Tomo II de la transcripción de la prueba oral.
[44] Véase, págs. 143-144 del Tomo II de la transcripción de la prueba oral.
[45] Véase, pág. 144 del Tomo II de la transcripción de la prueba oral.
[46] Véase, págs. 147-150 del Tomo II de la transcripción de la prueba oral.
[47] Véase, págs. 156-157 del Tomo II de la transcripción de la prueba oral.
[48] Véase, págs. 159-60 del Tomo II de la transcripción de la prueba oral.
[49] Véase, pág. 166 del Tomo II de la transcripción de la prueba oral.

cuenta de Ixia por la cantidad de $98,646.00.[50] También declaró que el

dinero del causante era producto de la venta de las acciones de Paine

Webber y que no sabía qué había pasado con ese dinero.[51] Además,

indicó que ella no había recibido nada de ese dinero luego de la muerte

del causante ni al momento de su muerte.[52] También identificó una

carta con fecha de 22 de mayo de 1999 en la que le daba instrucciones

a Paine Weber para que hiciera tres transferencias: una de $100,000.00

a la cuenta de Clara, otra de $89,078.00 a la cuenta de Ixia y un

cheque de $30,000.00 pagadero a Nilsa.[53]

Clara declaró que desde el inicio del negocio de la Armería ésta

ayudaba al causante trabajando en el local.[54] Añadió que era un

trabajo "full-time" y que trabajaba allí todos los días. Ello así a pesar de

haber sido declarada incapacitada, ya que "el trabajo era bien distinto

una cosa y la otra".[55]

El cuarto testigo fue el señor Frank Harley Norwitch, examinador

forense de documentos cuestionables o dudosos y perito de la parte

apelada (en adelante "Norwitch"). Norwitch declaró que actualmente

trabajaba en el Norwitch Document Laboratory en West Palm Beach

desde 1994. Previo a eso trabajó para Associated Forensic Services

desde 1983 y en el Miami Dade Criminal Examination Laboratory desde

1979.[56] Testificó haber recibido entrenamiento del FBI, el Servicio

Secreto de los Estados Unidos, el Departamento de Estado de la Florida



---

[50] Véase, pág. 204 del Tomo II de la transcripción de la prueba oral.
[51] Véase, pág. 172 del Tomo II de la transcripción de la prueba oral.
[52] Véase, pág. 173 del Tomo II de la transcripción de la prueba oral.
[53] Véase, págs. 23-24 del Tomo III de la transcripción de la prueba oral.
[54] Véase, pág. 182 del Tomo II de la transcripción de la prueba oral.
[55] Véase, págs. 38-41 del Tomo III de la transcripción de la prueba oral.
[56] Véase, págs. 46-47 del Tomo III de la transcripción de la prueba oral.

KLAN201001695                                                               21

y el Rochester Institute of Technology.[57]   Además, indicó haber

publicado un libro de ciencias forenses como co-autor de la sección de

documentos dudosos.[58]  Así las cosas, el TPI lo admitió como perito sin

objeción alguna de la parte apelante.[59]

Sobre la opinión pericial de Norwitch en cuanto a la carta de 16

de octubre de 1996 se dio el siguiente intercambio:



> TESTIGO:
> Esa carta, ese documento fechado 16 de octubre de
> 1996, es fraudulento.  Es un documento espurio, que no
> existe.
> LCDO. DAPENA:
> ¿Por qué dice eso y basado en qué?
> [...]
> TESTIGO:
> Muy sencillo, la conclusión en muy fácil, que esas
> dos. firmas sí existieron en otro documento y fueron
> cortados de ese otro documento y fueron pegados en otro
> documento, en este caso en este documento en particular, y
> luego fotocopiado para producir lo que aparenta ser un
> documento que sencillamente nunca existió.
> LCDO DAPENA:
> Cuando usted se refiere a un documento que nunca
> existió, ¿qué es lo que quiere decir?
> TESTIGO:
> Muy sencillamente, que no hay un original de ese
> documento, fue fabricado.
> [...]
> TESTIGO:
> Bueno, a lo mejor hay un original, pero se va a notar
> que las dos firmas han sido pegadas en él.
> [...]
> TESTIGO:
> Este tipo de documento fraudulento yo me refiero
> como un corte y pega.  Esto no sucede muy frecuentemente
> hoy día.  Nosotros actualmente encontramos que eso es
> más bien hecho por un escrinador (fonética) y una
> impresión de computadora.  Pero de vez en cuando nos
> confrontamos este tipo de situación.
> En el proceso, por ejemplo, de tomar la firma del Sr.
> León Lyon Martín, que ha sido cortado de otro documento,
> y que fue colocado sobre el documento que habría de ser
> fotocopiado, ese, ese pegamento en realidad imbrica sobre

---

[57] Véase, pág. 47 del Tomo III de la transcripción de la prueba oral.
[58] Véase, pág. 48 del Tomo III de la transcripción de la prueba oral.
[59] Véase, pág. 52 del Tomo III de la transcripción de la prueba oral.

algún otro texto que ya existía en el documento subyacente.

En este caso en particular, el tope de la parte de arriba del pedazo que contenía la firma de León Martin, corta alrededor de una tercera parte o quizás más de una, del texto que pre-existía en el documento. Que es obviamente observable.

[...]

TESTIGO:

Además, el pedazo de papel que contenía la firma de Lyon Martin, había sido cortado para excluir la parte de abajo, la parte de debajo de la "Y" de la firma de Lyon. Esto estaba entonces en la hoja compuesta, y fue suplida a mano en el documento.

[...]

TESTIGO:

Pues posiblemente con una pluma. Este, lo cierto es que fue posteriormente.

[...]

TESTIGO:

Es, casi precisamente el mismo escenario sucede con la firma de Lyon Kalish.

LCDO. DAPENA:

¿Me permite un momento? ¿Cuándo dice Kalish quiere decir Nilsa Lyon Kalish?

TESTIGO:

Sí, eso es así.

LCDO. DAPENA:

Okey.

TESTIGO:

El pedazo de papel que se cortó que contenía esa firma, fue cortado a ras arriba...

LCDO. DAPENA:

Arriba.

TESTIGO:

...cortado arriba, la parte superior, posiblemente cortado para excluir cualquiera otro texto que había pre-existente en el sitio de donde se extrajo la firma. Pero, nuevamente, podemos casi trazar una línea recta de izquierda a derecha, sobre la parte superior de la firma.

Y, nuevamente, la "L" que aparece en ese documento ha sido la parte de arriba (fonética) ha sido adicionada a mano, este, en ese documento.

LCDO. DAPENA:

Para concluir. Es su opinión que ese documento que ha sido identificado en la Identificación 1 en un "forgery", una falsificación.

[...]

TESTIGO:

El documento sencillamente no es genuino, el documento es fraudulento.[60]



---

[60] Véase, págs. 58-67 del Tomo III de la transcripción de la prueba oral.

El próximo testigo fue Ixia. Ésta testificó que sus padres se comportaban "[c]omo todos los matrimonios. Él era el esposo, ella era la esposa. Él compraba con ella, vendían, sacaban, vendían, hacían todo juntos; como un matrimonio común y corriente."[61] Añadió que sus padres adquirieron en conjunto la propiedad donde ubica la Armería y la propiedad de Coral Gables en Miami.[62] Además, indicó que sus padres administraban el negocio de la Armería en conjunto.[63]

Por otro lado, Ixia declaró que nunca vivió en la residencia del matrimonio Lyon-Mercado. Además, relató que se casó en el 1971 y se mudó con su marido del área.[64] A preguntas de dónde está el dinero que pasó a su posesión en el 1996 y 1999, Ixia contestó "No sé."[65]

Luego declaró Tamara. Relató que se fue de Puerto Rico a los trece (13) años a un "boarding school", pero que todos los años regresaba a casa de sus padres en los veranos y en las vacaciones de navidad.[66] Indicó que sus padres hacían todo juntos, a saber, abrir y cerrar cuentas de banco, adquirir y vender propiedades, entre otras cosas.[67] Además, testificó que Clara ayudaba en el negocio y trabajaba en la Armería.[68] También declaró que sus padres le cedieron el apartamento de Coral Gables porque la querían mucho.[69] Por otro lado, indicó que no tenía conocimiento que sus padres hubieran



---

[61] Véase, pág. 15 del Tomo IV de la transcripción de la prueba oral. Véase, además, pág. 59 del Tomo IV de la transcripción de la prueba oral.
[62] Véase, págs. 17 y 20-22 del Tomo IV de la transcripción de la prueba oral.
[63] Véase, pág. 57-58 del Tomo IV de la transcripción de la prueba oral.
[64] Véase, págs. 61-62 del Tomo IV de la transcripción de la prueba oral.
[65] Véase, pág. 75 del Tomo IV de la transcripción de la prueba oral.
[66] Véase, pág. 85 del Tomo IV de la transcripción de la prueba oral.
[67] Véase, pág. 86 del Tomo IV de la transcripción de la prueba oral.
[68] Véase, pág. 88 del Tomo IV de la transcripción de la prueba oral.
[69] Véase, págs. 88-89 del Tomo IV de la transcripción de la prueba oral.

KLAN201001695                                                                          24

suscrito capitulaciones matrimoniales previo a contraer nupcias.[70]

Los apelados presentaron como perito al señor Reynaldo Quiñones Márquez, Contador Público Autorizado (en adelante "Quiñones"), quien el 14 de agosto de 2008 presentó su informe pericial, el cual fue posteriormente enmendado el 28 de septiembre de 2008 por su testimonio en juicio. Dicho informe pericial incluye un inventario, rastreo de bienes, avalúo, colación y partición de los bienes del causante entre los cuales se encuentran los activos y la propiedad donde ubica la Armería. Las apelantes anunciaron un perito que nunca presentaron en el juicio.





Quiñones declaró estar casado, residir en Cupey y poseer un bachillerato en administración de empresas y un *Juris Doctor* de la Universidad de Puerto Rico.[71] Testificó ser investigador de fraude certificado, contador forense certificado, especialista en valoraciones certificado y contador público autorizado.[72] Además, indicó tener vasta experiencia en casos de sucesiones y haber sido nombrado por el tribunal contador partidor de herencias para liquidar sucesiones.[73] Así las cosas, el TPI aceptó a Quiñones como perito de los apelados.[74]

Quiñones declaró que el caudal partible del causante ascendía a $6,786,000.00.[75] Excluyendo los frutos y los intereses del principal, a Nilsa le tocarían $2,485,000.00; a Ixia $1,118,000.00; a León, Jr. $754,000.00; y a Clara $389,000.00 por concepto de cuota viudal

---

[70] Véase, pág. 91 del Tomo IV de la transcripción de la prueba oral.
[71] Véase, pág. 102 del Tomo III de la transcripción de la prueba oral.
[72] Véase, pág. 102 del Tomo III de la transcripción de la prueba oral.
[73] Véase, pág. 103 del Tomo III de la transcripción de la prueba oral.
[74] Véase, pág. 105 del Tomo III de la transcripción de la prueba oral.
[75] Véase, pág. 108 del Tomo III de la transcripción de la prueba oral.

KLAN201001695                                                      25

usufructuaria.[76]  No obstante, hizo la salvedad de que, "[e]sa es la
cantidad que le tocaría de estar el caudal ahí, sin tomar en cuenta lo
que ya han tomado, que es colacionable, y lo que ellas puedan haber
tomado bajo las circunstancias que aquí se han estado discutiendo."[77]

Posteriormente declaró que, a la fecha del juicio y luego de las
deducciones correspondientes, a Nilsa  le tocarían $2,040,000.00 de
principal,   más   $587,770.00   en   frutos,   para   un   total   de
$2,627,770.00.[78]  En el caso de León, Jr., al día del juicio, su
participación en el caudal ascendía a $754,000.00 de principal, más
$279,608.00 de frutos, para un total de $1,033,608.00.[79]

Indicó que para descargar su función examinó los récords
provistos por las partes y realizó un inventario y avalúo de los bienes
del caudal.  Quiñones declaró que identificó las cuentas de inversiones
y las donaciones recibidas por las partes durante la vida del causante,
las cuales deben ser colacionadas.  Además, tomó en consideración las
acciones de la armería y la propiedad donde ubica el negocio. [80]

Quiñones testificó que de la planilla de contribuciones sobre
ingreso de del causante y Clara de 1999 se desprende que hubo una
venta o permuta de activos de capital de $3,979,127.00.  Además, de la
misma se desprende que dichos activos fueron adquiridos en enero de
1950, a saber, previo a que el matrimonio Lyon-Concepción contrajeran
nupcias y otorgaran las capitulaciones matrimoniales.[81]

En cuanto a las transferencias de las cuentas del causante en



---

[76] Véase, págs. 108 y 122 del Tomo III de la transcripción de la prueba oral.
[77] Véase, pág. 112 del Tomo III de la transcripción de la prueba oral.
[78] Véase, pág. 114 del Tomo III de la transcripción de la prueba oral.
[79] Véase, pág. 123 del Tomo III de la transcripción de la prueba oral.
[80] Véase, págs. 123-124 del Tomo III de la transcripción de la prueba oral.
[81] Véase, págs. 127-130  del Tomo III de la transcripción de la prueba oral.

Paine Webber realizadas en el 1996 y las del *León Lyon Martin Revocable Trust* en el 1999, Quiñones testificó lo siguiente:

LCDO. DAPENA:
... explíquele al tribunal cómo fue, eh, eh, que usted hizo la colación con relación a transacciones del '96 y el '99 en las cuentas de Don León Lyon Martin.
TESTIGO:
Okey. Si vamos a la página, al Anejo 4 del informe, básicamente aquí hay dos, dos transacciones importantes o significativas, que son las que más afectaron los cómputos. Y el último, la primera es las transferencias de los días (fonética) de las cuentas de León Lyon a las cuentas de las demandadas en este caso. Déjeme localizar el anejo para estar claro.

Vamos primero a unos anejos. La página 10 de mi informe, aquí yo tengo un resumen de las transferencias hechas de la cuenta, las transferencias hechas en octubre de 1996 de la cuenta JX2172... 21742 en Paine Weber, la cual estaba a nombre de León Lyon Martin, la primera. La primera transacción que tengo como el número 1 ahí, es una transferencia de $242,465.00 de la cuenta JX21742, la cual estaba a nombre de León Lyon Martin y Tamara Concepción. Ahí se transfirieron a la cuenta JX31913 a nombre de Ixia Mercado Concepción. Esta es la primera transacción.

La segunda es una transferencia a la cuenta JX14602 en Paine Weber, la cual estaba a nombre de León Lyon Martin y Clara Lyon Concepción, se transfirieron esos $91,643.00 (fonética) a la cuenta de JX31913, a nombre de Ixia Mercado Concepción.

Tercera transacción del 22 de octubre del '96, se transfirió la cantidad de $613,914.00 de la cuenta JX21741, la cual estaba a nombre de León Lyon Martin y Nilsa Lyon Kalish, transferidos a la cuenta número JX931913, a nombre de Ixia Mercado Concepción.

Cuarta transacción, 22 de octubre del '96, se transfirieron $116,694.00 de la cuenta JX23274 en Paine Weber, la cual estaba a nombre de León Lyon Martin e Ixia Mercado, a la cuenta número JX3193, a nombre de Ixia Mercado. Estas cin... cuatro transacciones, reflejan que en ese mes, en esos dos o tres días, se transfirieron de estas cuentas, de las que estaban a nombre de León Lyon Martin y/o otras personas, se transfirieron a la cuenta de Ixia Mercado Concepción $1,071,716.00. Así lo refleja mi resumen en la página 10 del informe y en la página 12 del informe. Esta es la primera, el primer grupo de transacciones que yo tomé en consideración.

El segundo está en la página 12 del informe, en el cual, de una cuenta JX34593 se transfirieron estos fondos

a nombre de varias cuentas en Paine Weber, a nombre de las co-demandadas Ixia Mercado Concepción, Tamara Lyon Concepción y Clara Concepción, las siguientes cantidades...
[...]
TESTIGO:
... la primera transferencia se hizo a la cuenta JX31913 por $89,078.00, era una cuenta a nombre de Ixia Mercado Concepción. La segunda fue por $1,893,505.00 a otra cuenta de Ixia Mercado Concepción. O sea, esos tres millones nueve cincuenta, total transferidos a Ixia un millón nueve ochenta y dos cinco ochenta y tres.

Se transfirieron también a una cuenta de Paine Weber $1,893,505.00 a la cuenta JX38426 a nombre de Tamara Lyon Concepción. Fíjese es cantidad similar a la que se le transfirió a Ixia. Se transfirieron también en esa misma transacción a nombre de Doña Clara Concepción Lazzarini viuda de León, a una cuenta JX31912, $1000,000.00. Que todas las partidas suman $3,976,088.00. Si yo sumo esas partidas de $3,976,088.00 al $1,071,716.00 que describí antes en la página 10, eso me dice que se transfirieron $5,047,804.00.

Hay una transferencia adicional de $125,325.00 a nombre de Doña Clara. O sea, que el total transferido a esas cuentas a nombre de las co-demandadas es $5,173,129.00. Y básicamente esas son las, las cantidades que yo estoy diciendo que son parte del caudal, y son las que uso para el inventario, las cuales sumadas a los bienes, al valor de los bienes donados, son las que reflejan el total del caudal, que fue el que dividí en el Anejo 1.[82]

Dichas transferencias se desglosan de la siguiente manera:[83]





| 18 de octubre de 1996 | | |
|---|---|---|
| DE: Paine Weber JX21742 – León Lyon Martin y/o Tamara Lyon Concepción | A: Paine Weber JX31913 – **Ixia Mercado Concepción** | $242,465.00 |
| DE: Paine Weber JX14602 – León Lyon Martin y/o Clara Lyon Concepción | A: Paine Weber JX31913 – **Ixia Mercado Concepción** | $98,643.00 |
| 22 de octubre de 1996 | | |
| DE: Paine Weber JX21741 – León Lyon Martin y/o Nilsa Lyon Kalish | A: Paine Weber JX31913 – **Ixia Mercado Concepción** | $613,914.00 |
| DE: Paine Weber JX23274 – León Lyon Martin y/o Ixia Mercado Concepción | A: Paine Weber JX31913 – **Ixia Mercado Concepción** | $116,694.00 |
| | | = $1,071,716.00 |

| mayo de 1999 |
|---|

[82] Véase, págs. 130-133 del Tomo III de la transcripción de la prueba oral.
[83] Véase, págs. 10-12 del Informe Pericial Enmendado del CPA Quiñones (págs. 265-267 del apéndice del recurso de *Apelación*).

| DE: Paine Weber JX34593 – León Lyon Martin Revocable Trust | A: Paine Weber JX31913 – **Ixia Mercado Concepción** | $89,078.00 |
|---|---|---|
| DE: Paine Weber JX34593 – León Lyon Martin Revocable Trust | A: Paine Weber JX38425 – **Ixia Mercado Concepción** | $1,893,505.00 |
| DE: Paine Weber JX34593 – León Lyon Martin Revocable Trust | A: Paine Weber JX38426 – **Tamara Lyon Concepción** | $1,893,505.00 |
| DE: Paine Weber JX34593 – León Lyon Martin Revocable Trust | A: Paine Weber JX31912 – **Clara Lyon Concepción** | $100,000.00 |
| | | = $3,976,088.00 |

| **Total de transferencias efectuadas en 1996 y 1999 de las cuentas del causante:** | = $5,047,804.00 |
|---|---|

Sobre las colaciones realizadas, Quiñones declaró lo siguiente:

LCDO. DAPENA:
¿Por qué razón las retrae en su análisis a manera de colación esas partidas que ha señalado?, Don Reinaldo.
TESTIGO:
Bueno, porque ese es el estado de derecho. Hay dos cosas, primero, las donaciones a los herederos forzosos si no fueron dispensados de colacionar pues hay que traerlas al caudal. Pero en el caso de Doña Ixia, la situación es diferente porque no siendo heredera forzoso, forzosa, pues el Código Civil claramente prohíbe que el marido le done a el hijo de su, o a cualquier de su nueva esposa, esas donaciones serían *ab initio*. En otras palabras, que esas, que esas hay que traerlas de todos modos, sean o no sean colacionables, porque, porque esa transacción es nula, según el Código Civil.
[...]
LCDO. DAPENA:
... ¿Qué otro activo señaló usted que colacionó igualmente?
TESTIGO:
En el, en el Anejo 19 de mi informe, se identificaron unas donaciones adicionales, las cuales totalizan $950,000.00, que son las que yo estoy trayendo de nuevo al caudal. Bajo la mecánica que se traen al caudal, se computan, determina cuánto es la participación de cada heredero, y luego, cuando se distribuían los bienes, pues eso se le descuenta a los herederos porque ya los recibió.
[...]
TESTIGO:
En el anejo, hay una, hay declaraciones en las deposiciones de que, de que se le transfirió a uno de los herederos las acciones corporativas, en este caso a Ixia. Y nosotros estimamos que el valor de esas acciones eran $400,000.00. Y hay también evidencia de que se le transfirió a Tamara el, el edificio, el cual está, según una

KLAN201001695

29

información que hay disponible, valorada en [...] $312,750.00. Y básicamente tabulamos las dos cantidades. Y eso suman, eso más las otras cantidades que habíamos mencionado anteriormente, pues son las, es la cantidad de activos que hay que incluir en el, en el caudal.[84]

Por otro lado, Quiñones también declaró sobre la cantidad correspondiente al usufructo viudal de Clara. Indicó que, luego de sus cómputos, la misma ascendía a $389,000.00.[85] Sin embargo, aunque entiende que será la decisión del TPI, éste opina que durante el matrimonio Lyon-Concepción no se constituyó una sociedad legal de gananciales, ya que su investigación arrojó que el dinero era exclusivamente del causante.[86] En base a dicha opinión fue que realizó los cómputos que incluyó en su informe.[87]

Sobre la naturaleza de las transferencias y el poder adquisitivo de las apelantes, se dio el siguiente intercambio:



> LCDO. DAPENA:
> Le pregunto, ¿si de los documentos que examinó usted pudo determinar, eh, pudo examinar las planillas de contribuciones sobre ingreso de una o más de las demandadas en este caso?
> TESTIGO:
> Sí.
> LCDO. DAPENA:
> Y le pregunto, ¿si antes de hacer estas transferencias surge de las mismas que fueran personas de medios? O sea, personas con los ingresos que aparentan tener después que se hicieron las transferencias.
> TESTIGO:
> La contestación es que no, que las planillas reflejan que los ingresos eran mínimos previo a estas transferencias. Y en el Anejo 12 tengo, por ejemplo, un resumen de cuáles eran los ingresos que reflejaba... Por ejemplo, Ixia Mercado en sus planillas en el año '93, $3,465.00; en el '94 $16,875. Y por ahí sigue hasta el '98. Y esos eran ingresos por concepto de rentas. En el '99,





---

[84] Véase, págs. 133-136 del Tomo III de la transcripción de la prueba oral.
[85] Véase, págs. 139-140 del Tomo III de la transcripción de la prueba oral.
[86] Véase, págs. 141-142 del Tomo III de la transcripción de la prueba oral.
[87] Véase, pág. 168 del Tomo III de la transcripción de la prueba oral.

KLAN201001695                                                                  30

cuando ya empiezan, tiene las inversiones bajo su control, pues sus ingresos aumentan significativamente a $293,093.00. Y en el 2000 tuvo ingresos de $955,195.00. O sea, que la contestación es que no, que los ingresos, según esas planillas, no reflejaban suficiente poder adquisitivo para adquirir las inversiones que más tarde aparecen en las cuentas de ella.[88]

En cuanto al informe rendido por el perito de la parte apelante, Quiñones declaró que el mismo era meramente un informe preliminar en reacción al preparado por éste y que estaba incompleto, ya que le faltaba información y evidencia necesaria para poder formar una conclusión responsable sobre el caudal y su liquidación. Es decir, el mismo carece de una conclusión.[89]

A preguntas del licenciado Vicente, Quiñones identificó una serie de documentos, mayormente escrituras públicas, en las que el causante y Clara comparecieron en conjunto en la adquisición y venta de propiedades, las cuales, según el criterio de la parte apelante, podrían indicar que la pareja se comportó como una sociedad de gananciales.[90]

En caso de que el TPI determinara que en el matrimonio Lyon-Concepción, en efecto, se había constituido una sociedad de bienes gananciales, Quiñones indicó que procedía dividir el caudal partible por la mitad para determinar lo que le correspondería a Clara, a saber, $3,393,000.00. Además, Quiñones testificó que bajo este supuesto las donaciones hechas por Clara a Ixia no serían nulas, sino inoficiosas hasta la porción en que afectara la legítima de Tamara.[91] Por otro lado, añadió que la cantidad que previamente había testificado que le correspondía a Nilsa también tendría que ser reducida a la mitad y

---

[88] Véase, págs. 145-146 del Tomo III de la transcripción de la prueba oral.
[89] Véase, págs. 150-151 del Tomo III de la transcripción de la prueba oral.
[90] Véase, págs. 171-209 del Tomo III de la transcripción de la prueba oral.
[91] Véase, págs. 210-213 del Tomo III de la transcripción de la prueba oral.

KLAN201001695                                                    31

deducirle las donaciones recibidas en vida las cuales ascienden a
$200,000.00, para llegar a un total de $1,013.885.00.[92]

Luego de desfilada la prueba en el juicio y tomando en
consideración que las apelantes no presentaron prueba pericial alguna
que controvirtiera la presentada por los apelados aún después de
habérseles concedido suficiente tiempo para ello, el 20 de septiembre de
2010 el TPI dictó *Sentencia* en la que declaró Con Lugar la *Demanda*
presentada por los apelados. Por medio de dicho dictamen, el TPI
determinó que hubo separación total de bienes en el matrimonio Lyon-
Concepción, por lo que las apelantes debían responderle a los apelados
por la totalidad que le correspondía a cada uno por concepto de la
liquidación del caudal del causante y los frutos generados por éstos.
Además, se les condenó a satisfacer solidariamente la cantidad de
$250,000.00 por los daños y perjuicios causados a Nilsa.



El TPI, dentro de su discreción, determinó que las apelantes
habían incurrido en temeridad, por lo que les impuso el pago de
honorarios de abogado a favor de los apelados.   En cuanto a las
obligaciones de Tamara, el TPI determinó que la cantidad de $45,000.00
fueron dados a Nilsa en concepto de préstamo y que el resto, según la
prueba, consistió en dádivas y donaciones de Tamara a favor de su
hermana Nilsa.



El 6 de octubre de 2010 Tamara presentó *Moción Solicitando
Reconsideración.*   De igual forma, el 7 de octubre de 2010 Clara
presentó *Moción de Reconsideración y Solicitud de Enmiendas y
Determinaciones Adicionales.*  Ambas mociones fueron declaradas No Ha

---

[92] Véase, págs. 9-15 del Tomo IV de la transcripción de la prueba oral.

Lugar por el TPI el 14 de octubre de 2010, notificadas y archivadas en autos el 15 de octubre de 2010. Aún insatisfechas con dichas determinaciones, las apelantes acudieron ante nosotros mediante el recurso de *Apelación* de epígrafe en el cual argumentan la comisión de los siguientes errores:

1. Erró el [TPI] al concluir que entre el causante y la señora Clara no se constituyó comunidad de bienes.

2. Erró el [TPI] al practicar una partición hereditaria sin realizar inventario y avalúo, desviándose de los postulados que rigen la colación y adjudicando responsabilidad solidaria contra todas las codemandadas.

3. Erró el [TPI] al concluir que Doña Clara no tiene derecho a la cuota viudal usufructuaria y al no hacer su adjudicación.

4. Erró el [TPI] al determinar que las apelantes adeudan dinero al demandante León hijo, por cuanto dicha determinación es contraria a derecho al no estar basada en el record ni haber tenido las demandadas la oportunidad de contrainterrogar al señor León hijo.

5. Erró el [TPI] al decidir que las donaciones hechas por el causante a la codemandada Ixia Mercado son nulas, por cuanto la prohibición de nuestro Código Civil aludida por el foro de instancia es inaplicable al caso de autos. Así como erró al no resolver como se tratarían las donaciones hechas por Clara a Nilsa.

6. Erró el [TPI] en su determinación de responsabilidad así como la valoración de la misma en contra de las codemandadas aquí comparecientes, por cuanto el dictamen apelado es contrario a la prueba desfilada.

7. Erró el [TPI] al determinar que sólo se probaron $45,000.00 en préstamos de Tamara a Nilsa y al no imponer intereses sobre dicha suma.

8. Erró el [TPI] al determinar que el edificio donde ubica la Armería Metropolitana fue donado a la codemandada Tamara Lyon Concepción.

9. Erró el [TPI] al concluir que las codemandadas ocasionaron daños a la demandante, que responden solidariamente, y que fueron temerarias.

Contando con el beneficio de la transcripción estipulada de la prueba y con los alegatos de ambas partes, procedemos a resolver según anticipado.

## II.

### A. Capitulaciones Matrimoniales

Sobre el matrimonio y la administración de sus bienes, como norma general, y a falta de pacto en contrario, la sociedad legal de gananciales es el régimen económico que regulará los derechos y las obligaciones de los cónyuges durante el matrimonio. Véase 31 L.P.R.A. secs. 3621-3623. En dicho régimen, los cónyuges son codueños y coadministradores de la totalidad de un patrimonio ganancial, sin distinción de cuotas o especial atribución privativa. Pagán Rodríguez v. Registradora, 177 D.P.R. 525 (2009); Montalbán Ruiz v. Rodríguez Navarro, 161 D.P.R. 411, 420 (2004).

De otra parte, las capitulaciones matrimoniales representan un medio contractual por el cual los cónyuges estipulan el régimen económico matrimonial o adoptan cualquier otra disposición relacionada al matrimonio. El contrato de capitulaciones matrimoniales, "permite regular los derechos de los esposos sobre sus bienes respectivos; los derechos sobre las ganancias realizadas por ellos durante su unión; los intereses de los hijos y de la familia; los intereses de los terceros que contratan con uno u otro de los esposos, y, en definitiva, el interés económico y social del matrimonio". Maldonado v. Cruz Dávila, 161 D.P.R. 1, 16 (2004).

KLAN201001695                                                                34

En nuestro ordenamiento una pareja puede otorgar capitulaciones matrimoniales únicamente antes de contraer matrimonio. En dicho contrato se puede disponer sobre bienes en ocasión del matrimonio y se pueden estipular las condiciones de la sociedad conyugal sobre los bienes presentes y futuros, ello sin menoscabo de las limitaciones estatutarias. Véase, 31 L.P.R.A. sec. 3551 y 3372; Maldonado v. Cruz Dávila, *supra*; S.L.G. Irizarry v. S.L.G. García, 155 D.P.R. 713 (2001); Umpierre v. Torres Díaz, 114 D.P.R. 449 (1983).

Por otro lado, en nuestro ordenamiento rige la doctrina de la inmutabilidad de las capitulaciones matrimoniales, lo que implica que lo estipulado en las capitulaciones es irrevocable, y que sólo los otorgantes podrán alterar las capitulaciones antes de celebrarse el matrimonio y que después de celebrado el matrimonio no se podrán alterar las capitulaciones otorgadas ya se trate de bienes presentes o bienes futuros. Véase, 31 L.P.R.A. secs. 3555-3556; Maldonado v. Cruz, *supra*; Domínguez Maldonado v. E.L.A., 137 D.P.R. 954 (1995); Umpierre v. Torres Díaz, *supra*; Vilariño Martínez v. Registrador, 88 D.P.R. 288 (1963).

Si bien las capitulaciones matrimoniales constituyen un contrato sujeto al régimen de libertad de pacto reconocido el Código Civil, la autonomía de la voluntad no es absoluta. Ab Intestato Saldaña, 126 D.P.R. 640, 643 (1990); Umpierre v. Torres Díaz, *supra*. Aquello que es contrario a las leyes o a las buenas costumbres, o depresivo de la autoridad que respectivamente corresponde en familia a los futuros cónyuges, no podrá pactarse. Domínguez Maldonado v. E.L.A., *supra*; Umpierre v. Torres Díaz, *supra*. Véase, además, 31 L.P.R.A. sec. 3552.

KLAN201001695                                                                    35

Conforme a la libertad de contratación, los cónyuges tienen la opción de elegir entre: la separación de bienes pero con participación en las ganancias; la sociedad de gananciales, para lo cual basta con guardar silencio y no estipular nada o estipularlo expresamente; renunciar al régimen legal de gananciales; total separación de bíenes; o cualquier otro régimen que combine las anteriores posibilidades, siempre que no infrinja las leyes, la moral o las buenas costumbres. Domínguez Maldonado v. E.L.A., *supra*.

Cabe señalar que cuando una pareja otorga capitulaciones matrimoniales, y expresamente pacta que no desea crear un régimen ganancial, **el hecho de que, posterior al matrimonio, la pareja lleve a cabo actos de administración y esfuerzo común no da vida a una sociedad de bienes gananciales**. Domínguez Maldonado v. E.L.A., *supra*. Lo contrario puede ocurrir, cuando en el contrato no se pacta el régimen económico deseado y, además, se prueba que los cónyuges utilizaron y administraron los bienes como si su matrimonio estuviere regido por una sociedad de gananciales. Umpierre v. Torres Díaz, *supra*.

Distinto es el caso de la separación total de bienes, donde no queda lugar a dudas de la intención de las partes antes del matrimonio acerca de cómo administrar los derechos y las obligaciones durante el matrimonio. En este caso, independientemente de cómo se comporten los cónyuges, el destino de los bienes de cada uno será privativo. Los intereses pecuniarios que surgen de la relación matrimonial y las condiciones relativas a los bienes presentes y futuros, se atienen a lo pactado en el contrato de capitulaciones. Véase, 31 L.P.R.A. sec. 3551;

KLAN201001695                                                          36

Gil Enseñat v. Marini Román, 167 D.P.R. 553 (2006); Maldonado v.
Cruz Dávila, supra.

En cuanto a la interpretación del contrato de capitulaciones,
nuestro más alto Foro expresó que, además de ser claras y precisas las
estipulaciones del contrato de capitulaciones, éstas deben interpretarse
estrictamente en todo lo que afecten al régimen económico matrimonial.
Vilariño Martínez v. Registrador, supra. No obstante, en ocasiones de
conflictos sobre una escritura de capitulaciones matrimoniales, la
facultad de interpretación compete al foro judicial.   Los tribunales
deberán ejercer su facultad interpretativa de conformidad con las
normas de hermenéutica contractual establecidas en el Código Civil.
Guadalupe Solís v. González Durieux, 172 D.P.R. 676 (2007).

A esos efectos, es norma reiterada que cuando los términos de un
contrato son claros y no dejan duda alguna sobre la intención de las
partes, se utilizará el sentido literal de sus cláusulas. Véase, 31 L.P.R.A.
sec. 3471; Rivera Carrasquillo v. A.A.A., 177 D.P.R. 341 (2009);
Trinidad García v. Chade, 153 D.P.R. 280, 291 (2001).

**B. Cuota Usufructuaria**

La legítima del cónyuge supérstite es un derecho que la ley le
atribuye de carácter concurrente con el derecho de cualquier otro
legitimario, que consiste en un usufructo de cuantía variable,
dependiendo de la clase de legitimarios que concurran en la herencia
con éste. Véase, Artículos 736 y 761 del Código Civil de Puerto Rico, 31
L.P.R.A. 2362 y 2411, respectivamente.  Sin embargo, dicho derecho
está limitado, pues no recibe bienes del caudal en pleno dominio, sino

sólo en usufructo. E. González Tejera, <u>Derecho de Sucesiones</u>, San Juan, Editorial de la Universidad de Puerto Rico, 2001, T. I, pág. 101.

En <u>Ab Intestato Saldaña Candelario</u>, 126 D.P.R. 640 (1990), nuestro más alto Foro se expresó en cuanto a la figura del usufructo viudal en el contexto de un matrimonio cuyo régimen económico se encontraba delimitado por capitulaciones matrimoniales. Sobre el particular, dispuso lo siguiente:

> La fuente del derecho a la cuota viudal usufructuaria es el Art. 761 del Código Civil, 31 L.PR.A. sec. 2411, expositivo de que "[e]l viudo o viuda que al morir su consorte no se hallare divorciado, o lo estuviere por culpa del cónyuge difunto, *tendrá derecho a una cuota, en usufructo*, igual a la que por *legítima* corresponde a cada uno de sus hijos o descendientes legítimos no mejorados". (Énfasis suplido.) El Código Civil no distingue a aquellos cónyuges supérstites cuyo régimen económico matrimonial estuvo regido por capitulaciones de aquellos cónyuges supérstites sujetos a las disposiciones de la sociedad legal de gananciales. Ante ese silencio legislativo, resolvemos que debe aplicarse el principio de que "cuando la ley no distingue, tampoco nos incumbe distinguir". Ochoteco, *supra.* 84-85.

> Sobre este particular, Manresa sostiene que "[e]l régimen de la sociedad conyugal, aceptado por los contrayentes respecto a los bienes, aun cuando sea el de la *separación*, tampoco influye en la concesión del derecho al viudo". J.M. Mairesa, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1973, T. VI, Vol. 1, pág.- 895. Por otro lado, Puig Brutau, al glosar el tema de la legítima del cónyuge supérstite con lógica nos dice que "[u]n derecho propiamente sucesorio a favor del cónyuge supérstite, *será tanto más necesario* cuando, por haber vivido el matrimonio bajo un régimen de *absoluta separación de bienes*, no exista un derecho de participar en las ganancias obtenidas en vida por el pre-muerto". (Énfasis suplido.) J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1977, T. Vol. 111, pág. 107.

> Aun cuando las capitulaciones matrimoniales constituyen un contrato sujeto al régimen de libertad que impera en nuestro sistema de contratación, la autonomía

de la voluntad le las partes no es absoluta. *Umpierre v. Torres Díaz*, 114 D.P.R.449, 459 (1983). Los otorgantes de capitulaciones matrimoniales no podrán estipular nada que sea contrario a las leyes o a las buenas costumbres ni depresivo de la autoridad que respectivamente corresponda en la familia a los futuros cónyuges. Art. 1268 del Código Civil, 31 L.P.R.A. sec. 3552; Art. 1207 del Código Civil, 31 L.PR.A. sec. 3372. Esa restricción contractual, en armonía con el Art. 1223 del Código Civil, 31 L.PR.A. sec. 3421 prohíbe generalmente la contratación sobre la herencia futura. Es razonable concluir, pues, que los cónyuges que optan por regular su relación patrimonial mediante un régimen de separación no pueden renunciar en forma expresa o tácita al derecho de usufructo viudal. Ochoteco, *supra,* pág. 86. Al respecto, Manresa indica que "la renuncia o transacción sobre la legítima que debe corresponder a alguno de los desposados, la condición de haber de aportarse al matrimonio... constituye otra serie de actos prohibidos en general por la ley, y no admisibles, por tanto en las capitulaciones matrimoniales". Manresa, *op cit.,* 1969, T. IX, pág. 144. Esta conclusión está en armonía y encuentra apoyo en nuestra jurisprudencia, la cual ha reconocido que el cónyuge viudo es un *heredero forzoso.* *Colón Gutiérrez v. Registrador,* 114 D.P.R. 850, 858 91983); Art. 736 del Código Civil, 31 L.P.R.A. sec. 2362.



Cabe   nuevamente   reproducir   el   análisis   de Ochoteco:

Al   determinar   dicho   Código   quiénes pueden suceder con testamento y quiénes son incapaces para ello (artículos 675 y 676), no incluye entre los últimos al viudo o viuda de los que       fallezcan       bajo       capitulaciones matrimoniales,   como   tampoco   excluye   a aqu[é]llos en su artículo 642 entre las personas que deben ser citadas en los procedimientos de protocolización de los testamentos ológrafos.

Y   es   lógico   que   así   sea,   ya   que   las capitulaciones matrimoniales sólo dan  vida a un régimen económico que no tiene, ni puede tener pacto alguno con la muerte y en cuanto a los  herederos  sucesorios  se  refiere,  con  las solas excepciones dispuestas por ley.

Por disposición terminante del artículo 603 de dicho cuerpo legal, la muerte y sólo la muerte   engendra   la   transmisión   de   los

> derechos de sucesión de un finado, que por
> ficción de ley, continúa viviendo en la persona
> de sus herederos; *Porto Rico R. L. & P. Co. vs,
> Corte de Distrito*, 38 D.P.R. 340 (1928). No
> alcanzamos a comprender, cómo el óbito de un
> cónyuge puede arrastrar hasta la tumba la
> personalidad que como tal cónyuge ha
> conservado el supérstite durante la convivencia
> matrimonial, y no obstante la existencia y sus
> efectos únicamente económicos, reiteramos, de
> las                capitulaciones            matrimoniales
> capitulaciones matrimoniales, al igual que
> sucede con la propia sociedad de gananciales.
> (Cita omitida). Ochoteco, *supra,* pág. 85.

El Artículo 765 del Código Civil de Puerto Rico, 31 L.P.R.A. sec.

2415, le otorga a los herederos la facultad de satisfacer al cónyuge

supérstite la parte de su usufructo, asignándole una renta vitalicia, o

los productos de determinados bienes o un capital en efectivo,

procediendo de mutuo acuerdo. <u>Colón Gutiérrez v. Registrador</u>, 114

D.P.R. 850, 859 (1983); <u>Cortés Córdova v. Cortés Rosario</u>, 86 D.P.R.

117, 123 (1962). A esta forma de los herederos satisfacer la cuota

usufructuaria al cónyuge supérstite, se le denomina en derecho

sucesorio como conmutación, conversión o sustitución del usufructo

viudal. *Id.* Esto sólo procederá por mutuo acuerdo de los herederos, y,

en su defecto, por virtud de mandato judicial. Véase, Artículo 765 del

Código Civil de Puerto Rico, *supra.*

En caso de no existir acuerdo entre los herederos y el cónyuge

supérstite, el Artículo 765, *supra*, le concede al foro sentenciador la

facultad de decidir la forma de pago que estime más equitativa y justa

de las que la ley establece. <u>Calimano Díaz v. Rovira Calimano</u>, 113

D.P.R. 702, 711 (1983). Este desacuerdo es una cuestión de hecho no

impugnable en apelación cuando no se demuestre error evidente. *Id.*, a las págs. 709-710.

Mientras no se efectúe la conmutación, todos los bienes de la herencia estarán afectos al pago de la referida cuota viudal usufructuaria. Colón Gutiérrez v. Registrador, *supra.* "[S]e trata 'de una garantía pa[ra] asegurar el pago de lo que si bien puede ser un derecho real, autoriza la ley para que se convierta en una obligación de los herederos propietarios'. [C]omo corolario de lo anteriormente expresado, una vez es satisfecha o efectivamente asegurada la cuota usufructuaria no hay razón legal alguna para requerir la participación o consentimiento del cónyuge supérstite en las actividades particionales que realicen los otros herederos." *Id.*, a la pág. 860, citando a J.M. Manresa, *Comentarios al Código Civil Español,* 8va. Ed. Madrid, Ed. Reus, S.A., T. VI, Vol. I, págs. 929-930.

La opción en la forma de satisfacer la cuota viudal usufructuaria solamente puede ejercitarse una vez y antes, o al momento, de efectuarse la partición. Colón Gutiérrez v. Registrador, *supra*, a la pág. 861. En la valoración de la cuota viudal se considera el valor de los bienes al momento de efectuarse la conversión o conmutación para así proteger adecuadamente los derechos del cónyuge supérstite. *Id.*

El monto del usufructo viudal, al igual que la porción del caudal que quedará gravado, dependerá de los parientes con los que concurra el cónyuge supérstite. Si el cónyuge supérstite concurre con un sólo hijo o descendiente, le corresponde el tercio de mejora en usufructo. Si concurre con hijos o descendientes de un mismo matrimonio o relación amorosa, su usufructo se obtiene dividiendo la legítima larga menos las

mejoras, entre el número de hijos y el cónyuge supérstite. En este caso quedará gravado el tercio de mejora. Si el cónyuge supérstite concurre con hijos o descendientes de diferentes matrimonios o relaciones amorosas, el usufructo se obtiene dividiendo la legítima larga menos las mejoras entre el número de hijos, sin incluirlo a éste. E. Martínez Moya, El Derecho Sucesorio Puertorriqueño, 67 Rev. Jur. U.P.R. 1 (1998). En el caso de que concurra con hijos de dos o más matrimonios, el usufructo correspondiente al cónyuge supérstite de segundas nupcias se detraerá de la tercera parte de la libre disposición. Véase, Art. 766 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2416.

La fórmula para determinar el capital en efectivo para pagar la cuota usufructuaria, según lo dispuesto en el Art. 765, *supra*, parte de la premisa de que el principal del usufructo debe producir una renta anual a razón de un seis porciento (6%). Calimano Díaz v. Rovira Calimano, *supra;* Vda. de Giol v. Giol García, 98 D.P.R. 227, 234 (1969). Ahora bien, para determinar el valor actual de dicha anualidad en determinado número de años se multiplica la misma por el valor de un dólar ($1.00) por año pagadero al final de cada año, durante el número de años determinado como la expectativa de vida del cónyuge supérstite a partir del fallecimiento del causante. Vda. de Seraballs v. Abella Hernández, 90 D.P.R. 368, 370 (1962).

A estos efectos, los pasos a seguir para determinar el valor presente de la cuota viudal usufructuaria son los siguientes:

1. Determinar el valor de la cuota usufructuaria al momento de la conversión o conmutación;
2. Determinar la edad del cónyuge supérstite a la fecha de la muerte del causante;

3. Una vez se obtiene la edad del cónyuge supérstite, se procede a utilizar la Tabla de Expectativa de Vida Promedio en Puerto Rico. Localizar la edad del cónyuge supérstite, según su sexo, en dicha tabla y ésta le indicará la expectativa de vida de dicho cónyuge supérstite.

4. Una vez se obtiene la expectativa de vida del cónyuge supérstite, se busca el factor matemático para conmutar el valor actual de cada dólar pagadero al final de cada año al interés compuesto de un seis porciento (6%) anual en la Tabla para determinar la conmutación del usufructo.

5. Multiplicar el valor de la cuota usufructuaria por el seis porciento (6%). El producto obtenido es la renta anual pagadera al final de cada año ('ordinary annuity').

6. Multiplicar la renta anual por el factor matemático obtenido. El resultado es la cantidad que se debe entregar al cónyuge supérstite, tomando éste dicha cantidad como único titular. J. Muñiz Belbrú, *Herencia, El Usufructo Viudal, Determinación y Liquidación,* Puerto Rico, 1997, pág. 42; E. González Tejera, *op. cit.,* págs. 121-122.



## C. Preterición

Cuando un testador priva tácita y totalmente de su legítima a un heredero forzoso se produce lo que se conoce como preterición. <u>Blanco v. Sucn. Blanco Sancio,</u> 106 D.P.R. 471, 475 (1977). La preterición consiste en omitir a un heredero en el testamento o cuando aun nombrándole como padre, hijo, u en otro carácter, no se instituye como heredero ni se le deshereda expresamente, y tampoco se le asigna parte alguna de los bienes, por lo cual es privado de un modo tácito de su derecho a la legítima. <u>Cabrer v. Registrador,</u> 113 D.P.R. 424, 437 (1982); <u>Blanco v. Sucn. Blanco Sancio,</u> *supra,* a la pág. 476.

El Artículo 742 del Código Civil, 31 L.P.R.A. sec. 2368, dispone lo siguiente respecto al concepto de la preterición:

La preterición de alguno o de todos los herederos forzosos en línea recta, sean que vivan al otorgarse el testamento o sea que nazcan después de muerto el testador, anulará la

institución del heredero; pero valdrán las mandas y mejoras en cuanto no sean inoficiosas.

La preterición del viudo o viuda no anula la institución; pero el preterido conservará los derechos que le conceden este título.

Si los herederos forzosos preteridos mueren antes que el testador, la institución surtirá efecto.

La preterición de un heredero forzoso no produce la nulidad del testamento. Por el contrario, su efecto es la nulidad de la institución de herederos. Cabrer v. Registrador, *supra*, a la pág. 436; Blanco v. Sucn. Blanco Sancio, *supra*; Díaz Lamoutte v. Luciano, 85 D.P.R. 834, 857-858 (1962); Cortés v. Cortés, 73 D.P.R. 693 (1952). Sin embargo, si a un heredero no se le instituye como tal en un testamento, pero se le deja al menos un legado, ello no conlleva su preterición y no queda anulada la institución de herederos. Procede su complemento.

Conforme al Artículo 742 del Código Civil, *supra,* en los casos de preterición testamentaria de un heredero forzoso, sobreviven las mandas y legados que no sean inoficiosas. Véase, E. González Tejeras, *Derecho Sucesorio Puertorriqueño*, San Juan; Puerto Rico, Ramallo Bros. Printing, Inc., 1983, a la pág. 429; Cortés v. Cortés, *supra*, a la pág. 707.

**D. Descubrimiento de Prueba**

Nuestro ordenamiento jurídico exige una serie de requisitos con los que deben cumplir los procedimientos adversativos de forma cónsona con el debido proceso de ley, en su dimensión procesal. Estos son: "a) notificación adecuada de la reclamación presentada; b) proceso ante un juzgador imparcial; c) oportunidad de ser oído; d) derecho a contrainterrogar testigos y examinar la evidencia presentada en su

KLAN201001695                                                              44

contra; e) tener asistencia de abogado; y, f) que la decisión se base en el récord." *Álvarez v. Arias*, 156 D.P.R. 352, 365 (2002). *Véase, además:* Feliciano Figueroa, et. als. v. Toste Piñero, 134 D.P.R. 909, 914-915 (1993); Rivera Rodríguez & Co. v. Stowell Taylor, Ect., 133 D.P.R. 881, 889 (1993). También se ha establecido que como parte del debido proceso de ley todo individuo tiene derecho de presentar prueba oral y escrita a su favor. López y otros v. Asoc. De Taxis de Cayey, 142 D.P.R. 98, 114 (1996).

Aunque es cierto que el derecho constitucional al debido proceso de ley exige la concesión de vista, el derecho a ser oído, presentar prueba y confrontar a los testigos, el mismo no priva a los tribunales de su discreción para controlar los procesos ante sí. Ello es así de conformidad con la clara y firme política de que los casos sean resueltos en sus méritos. Neptune Packing Corp. v. Wackenhut Corp., 120 D.P.R. 283, 293 (1988).

Como es sabido, la Regla 23 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 23, rige el descubrimiento de prueba entre las partes antes del juicio. De dicha disposición procesal se desprende el principio rector de que el descubrimiento de prueba debe ser amplio y liberal, siempre que las materias no sean de carácter privilegiado y que tengan pertinencia al asunto en controversia. Alfonso Brú v. Trane Export Inc., 155 D.P.R. 158 (2001); Rivera y otros v. Banco Popular de Puerto Rico, 152 D.P.R. 140 (2000); Aponte v. Sears Roebuck de Puerto Rico, 129 D.P.R. 1042, 1049 (1992); General Electric v. Concessionaires, Inc., 118 D.P.R. 32, 40 (1986); Lluch v. España Service Station, 117 D.P.R. 729, 743 (1986); Ades v. Zalman, 115 D.P.R.




KLAN201001695                                                                    45

514, 518 (1984); <u>Rivera Alejandro v. Algarín</u>, 112 D.P.R. 830, 834
(1982); <u>Rodríguez v. Scotiabank</u>, 113 D.P.R. 210 (1982). Un sistema
liberal de descubrimiento de prueba facilita la tramitación de los pleitos
y evita las sorpresas e injusticias que surgen cuando las partes ignoran
hasta el día de la vista, las cuestiones y los hechos que en realidad son
objeto del litigio. <u>General Electric v. Concessionaires, Inc.</u>, *supra*; <u>Lluch
v. España Service Station</u>, *supra*.

Los tribunales vienen obligados a cumplir con su objetivo de
llevar a cabo un proceso justo, rápido y económico para las partes,
asumiendo un rol activo en el mismo. Por ello, poseen amplia discreción
para limitar o extender el alcance del descubrimiento de prueba. Como
norma general, también gozan de poderes específicos de supervisión a
través de los mecanismos particulares de descubrimiento de prueba y el
poder para sancionar a la parte que es compelida y se rehúsa a cumplir
las órdenes dirigidas a descubrir prueba. Regla 23.2 de Procedimiento
Civil, 32 L.P.R.A. Ap. V, R. 23.2; <u>Medina v. Merk Sharp & Dohme</u>, 135
D.P.R. 716, 730-731 (1994); <u>Ortiz Rivera v. ELA, National Insurance
Co.</u>, 125 D.P.R. 65, 70 (1989); <u>Granados v. Rodríguez Estrada II</u>, 124
D.P.R. 593 (1989); <u>Dávila v. Hospital San Miguel Inc.</u>, 117 D.P.R. 807
(1986); <u>General Electric v. Concessionaires Inc.</u>, *supra*, pág. 38-39.

En el caso de <u>Rivera y otros v. Bco. Popular</u>, *supra*, a la pág. 152,
el Tribunal Supremo de Puerto Rico también se expresó en torno a otros
intereses que se adelantan con el descubrimiento de prueba. Dicho
Foro expresó que:




Estos mecanismos están basados en el principio básico de
que, antes del juicio, las partes tienen derecho a descubrir

toda la información relacionada con su caso, independientemente de quién la posea...

Las normas de descubrimiento de prueba persiguen los siguientes propósitos: (1) precisar los asuntos en controversia; (2) obtener evidencia para ser utilizada en el juicio, evitando así sorpresas en esta etapa de los procedimientos; (3) facilitar la búsqueda de la verdad; y (4) perpetuar evidencia. **En esencia, su finalidad es permitir que las partes puedan prepararse para el juicio, de forma tal que tengan la oportunidad de obtener la evidencia necesaria para evaluar y resolver las controversias del caso**...No obstante, los tribunales de instancia tienen amplia discreción para regular el ámbito del descubrimiento, pues es su obligación garantizar una solución justa, rápida y económica del caso, **sin ventaja para ninguna de las partes**. <u>Rivera y otros v. Bco. Popular</u>, *Id.* (Énfasis nuestro.)

### E. Donaciones



Nuestro estado de derecho establece que por la *donación,* una persona dispone gratuitamente de una cosa en beneficio de otra que la acepta. Véase, 31 L.P.R.A. sec. 1981. La principal característica de esta figura es la liberalidad (*animus donandi*), por lo que, en ausencia de la intención de gratificar a quien ésta le favorece, el acuerdo habido entre las partes no consiste propiamente de una donación, aunque el mismo se asemeje a sus características. <u>Lage v. Central Fed. Savings,</u> 108 D.P.R. 72 (1978); <u>Senior Las Marías v. Registrador,</u> 113 D.P.R. 675 (1982). Por tanto, para que determinada transacción se repute como donación, es necesaria la concurrencia de los siguientes criterios: 1) intención predominante de beneficiar y; 2) ausencia de causa. <u>Senior Las Marías v. Registrador,</u> *Id.*

La donación supone una disminución en el patrimonio del donante y un aumento en el del donatario. Por ello, se le califica como un negocio jurídico voluntario de índole traslativo, caracterizado por el

empobrecimiento de uno y el enriquecimiento del otro. J.R. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos,* Revista Jurídica de la Universidad Interamericana de Puerto Rico, Facultad de Derecho, Tomo IV, Vol. II, 1990, pág. 221. En atención al momento en que la misma ha de producir efecto legal, la doctrina distingue entre las donaciones entre vivos o por causa de muerte. En lo pertinente, aquéllas que han de cobrar eficacia en vida se rigen por la norma general del derecho de obligaciones y contratos en todo lo que no regule el Título III de nuestro Código Civil. Las donaciones por causa de muerte "se regirán por las reglas establecidas para la sucesión testamentaria". Véase, 31 L.P.R.A. sec. 1985.

El Artículo 578 del Código Civil, 31 L.P.R.A. sec. 2023, establece que ninguna persona podrá dar ni recibir, por vía de donación, más de lo que pueda dar o recibir por testamento y que la donación será inoficiosa en todo lo que exceda de esta medida. Una donación inoficiosa deberá ser reducida en cuanto al exceso, luego de computado el valor líquido de los bienes del donante al tiempo de su muerte, pero dicha reducción no obstará para que tenga efecto durante la vida del donante y para que el donatario haga suyos los frutos. Véase, Artículo 596 del Código Civil, 31 L.P.R.A. sec. 2051. Asimismo, nos indica el Artículo 746 del Código Civil, 31 L.P.R.A. sec. 2372, que en el caso de las donaciones colacionables se tomará en consideración el valor de éstas al momento de haberse hecho.

A tenor con ello "...la colación por parte del donatario legitimario se da solamente en cuanto al valor de lo recibido al momento de la donación." González Tejera, *supra,* a la pág. 380. Esta es la norma en

Case:14-00002-BKT Doc#:1-2 Filed:01/02/14 Entered:01/02/14 16:49:56 Desc:
Exhibit B Page 50 of 69

nuestro ordenamiento sucesoral, aun cuando ello no produzca un trato igualitario entre los herederos forzosos. *Id.*

El Artículo 989 del Código Civil, 31 L.P.R.A. sec. 2841, establece que "el heredero forzoso que concurra con otros que también lo sean a una sucesión, deberá traer a la masa hereditaria los bienes o valores que hubiese recibido del causante de la herencia, en vida de éste, por dote, donación u otro título lucrativo, para computarlo en la regulación de las legítimas y en la cuenta de partición." Asimismo, el Artículo 1001 del Código Civil, 31 L.P.R.A. sec. 2853, dispone que "el donatario tomará de menos en la masa hereditaria tanto como ya hubiese recibido, percibiendo sus coherederos el equivalente, en cuanto sea posible, en bienes de la misma naturaleza, especie y calidad."

Cuando se trata de una donación realizada a uno de los herederos forzosos de una sucesión, éste viene obligado a la colación de los bienes recibidos, "para computarlo en la regulación de las legítimas y en la cuenta de la partición." Véase, 31 L.P.R.A. sec. 2841; Sucn. Toro v. Sucn. Toro, 161 D.P.R. 391, 398-399 (2004); González Muñiz, *Ex parte*, 128 D.P.R. 565, 575 (1991).

Por otro lado, el Artículo 1287 del Código Civil dispone que: "será nula toda donación hecha durante el matrimonio, por uno de los cónyuges, a los hijos que el otro cónyuge tenga de diverso matrimonio, o a las personas de quienes sea heredero presunto, al tiempo de la donación." 31 L.P.R.A. sec. 3589. Por ser nulas *ab initio*, dichas donaciones deben ser devueltas al caudal hereditario. Lo mismo ocurre con las donaciones efectuadas entre cónyuges durante la vigencia de su

KLAN201001695                                                                    49

matrimonio, conforme al Artículo 1286 del Código Civil. 31 L.P.R.A sec.

3588.

### F. Daños y Perjuicios

El Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec.

5141, establece la obligación de reparar daños causados en los que

medie culpa o negligencia. En particular, dispone:

> El que por acción u omisión causa daño a otro, interviniendo
> culpa o negligencia, está obligado a reparar el daño causado.
> La imprudencia concurrente del perjudicado no exime de
> responsabilidad, pero conlleva la reducción de la
> indemnización.

Para que surja la responsabilidad civil extracontractual al amparo

de dicha disposición deben concurrir los siguientes tres elementos: un

daño, una acción u omisión negligente o culposa y, la correspondiente

relación causal entre ambos. Rivera v. S.L.G. Díaz, 165 D.P.R. 408

(2005); Toro Aponte v. E.L.A. 142 D.P.R. 464 (1997); Ramírez v. ELA,

140 D.P.R. 385 (1996).

La culpa o negligencia es la falta del debido cuidado al no

anticipar y prever las consecuencias racionales de un acto, o la omisión

de un acto, que una persona prudente y razonable habría previsto en

las mismas circunstancias. Rivera v. S.L.G. Díaz, supra; Ramos v.

Carlo, 85 D.P.R. 353 (1962); Toro Aponte v. E.L.A., supra. El concepto

de "culpa" del Artículo 1802, supra, es tan infinitamente abarcador

como lo suele ser la conducta humana. Por ello, ésta se debe analizar

con un criterio amplio. Rivera v. S.L.G. Díaz, supra; Toro Aponte v.

E.L.A., supra; Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1 (1994).

Sobre el elemento de la causalidad, en nuestra jurisdicción rige la

doctrina de la causalidad adecuada. Conforme a ella, se considera



causa aquella condición que ordinariamente produciría el daño, según la experiencia general. *Id.*; Toro Aponte v. E.L.A., *supra*; Soto Cabral v. E.L.A., 138 D.P.R. 298 (1995).

En cuanto al tercer requisito, el daño, el Tribunal Supremo ha expresado que éste constituye el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención de una norma jurídica y por el cual ha de responder otra persona. Nieves Díaz v. González Massas, 178 D.P.R. 820 (2010); Ramírez Ferrer v. Conagra Foods PR, 175 D.P.R. 799 (2009); López v. Porrata Doria, 169 D.P.R. 135, 151 (2006). En los casos en que el daño alegado se deba a una omisión, se configurará una causa de acción cuando: "(1) exista un deber de actuar y se quebrante esa obligación, y (2) cuando de haberse realizado el acto omitido se hubiese evitado el daño." Santiago v. Sup. Grande, 166 D.P.R. 796, 807 (2006). Por lo anterior, en contextos caracterizados por una especie de inadvertencia u omisión, procede determinar si existía un deber jurídico de actuar por parte de quien alegadamente causó el daño. Arroyo López v. E.L.A., 126 D.P.R. 682, 686-87 (1990).

Existen dos tipos de daños: (1) los daños especiales, conocidos como daños físicos, patrimoniales, pecuniarios o económicos; y (2) los daños generales, conocidos como daños morales. Los daños especiales se refieren a "toda aquella pérdida que recae sobre bienes objetivos, pues éstos admiten valoración económica debido a que impactan directamente el patrimonio del perjudicado." Nieves Díaz v. González Massas, *supra.* Véase, además, Rivera v. S.L.G. Díaz, *supra,* a la pág. 428. Los daños generales son los infligidos a las creencias, los

KLAN201001695                                                              51

sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado. *Id.* **La valoración de los daños generales descansa en la sana discreción del juzgador basada en los hechos que considere probados.** *Id.*

Sobre la estimación y valoración de los daños, el Tribunal Supremo ha resuelto que se trata de una gestión judicial difícil y angustiosa, debido a que no existe un sistema mecánico que permita llegar a un resultado exacto con el cual todas las partes queden satisfechas y complacidas. Blas Toledo v. Hospital Nuestra Sra. de la Guadalupe, 146 D.P.R. 267, 339 (1998). Dicha valorización conlleva siempre cierto grado de especulación. No obstante, el derecho a ser compensado no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de daños. Rivera v. Pitusa Inc., 148 D.P.R 695, 700 (1999); Odriozola v. S. Cosmetic Dist. Corp., 116 D.P.R. 485, 510 (1985). Al medir los daños, el juzgador debe hacerlo a base de la prueba, procurando siempre que la indemnización no se convierta en una industria. Atiles Moreu, Admor. v. McClurg, 87 D.P.R. 865, 877 (1963).

En relación con esta difícil y angustiosa labor, también se ha reconocido que, de ordinario, el tribunal de primera instancia está en una mejor posición que los tribunales apelativos para evaluar la situación, debido a que son éstos los que tienen contacto directo con la prueba que a esos efectos se presenta. Blas Toledo v. Hospital Nuestra Sra. de la Guadalupe, *supra.* Ese contacto con la prueba y las impresiones derivadas de la apreciación visual del juez, es la razón principal para que, en ausencia de un dictamen en el que se imponga

KLAN201001695                                                                 52

una cuantía ridículamente baja o exageradamente alta, prevalezca la
norma de abstención judicial fundada en criterios de estabilidad y de
respeto a los tribunales de primera instancia. Publio Díaz v. E.L.A., 106
D.P.R. 854, 868 (1978). En todo caso, corresponde a la parte que
solicita la modificación de las sumas concedidas demostrar la existencia
de circunstancias que hagan meritorio que se modifique esa cuantía.
Canales Velázquez v. Rosario Quiles, 107 D.P.R. 757 (1978); Rodríguez
Cancel v. E.L.A., *supra*.

### G. Responsabilidad Solidaria

Nuestro ordenamiento jurídico reconoce la responsabilidad
solidaria entre los co-causantes de un daño. Arroyo v. Hospital de la
Concepción, 130 D.P.R. 596 (1992). El Artículo 1097 del Código Civil,
31 L.P.R.A. sec. 3108, dispone que cuando se tienen deudores
solidarios, "el acreedor puede dirigirse contra cualquiera de los
deudores solidarios o contra todos ellos simultáneamente. Las
reclamaciones entabladas contra uno no serán obstáculo para las que
posteriormente se dirijan contra los demás, mientras no resulte cobrada
la deuda por completo".

Posteriormente, el Artículo 1098 del Código Civil, 31 L.P.R.A. sec.
3109, dispone que "[e]l pago hecho por uno de los deudores solidarios
extingue la obligación". Ahora bien, "[e]l que hizo el pago sólo puede
reclamar de sus codeudores la parte que a cada uno corresponda, con
los intereses del anticipo". Nuestro más alto Foro ha expresado que,
una vez un deudor solidario realiza un pago en proporción mayor a la
responsabilidad que le corresponde, surge a su haber un crédito a ser
satisfecho mediante la acción de nivelación, que no es otra cosa que el



derecho a reclamar la cuantía satisfecha en exceso de su responsabilidad objetiva. S.L.G. Szendrey v. Hospicare, Inc., 158 D.P.R. 648, 654 (2003); García v. Gobierno de la Capital, 72 D.P.R. 138 (1951).

Por otro lado, también se ha reconocido que "el codeudor solidario que por haber pagado en exceso de lo que le corresponda a base de la relación interna entre codeudores solidarios, tenga derecho a ejercitar la acción de nivelación, tiene la opción de hacerlo mediante un pleito independiente o dentro del pleito en que se dictara la sentencia en que se hubiere determinado la solidaridad de la obligación". Soc. de Gananciales v. Soc. de Gananciales, 109 D.P.R. 279, 285-286 (1979).

**H. Valoración de Daños**

En lo concerniente a la estimación y valoración de los daños, repetidamente se ha afirmado que se trata de una gestión judicial difícil y angustiosa puesto que no existe un sistema mecánico que permita llegar a un resultado exacto con el cual todas las partes queden satisfechas y complacidas. Blas Toledo v. Hospital Nuestra Sra. de la Guadalupe, 146 D.P.R. 267, 339 (1998); Rodríguez Cancel v. E.L.A., 116 D.P.R. 443, 451 (1985); Urrutia v. A.A.A., 103 D.P.R. 643, 647 (1975). Tal valorización entraña siempre cierto grado de especulación. Sin embargo, el derecho a ser compensado no puede derrotarse meramente por el carácter especulativo que en alguna medida supone el cómputo de daños. Rivera v. Pitusa Inc., 148 D.P.R 695, 700; Odriozola v. S. Cosmetic Dist. Corp., 116 D.P.R. 485, 510 (1985). Al medir los daños, el juzgador debe hacerlo a base de la prueba, procurando

KLAN201001695                                                              54

siempre que la indemnización no se convierta en una industria. Atiles
Moreu, Admor. v. McClurg, 87 D.P.R. 865, 877 (1963).

En relación con esta difícil y angustiosa labor, se ha reconocido
que, de ordinario, el tribunal de primera instancia está en una mejor
posición que los tribunales apelativos para evaluar la situación, puesto
que son los que tienen contacto directo con la prueba que a esos efectos
se presenta. Blas Toledo v. Hospital Nuestra Sra. de la Guadalupe,
*supra.* Ese contacto con la prueba y las impresiones derivadas de la
apreciación visual del juez, es la razón principal para que, en ausencia
de un dictamen en el que se imponga una cuantía ridículamente baja o
exageradamente alta, prevalezca la norma de abstención judicial
fundada en criterios de estabilidad y de respeto a los tribunales de
primera instancia. Publio Díaz v. E.L.A., 106 D.P.R. 854, 868 (1978).
En todo caso, corresponde a la parte que solicita la modificación de las
sumas concedidas demostrar la existencia de circunstancias que hagan
meritorio que se modifique esa cuantía. Canales Velázquez v. Rosario
Quiles, 107 D.P.R. 757 (1978); Rodríguez Cancel v. E.L.A., *supra.*

**I. Temeridad**

La temeridad es "una actitud que se proyecta sobre el
procedimiento y que afecta el buen funcionamiento y la administración
de la justicia. También sujeta al litigante inocente a la ordalía del
proceso judicial y lo expone a gastos innecesarios y a la contratación de
servicios profesionales, incluyendo abogados, con gravamen a veces
exorbitantes para su peculio". H. Sánchez Martínez, *Rebelde sin costas,*
Año 4 (Núm. 2) Boletín Judicial (abril-junio 1982); Oliveras, Inc. v.
Universal Ins. Co., 141 D.P.R. 900, 935 (1996).

El propósito de la imposición de honorarios por temeridad es penalizar a la parte "que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". Rivera v. Tiendas Pitusa, Inc., 148 D.P.R. 695, 702 (1999); Ramírez v. Club Cala de Palmas, 123 D.P.R. 339, 349-350 (1989). Se trata de un mecanismo para penalizar la conducta que propicia un pleito que se pudo haber evitado. Andamios de Puerto Rico, Inc. v. JPH Contractors, Corp., 179 D.P.R. 503 (2010).

Algunos de los actos que constituyen temeridad de una parte son: (1) si el demandado contesta una demanda y niega su responsabilidad total, aunque la acepte posteriormente, Rodríguez Cancel v. A.E.E., 116 D.P.R. 443 (1985); (2) si se defiende injustificadamente de la acción, Montañez Cruz v. Metropolitan Cons. Corp., 87 D.P.R. 38 (1962); (3) si la parte demandada no admite francamente su responsabilidad, para limitar la controversia a la fijación de la cuantía a ser concedida, Mercado v. American Railroad Co., 61 D.P.R. 228 (1943), Reyes v. Aponte, 60 D.P.R. 890 (1942); (4) si se arriesgó a litigar un caso del que se desprendía prima facie la negligencia, Pérez Cruz v. Hosp. La Concepción, 115 D.P.R. 721 (1984); (5) si niega un hecho que le consta que es cierto, Abreu Román v. Rivera Santos, 92 D.P.R. 325 (1965). En estos casos, el litigante perdidoso "[d]ebe asumir, pues, la responsabilidad por sus actos". Fernández v. San Juan Cement Co., 118 D.P.R. 713, 719 (1987).

La determinación de que una parte obró con temeridad descansa en la sana discreción del juez sentenciador. P.R. Oil v. Dayco, 164

KLAN201001695                                                              56

D.P.R. 486 (2005); Montañez Cruz v. Metropolitan Cons. Corp., 87
D.P.R. 38, 40 (1962). Una vez éste determina que hubo conducta
temeraria, procede la imposición de los honorarios de abogado. P.R. Oil
v. Dayco, supra, a la pág.1062; Jarra Corp. v. Axxis Corp., 155 D.P.R.
764 (2001).

### J. Apreciación de la Prueba

En ausencia de circunstancias extraordinarias, o indicios de
pasión, prejuicio, parcialidad o error manifiesto, la apreciación de la
prueba hecha por los tribunales de primera instancia merece deferencia
y respeto por parte del Tribunal de Apelaciones. Argüello v. Argüello,
155 D.P.R. 62 (2001); Trinidad v. Chade, 153 D.P.R. 280, 289 (2001);
Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996); Orta v.
Padilla, 137 D.P.R. 927 (1995). Los tribunales apelativos deben prestar
la debida deferencia a la apreciación de los hechos y la prueba
efectuada por el juzgador, por ser el foro más idóneo para llevar a cabo
esa función. McConnell v. Palau, 161 D.P.R. 734 (2004). No debemos
descartar esa apreciación, incluso cuando según nuestro criterio
hubiéramos emitido un juicio distinto con la misma prueba. Arguello v.
Arguello, supra; Trinidad v. Chade, supra; Acosta y Rodas, Inc. v.
PRAICO, 112 D.P.R. 583, 607 (1982).

Nuestro más Alto Foro ha expresado que la adjudicación de
credibilidad de un testimonio vertido ante el tribunal de instancia "es
merecedora de gran deferencia por parte del tribunal apelativo por
cuanto es ese juzgador quien está en mejor posición para aquilatar la
prueba testifical desfilada ya que él fue quien oyó y vio declarar a los
testigos". Pueblo v. Bonilla Romero, 120 D.P.R. 92, 111 (1987). Es

KLAN201001695 57

decir, sólo el juez de primera instancia tiene la oportunidad de ver al testigo declarar, escuchar su testimonio vivo y evaluar su *demeanor*. Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357, 365 (1982); Sepúlveda v. Depto. de Salud, 145 D.P.R. 560, 573 (1998).

El Tribunal Supremo ha expresado que los tribunales apelativos no están facultados para sustituir las apreciaciones de prueba y credibilidad de los testigos que realicen los tribunales de primera instancia por los propios. Rolón García y otros v. Charlie Car Rental, Inc., 148 D.P.R. 420, 433 (1999). Sin embargo, cuando del examen de la prueba se desprende que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios improbables o imposibles, se ha justificado la intervención del tribunal apelativo con la apreciación de la prueba realizada por el tribunal sentenciador. C. Brewer P.R., Inc. v. Rodríguez, 100 D.P.R. 826, 830 (1972); Pueblo v. Luciano Arroyo, 83 D.P.R. 573 (1961).

"El arbitrio del juzgador de hechos es respetable, mas no absoluto." Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987). Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. *Id.* No obstante, un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985).

Finalmente, la Regla 110 de Evidencia dispone que un testigo que merezca entero crédito al Tribunal de Primera Instancia es prueba suficiente de cualquier hecho. Véase, Regla 110 de las de Evidencia, 32

L.P.R.A. Ap. IV, R. 110; Trinidad v. Chade, *supra*; Pueblo v. Rodríguez Román, 128 D.P.R. 121, 128 (1991).

### III.

#### A.

1.  Erró el [TPI] al concluir que entre el causante y la señora Clara no se constituyó comunidad de bienes.

Según mencionamos anteriormente, previo a contraer nupcias el causante y Clara otorgaron capitulaciones matrimoniales en las cuales se determinó que no regiría la sociedad de gananciales, pero no se especificó el régimen económico que, en efecto, regularía el matrimonio. En Domínguez Maldonado v. E.LA., *supra,* nuestro Tribunal Supremo estableció, en lo que se refiere a este tipo de capitulaciones, que podrá surgir la comunidad de bienes si la pareja así se comportara, administrando conjuntamente su patrimonio y aportando trabajo y esfuerzos en común.

No obstante, de la prueba desfilada ante el TPI se desprende que el causante mantuvo pleno control y administración sobre sus bienes, al igual que Clara lo tuvo sobre los ingresos que ésta generaba como producto de su trabajo asalariado. Lo anterior también surge del testimonio de Clara, quien en el 1957, al momento de contraer matrimonio con el causante, trabajaba a tiempo completo devengando un sueldo módico y del cual fue pensionada por incapacidad en el 1971. Además, según indica el TPI en la *Sentencia* apelada, aun tomando como cierto que Clara trabajaba ayudando en la Armería, lo cierto es que la Armería es una corporación y, según se desprende de su propio

testimonio, el dinero del causante provenía mayormente de sus acciones e inversiones y no del Negocio de la Armería.

En cuanto a las cuentas de corretaje abiertas en vida por el causante a nombre de Clara, según surge de la prueba, éstas fueron firmadas sólo por Clara, pero sin aportación de capital alguno de su parte. Por ello, al igual que el TPI, concluimos que las mismas constituyen donaciones entre esposos, en contravención a lo dispuesto en el Artículo 1286 del Código Civil, *supra*. Dichas cuentas de corretaje de por sí no constituyen prueba suficiente para reconocer la existencia de una comunidad de bienes en contravención a lo estipulado en las capitulaciones.

De la prueba también surge, que previo a contraer nupcias con Clara, el causante ya trabajaba con efectos de armerías, negocio que continuó y expandió luego de su matrimonio, mientras Clara trabajaba por su lado a tiempo completo.



Por otro lado, el hecho de que Clara haya comparecido con el causante en la otorgación de varias escrituras no conlleva automáticamente la suposición de que éstos se comportaban como una sociedad legal de gananciales. Ello, debido a que el dinero utilizado para las transacciones salía del caudal del causante, quien era el único que lo administraba, tenía pleno control sobre él y trabajaba para aumentar el mismo.

A tenor con la situación presente en este caso y el estado de derecho vigente en nuestra jurisdicción a raíz de <u>Domínguez v. E.LA.</u>, *supra,* entendemos que no se constituyó una comunidad de bienes durante el matrimonio de Clara con el causante. Por el contrario, el

KLAN201001695                                                                   60

matrimonio siempre estuvo regido por la total separación de bienes.

Ello así, el TPI actuó conforme a derecho al así reconocerlo.

**B.**

> 2. Erró el [TPI] al practicar una partición hereditaria sin
> realizar inventario y avalúo, desviándose de los
> postulados que rigen la colación y adjudicando
> responsabilidad solidaria contra todas las
> codemandadas.

Las apelantes alegan que erró el TPI al realizar la partición de la

herencia sin antes realizar el correspondiente inventario y avalúo de los

bienes del caudal. Sin embargo, el informe pericial presentado por

Quiñones contó con un inventario y rastreo de los bienes del caudal, así

como con una correspondiente colación y partición de los bienes del

causante.[93] El mismo fue acogido por el TPI, ya que el testimonio de

Quiñones le mereció entero crédito y se sostuvo con la prueba desfilada

por la parte apelada. Además, las apelantes no presentaron prueba

pericial alguna que lo controvirtiera, a pesar de haber tenido tiempo

suficiente para ello.

Al encontrarse este Tribunal en igual posición que el TPI al

evaluar la prueba presentada y por entender que no medió prejuicio,

parcialidad o arbitrariedad en la apreciación de la prueba, concluimos

que no se cometió el error señalado.

Sobre la adjudicación de responsabilidad solidaria nos

expresaremos más adelante.

**C.**

> 3. Erró el [TPI] al concluir que Doña Clara no tiene derecho
> a la cuota viudal usufructuaria y al no hacer su
> adjudicación.

---

[93] Véase, Informe Pericial Enmendado del CPA Quiñones, págs. 253-302 del apéndice
del recurso de *Apelación*).

KLAN201001695                                                                61

De los hechos probados y no controvertibles surge que al momento de la muerte del causante, éste se encontraba casado con Clara mediante capitulaciones matrimoniales donde se especificó que no regiría la sociedad de bienes gananciales.  No obstante, según mencionamos anteriormente, en Ab Intestato Saldaña Candelario, *supra*, el Tribunal Supremo resolvió que independientemente de que en un matrimonio rija la total separación de bienes, posterior a la muerte de uno de los cónyuges procede el pago de la cuota viudal usufructuaria.

Como bien alega la parte apelante, surge del informe pericial presentado por Quiñones que del caudal relicto la cantidad de $752,492.00 corresponde a la cuota viudal usufructuaria, con un valor de conmutación de $389,105.00.[94]  Al no presentarse en juicio prueba que controvirtiera la información presentada en dicho informe pericial, y al ser acogido el mismo como válido por el TPI, concluimos que no está en controversia el evidente derecho a la cuota viudal usufructuaria de Clara sobre el caudal relicto.  Por lo anterior, erró el TPI al no adjudicarla.

**D.**

4. Erró el [TPI] al determinar que las apelantes adeudan dinero al demandante León hijo, por cuanto dicha determinación es contraria a derecho al no estar basada en el record ni haber tenido las demandadas la oportunidad de contrainterrogar al señor León hijo.

De la *Sentencia* apelada surge que la cuantía destinada para León, Jr. es por concepto de legítima estricta, como heredero forzoso del causante, y no por concepto de daños y perjuicios.  Por ello, es

---

[94] Véase, Anejo 8 del Informe Pericial Enmendado del CPA Quiñones (págs. 290 del apéndice del recurso de *Apelación*).

KLAN201001695                                                              62

improcedente la alegación de la parte apelante, de que al no haber
comparecido León, Jr. al juicio y no haber sido sometido a
contrainterrogatorio, no tiene derecho a suma alguna.  De reconocerse
como válida dicha alegación estaríamos en contravención al estado de
derecho vigente en nuestra jurisdicción a los efectos de que los
herederos forzosos no pueden ser privados de sus legítimas. Clavell
Rodríguez v. Registrador, 95 D.P.R. 348 (1967); Cód. Civil, Art. 741, 31
L.P.R.A. sec. 2367.

Por otro lado, la parte apelante alega que procede celebrar una
nueva vista para que León, Jr. presente su testimonio en referencia a
las donaciones recibidas por éste del causante.  Sin embargo,
entendemos que dicha alegación es improcedente, ya que durante el
descubrimiento de prueba la parte apelante tuvo a su disposición los
distintos métodos de descubrimiento para obtener dicha evidencia y no
los utilizó.

Cabe señalar que la parte apelante también tuvo la oportunidad
para refutar el informe del perito de la parte apelada y para traer al
caudal donaciones efectuadas por el causante a León, Jr. en vida.  Sobre
este particular y luego de un examen cuidadoso de los autos del caso,
surge  claramente  que  la  parte  apelante  no  presentó  prueba
contundente y dirigida concretamente a derrotar el informe pericial, el
cual mereció el entero crédito del juzgador del TPI.  Por lo anterior, no
se cometió el error señalado.

**E.**

5. Erró el [TPI] al decidir que las donaciones hechas por el
   causante a la codemandada Ixia Mercado son nulas, por
   cuanto la prohibición de nuestro Código Civil aludida

por el foro de instancia es inaplicable al caso de autos. Así como erró al no resolver como se tratarían las donaciones hechas por Clara a Nilsa.

Según mencionamos anteriormente, el Artículo 1287 del Código Civil, *supra*, prohíbe a un cónyuge realizar donaciones a los hijos del otro cónyuge que no sean suyos propios. Por lo anterior, habiendo previamente determinado que en el matrimonio Lyon-Concepción rigió la total separación de bienes y que, por lo tanto, el dinero utilizado para realizar las donaciones a Ixia correspondía al causante, aunque éste haya utilizado a Clara como intermediaria para realizar las mismas, éstas son nulas conforme al Artículo 1287, *Id.* Ello así, no se cometió el error imputado.



Por otro lado, en cuanto a las donaciones realizadas por Clara a Nilsa, entendemos que las mismas, aunque colacionables, fueron válidas. La prueba desfilada reflejó que se trataron de donaciones realizadas por el causante a su hija utilizando como intermediaria a su esposa Clara. Lo anterior, debido a que el dinero donado correspondía al causante y, más aún, ya que Clara carecía de los ingresos suficientes para tales efectos. Además, cabe señalar que dichas donaciones fueron colacionadas, según requerido por el Código Civil y según se desprende del informe pericial suscrito por Quiñones. Por tal motivo, dicha alegación carece de méritos.

**F.**

7. Erró el [TPI] al determinar que sólo se probaron $45,000.00 en préstamos de Tamara a Nilsa y al no imponer intereses sobre dicha suma.

La parte apelante alega que erró el TPI al cuantificar los alegados préstamos realizados por Tamara a favor de Nilsa, ya que según ésta,

KLAN201001695                                                                    64

los mismos exceden la cuantía impuesta.  Además, alega que procede la
imposición de intereses sobre dicha suma a razón del seis porciento
(6%)   anual conforme a la Regla 44.3(b) de Procedimiento Civil, 32
L.P.R.A. Ap. V, R. 44.3(b).

Luego de evaluada la prueba presentada en este caso, se
desprende del testimonio de Nilsa que, con la excepción del pagaré de
$20,000.00 emitido para garantizar el pago de la guagua Nissan, los
demás pagos hechos por Tamara a favor de Nilsa y los retiros de la
cuenta utilizando la ATH y tarjeta de crédito, fueron todos regalos y
dádivas entre hermanas. A diferencia de la transacción de la guagua, la
parte apelante no presentó evidencia alguna que acreditara el carácter
de préstamo de los distintos cheques emitidos por Tamara a favor de
Nilsa, como tampoco lo hizo sobre las transacciones efectuadas
utilizando la tarjeta de crédito o de ATH.   Además, Tamara tuvo la
oportunidad de controvertir en corte abierta el testimonio vertido por
Nilsa, más no lo hizo.

Por otro lado, surge de los estados de cuenta que obran en el
expediente que la cuenta de donde se realizaron las transacciones
utilizando la tarjeta de crédito o ATH estaba a nombre de ambas
Tamara y Nilsa.  Es decir, aunque el dinero haya sido propiamente de
Tamara, ésta última había autorizado a Nilsa a tener acceso a la misma
y a girar transacciones en su contra.  Ello así, diferimos del criterio del
TPI al evaluar las referidas transacciones y concluimos que el único
préstamo que otorgó Tamara a favor de Nilsa fue aquél de $20,000.00
sobre la guagua Nissan.  Habiendo Nilsa entregado en garantía ciertos
bienes valorados en $6,000.00, únicamente procede la deducción de

KLAN201001695                                                                    65

$14,000.00 en calidad de préstamo.   Cabe señalar que el pagaré

dispone que dicha suma será "without interest"[95], por lo que no procede

la imposición de intereses.

**G.**

> 8. Erró el [TPI] al determinar que el edificio donde ubica la
> Armería Metropolitana fue donado a la codemandada
> Tamara Lyon Concepción.

De la prueba desfilada ante el TPI surge que el causante y Clara

otorgaron una escritura de compraventa del edificio de la Armería a

favor de Tamara el 13 de julio de 1992 por la cantidad de $225,000.00,

al cual Quiñones le atribuye un valor de $312,750.00 a la fecha de la

muerte del causante.   Sin embargo, la parte apelada en ningún

momento pudo acreditar la validez de dicha transacción, ya que no

presentó evidencia alguna del pago realizado como contraprestación.

Por lo anterior, al igual que el TPI, concluimos que dicho negocio

constituyó una donación simulada que debe ser colacionada para la

posterior repartición de los bienes del caudal hereditario.

**H.**

> 6. Erró el [TPI] al concluir que las codemandadas
> ocasionaron daños a la demandante, que responden
> solidariamente, y que fueron temerarias.

> 9. Erró el [TPI] en su determinación de responsabilidad así
> como la valoración de la misma en contra de las
> codemandadas aquí comparecientes, por cuanto el
> dictamen apelado es contrario a la prueba desfilada.

Por el sexto y noveno señalamiento de error estar íntimamente

relacionados, procederemos a discutirlos en conjunto.

La parte apelante aduce que la determinación del TPI de que

éstos  causaron daños a Nilsa al usurpar los ingresos de su legítima



---

[95] Véase, *Automobile Chattel Mortgage*, pág. 338 del apéndice del recurso de *Apelación*.

KLAN201001695                                                          66

porción del caudal hereditario es improcedente, ya que ésta había recibido su caudal hereditario en vida.   No nos convence la tesis propuesta por los apelantes, ya que según surge de la prueba documental presentada ante este Tribunal, éstas participaron activamente y se confabularon a fin de defraudar el caudal hereditario. Por su parte, Nilsa testificó sobre su sufrimiento, angustias mentales, profunda tristeza, falta de sueño y depresión.   Su expresión, aspecto y comportamiento le dio a entender al TPI que había sufrido considerablemente.    Además, el TPI fue el juzgador ante quien declararon los testigos y quien tuvo la oportunidad de verlos declarar y apreciar su "demeanor". Ramos Acosta v. Caparra Dairy, Inc., *supra*; Flores v. Soc. Gananciales, *supra*.

Conforme a lo anterior, concluimos que la apreciación de la prueba realizada por el TPI merece gran deferencia, ya que de un examen minucioso de la misma no surgen indicios de error manifiesto, pasión, prejuicio o parcialidad.   Véase, Carrasquillo v. A.A.A., *supra*; Ramírez Ferrer v. Conagra Foods P.R., *supra*; Vélez v. Srio. de Justicia, *supra*.

En el recurso presentado, la parte apelante sostiene que el TPI erró en su determinación de imponerle el pago de $250,000.00 por concepto de daños y perjuicios a favor de Nilsa.   En ausencia de elementos que justifiquen modificar la cuantía impuesta por el TPI, nos encontramos impedidos de así hacerlo. Por las consideraciones antes expuestas,   y por entender, luego de un minucioso examen de la prueba, que no surge error manifiesto, pasión, prejuicio o parcialidad en la apreciación de la misma, por parte del TPI, no se cometió el error

señalado. Además, procede la determinación de solidaridad, ya que las apelantes, al actuar en común acuerdo, fueron las co-causantes de los daños sufridos por Nilsa.

En cuanto a la determinación de temeridad, tampoco se equivocó el TPI. Surge del expediente que las apelantes dilataron el procedimiento de descubrimiento de prueba al anunciar un perito que ni siquiera presentaron en el juicio. Además, de la prueba desfilada ante el TPI, y ahora ante este Tribunal, se desprende que las apelantes no tenían prueba suficiente ni contundente, como tampoco motivos fundados, para negar gran parte de la prueba ofrecida por la parte apelada. Esa temeridad las ha acompañado, incluso, hasta este Tribunal. Ello así, procede la determinación de temeridad impuesta por el TPI.

## IV.

Por los fundamentos antes expuestos, se modifica la *Sentencia* apelada y, así modificada, se confirma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones