## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **IN RE:** | **CASE NO. 13-09126** |
| **IXIA MERCADO CONCEPCION** | |
| **Debtor** | |
| **NILSA LYON RIOS** <br> **LEON LYON-REJINCOS** | **Chapter 7** |
| **Plaintiffs** <br> **vs.** | |
| **IXIA MERCADO CONCEPCION** <br> **BIANCA BLAY-MERCADO** <br> **MARCEL ENRIQUE BLAY-MERCADO** <br> **BLAY-MERCADO SIBBLINGS TRUST** <br> **LA ARMERÍA METROPOLITANA, INC.** <br> **NOREEEN WISCOVITCH RENTAS,** <br> **CHAPTER 7 TRUSTEE** | **Adversary No. 14-0002** |
| **Defendants** | **FILED & ENTERED ON 03/21/2017** |

## OPINION & ORDER

Before this Court is Plaintiffs' Motion for Partial Summary Judgment as to Count 5 of Amended Compliant ("Motion") filed on July 14, 2016 [Dkt. No. 155]. This Motion was unopposed by the Defendants despite receiving various extensions of time to oppose to the Motion. For the reasons set forth below, the Plaintiffs' Motion is GRANTED.

The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required. Under Fed.R.Civ.P., Rule 56(c), made applicable in bankruptcy by Fed.R.Bankr.P., Rule 7056, a summary judgment is available if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). See also, Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986). As to issues on which the movant, at trial, would be compelled to carry the burden of proof, it must identify those portions of the pleadings which it believes demonstrates that there is no genuine issue of material fact. In re Edgardo Ryan Rijos & Julia E. Cruz Nieves v. Banco Bilbao Vizcaya & Citibank, 263 B.R. 382, 388 (B.A.P. 1st Cir. 2001).

Even when a motion for summary judgment is unopposed, the court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law. Likewise, the court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact. In an unopposed motion for summary judgment, the court is still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate. Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19 (1st Cir.2006); Mullen v. St. Paul Fire and Marine Ins. Co., 972 F.2d 446, 452 (1st Cir.1992); Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7 (1st Cir.1990); Fed.R.Civ.P. 56(e)); and Pico Vidal v. Ruiz Alvarado, 377 B.R. 788 (D.P.R., 2007).

It is well-settled that "before granting an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it

to summary judgment as a matter of law." Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir.1991). Accordingly, we emphasize that courts "in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir.1993).

**Factual Background**

This amended complaint filed on June 3, 2014, [Dkt No. 24] stems from the determination of dischargeability of debt pursuant to 1 1 U.S.C. §523 (a)(2),(a)(4), and (a)(6), and to recover property of the bankruptcy estate pursuant to 11 U.S.C. §541 and §542.

The Defendant, Ixia Mercado Concepcion, filed bankruptcy on October 31, 2013, under a chapter 7 petition. On January 2, 2014, the Plaintiffs filed a complaint against the Defendants, amending the complaint on June 3, 2014 [Dkt. No. 24]. The Plaintiffs requested on July 14, 2016, [Dkt. 155] the determination of the Fifth Count of the Amended Complaint, for the piercing of the Blay-Mercado Trust ("Trust") to obtain a judgment pursuant to 11 U.S.C. § 541 and §542 to declare that the Trust is the alter ego of the bankruptcy estate and the assets of this Trust revert to the bankruptcy estate.

Several extensions were requested by the Trust to oppose to the Motion or to reach an agreement: July 26, 2016 [Dkt. No. 156]; August 29, 2016 [Dkt. No. 162]; September 9, 2016 [Dkt. No. 165]; October 17, 2016 [Dkt. No. 171]; October 21, 2016 [Dkt. No. 175]; November 11, 2016 [Dkt. No. 179]; December 2, 2016 [Dkt. No. 181]; and January 12, 2017 [Dkt. No. 186]. All these extensions were granted and as of this date no opposition nor agreement have been filed as to the Fifth Count of the Complaint.

On September 8, 2003, Plaintiffs filed a claim in Puerto Rico state court against the members of the estate of León Lyon Martin (Clara Concepción and Tamara Lyon) and against Ixia Mercado. Plaintiffs alleged that those defendants appropriated and stole the assets belonging to the estate of León Lyon Martin, exploiting the estate's resources for their personal benefit. As such, Plaintiffs were deprived of their corresponding participation in the estate as heirs. After several procedural incidents, the parties went to trial from May 24-28, 2010. Accordingly, on September 20, 2010, a Judgment was issued by the Puerto Rico Court of First Instance, in Case No. KAC 2003-5975 (508).

Among the findings of facts, that state court made the following finding of facts:

**"II. FINDINGS OF FACT**

**A. PURSUANT TO STIPULATION OF THE PARTIES**

1) The deceased Leon Lyon Martin died on January 17, 2003, in San Juan, Puerto Rico.

2) The deceased had three children from three different marriages: the plaintiffs, León Lyon Rejincos (hereinafter, Leon son) and Nilsa Lyon Ríos (hereinafter, Nilsa); and codefendant Tamara Lyon Concepción (hereinafter, Tamara).

3) Codefendant, Clara Concepción Lazarinni (hereinafter, Clara) is the third and last wife of the deceased. Clara had two children prior to marrying the deceased. Her children are Jorge Mercado, and codefendant Ixia Mercado (hereinafter Ixia).

**B. ACCORDING TO DOCUMENT AND TESTIMONY EVIDENCE**

**i. BACKGROUND**

25) The evidence shows that the deceased invested heavily and successfully in the stock market.

**ii. INVESTMENT ACCOUNTS AND TRANSFERS**

28) For the year 1996, the deceased, León Lyon Martin, was the owner of several investment accounts in the financial institution known at the time as PaineWebber (now UBS). These accounts were investment accounts, that although

they belonged to the deceased in their totality, they were opened under his name and the names of other parties in this suit. These are the following: JX21741, under the name of the deceased and Nilsa Lyon; JK21724, under the name of the deceased and Tamara Lyon; JX23274, under the name of the deceased and Ixia Mercado; and JX14602, under the name of the deceased and Clara Concepción.

29) During the month of October 1996, the assets in all of these accounts were transferred to the following investment accounts:

a. $242,465 from the account JX21742 to the account JX31913 opened by codefendant Ixia Mercado;
b. $98,643 from the accountJX14602 to the account JX31913 opened by codefendant Ixia Mercado;
c. $613,914 from the account JX21741 to the account JX31913 opened by codefendant Ixia Mercado;
d. $116,694 from the account JX23274 to the account JX31913 opened by codefendant Ixia Mercado;
e. $125,325 from the account JX14602 to the account JX31912 opened by codefendant Clara Concepción.

The total amount transferred was $1,197,041.00.

31) Moreover, in 1999, the deceased and father of the plaintiffs had approximately $4,000,000.00 in the account number JX34593 of PaineWebber. Said account was under the name of a trust fund known as the Leon Lyon Martin Revocable Trust. Said trust was created in Dade County, Florida, on December 3, 1991, but revoked by the deceased on February 10, 1997 in the same place.

32) By the year 1999, the account number JX34539 of PaineWebber, associated with the revoked trust fund belonging to the deceased, had $3,976,088.00 in stocks and other assets.

33) During the month of May 1999, the $3,976,088.00 were transferred from the deceased's account in PaineWebber to other accounts of said institution belonging to codefendants.

35) The amounts transferred and the receiving accounts in the month of may 1999 are the following:

a. $1,893,505 transferred to the account JX38425 for codefendant Ixia Mercado;

b. $89,078 transferred to the account JK31913 for codefendant Ixia Mercado;

c. $1,893,505 transferred to the account JX38426 for codefendant Tamara Lyon;

d. $100,000 to the account JX31912 for codefendant Clara Concepción

37) Codefendant Ixia Mercado admitted during her testimony in the court, to having appropriated the amounts transferred to the investment accounts in PaineWebber she opened under her name.

39) From the examination conducted by an expert calligrapher, Frank Harley Norwitch, it appears that the deceased's signature was falsified in the transfers made in 1996 and 1999.

43) By the year 1999, León Lyon Martin was 81 years old and there are no checks or documents signed by the deceased after 1999.

44) The evidence shows that the checks and disposition of assets after that date were made by the defendants through joint bank accounts in which the authorized signatures are the deceased's and codefendants', Ixia Mercado and Clara Concepción.

45) The actions of codefendants, consisting in stripping the deceased from his private goods prior to his death, show that they had no expectation on the ownership of said goods. Codefendants falsified the deceased's signature to appropriate his private goods several years before his death.

46) Codefendants are obligated to return to the estate all of the amounts they appropriated with their own goods.

iii.     **FINANCIAL CIRCUMSTANCES OF CODEFENDAN IXIA MERCADO**

48) The report from CPA Quiñones shows that the highest income obtained by codefendant Ixia Mercado, from 1993 to 1998, was $16,875 according to her Income Tax Return. Codefendant Ixia Mercado's income for 1993 was $3,465,

$16,875 for 1994 and $16,395 during 1995. These numbers show that she lacked the economic capability to buy the Armory in 1994 that is worth an approximate value of $400,000.00.

49) However, in 1999, the codefendant's tax return showed an increase in income of $48,400 and the sale of assets ascending to $240,000.00.

50) In 2000, codefendant Ixia Mercado sold capital assets for $888,172, according to her Income Tax Return filed that year.

51) Ixia Mercado's financial statements, as analyzed in the Expert Report by CPA Quiñones, show that she had a net income of $138,408, $143,928 and $130,040 for the years 2000, 2001, and 2002, respectively.

52) Codefendant Ixia Mercado's Income Tax Return does not inform sufficient income to acquire the investments that justify the fund deposits made in her investment account in PaineWebber.

### iv.    THE METROPOLITAN ARMORY

53) The Armory is a business founded and developed by the deceased during the sixties and seventies. It continues operating in the De Diego Avenue 799, Caparra Terrace, San Juan, P.R.

54) On November 8, 1971, the Armory was formally incorporated by the deceased, his son (co-plaintiff, León Lyon Rejincos) and Jorge Mercado (son of codefendant Clara Concepción and brother of codefendant Ixia).

55) By 1994, the co-plaintiff León Lyon Rejincos and Jorge Mercado and his wife, Vanessa Látimer, were no longer shareholders of the Armory.

56) According to the Memorandum from November 1, 1994, all the shareholders were present in the Board of Directors' meeting and codefendant Ixia Mercado Concepción appeared as such for the first time.

57) It appears from the Expert's Report, that the Armory's Board of Directors emitted a Resolution on November 1, 1994, in which they ratified the stock purchase previously mentioned, and established that the 150 stocks belonging to the deceased

would remain as the corporation's treasury stocks, and codefendant Ixia Mercado was declared director and new shareholder of the Armory. In the blink of an eye, without placing a single cent, codefendant Ixia Mercado became owner of the Armory.

58) The previously described transactions covered up the trespass of the Armory's stocks to the codefendant Ixia Mercado. On November 1, 2004 the shares supposedly bought by codefendant Ixia Mercado were valued at $400,000.00.

59) The illicit donation of the armory's stocks finalized on November 30, 1994. On said date, the deceased and codefendant Clara Concepción subscribed a Stock Purchase Agreement in which they sold their 150 corporate stocks to the Armory (they were redeemed) considering an alleged debt they allegedly had with the corporation. According to the agreement, the debt appeared in the Armory's financial statements for the fiscal year between 1993 and 1994. However, the alleged debt did not appear in said financial statements. Codefendant Ixia Mercado did not provide any credible evidence to sustain that in fact the deceased and Clara Concepción had said debt to justify a total surrender of their shares in the Armory as means of compensation.

60) In the agreement of November 30, 1994, codefendant Ixia Mercado appears on behalf of the corporation as its new President. Codefendant Ixia Mercado has not provided any credible evidence as to show how she acquired the control and the Armory's corporate stocks. According to the testimony heard before the court, and the Expert Report prepared by CPA Quiñones, the Armory's stocks were donated to codefendant, Ixia Mercado, by the deceased. Codefendant Ixia Mercado did not provide any evidence to demonstrate she paid for the Armory's corporate stocks, which were worth $400,000.00. Said amount belongs to the deceased's estate.

64) Since the business' transfer to the codefendant Ixia Mercado to the present date, Mercado has exercised complete control of the Armory, has exploited and enjoyed its resources, along with codefendant Clara Concepción.

### v. DONATIONS

65) In relation to the property where the Armory is located, CPA Quiñones' testimony and the evidence establish that said property was yielded by the deceased to codefendant Tamara Lyon on July 13, 1992, with no compensation in exchange. The codefendants did not refute this evidence. This was a donation.

66) On September 28, 1995, codefendant Tamara Lyon allegedly "sold" the property to the Armory (located in the De Diego Avenue #799, Caparra Terrace) to the codefendant Ixia Mercado for the price of $225,000.00. CPA Quiñones concluded that said property was "donated" to codefendant Ixia Mercado by the deceased and/or paid with the funds of the Armory. The defendants have not refuted said evidence. In few words, it was another donation.

67) Furthermore, according to the testimony of CPA Quiñones, codefendant Ixia Mercado received donations ascending to $533,471. This arises from Quiñones' Expert Report. The donations consist of the following: (a) $50,000.00 to liquidate the conjugal partnership with her previous husband; (b) an apartment in Loyola Condominium worth $300,000; and (c) $183,471 in a deposit certificate canceled in 2003.

### vi. CODEFENDANTS' COURSE OF ACTION

70) The codefendants have not partitioned or adjudicated the estate's assets as the law orders. This Court is astonished at how the codefendants denied these facts and did not comply with what the Puerto Rico Civil Code orders in terms of heritage.

72) At the time of the deceased's death, the codefendants had taken all of the estate's assets by transferring them to the investment and bank accounts under their names.

73) Their actions deprived plaintiffs from their participation in their father's estate and the corresponding goods. The codefendants conspired to deprive the deceased of his private assets prior to his death and intended to defraud plaintiffs.

74) The amounts and value of the assets taken by the codefendants exceed the amount that, by the free disposition, could be transferred from the estate without affecting the rights of the entitled heirs and the last will of the deceased.

75) The codefendants denied the allegations of the complaint; and made this Court believe they had valid defenses and credible testimony in order to deny and refute the operations of the estate and co-plaintiffs' claims. Furthermore, they obstructed the discovery of evidence; purposely delayed the process insisting on an expert witness and an expert report which they never presented. In addition, they assumed a challenging attitude during the trial, when this Court insisted on relevant evidence."

The Judgment issued by the Puerto Rico of First Instance was thereafter confirmed by the Puerto Rico Court of Appeals on October 11, 2012, (Case No. KLAN201001695) and by the Puerto Rico Supreme Court on April 6, 2013 (Case No. CC-2013-0074).

After reviewing the Plaintiffs' arguments, and the relevant law, this Court determines that there is no triable issue as to any material facts and that the moving party is entitled to judgment as a matter of law. The court concludes after a review of the documents provided by Plaintiffs that they have met their burden in terms of producing adequate affirmative evidence.

**THEREFORE,** Plaintiffs' Motion for Partial Summary Judgment as to Count 5 of the Amended Compliant shall be and is hereby GRANTED, declaring the Blay-Mercado Siblings Trust null and void. The assets of the Trust revert to the Bankruptcy Estate pursuant to 11 U.S.C. §541 and §542. The Clerk to enter a Partial Judgment.

**SO ORDERED**

In San Juan, Puerto Rico, this 21st day of March, 2017.

Brian K. Tester
U.S. Bankruptcy Judge